Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 1 of 104

EXHIBIT 2

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 2 of 104



UNITED STATES DISTRICT COURT

DISTRICT NEVADA

-oOo-

| | |
|---|---|
| MELANIE KEENER,<br><br>Plaintiff,<br><br>vs.<br><br>GERALD R. ANTINORO, an individual; STOREY COUNTY, a political subdivision of the State of Nevada; DOES I-V, inclusive, and ROE ENTITIES VI-X, inclusive,<br><br>Defendants. | CASE NO. 3:17-CV-00498-RCJ-VPC |

==================================================

DEPOSITION OF MELANIE KEENER

Wednesday, April 11, 2018

Reno, Nevada

REPORTED BY: MICHELLE BLAZER CCR #469 (NV) CSR #3361 (CA)

A I believe it's -- correct. Federal out there, Department of Defense.

Q Federal. Okay.

And you said you were going to -- she was going to be able to testify about your transfer. What, just what you told her about it, or did she have any other inside information about that?

A I don't know. I have been friends with her for several years, and she's my confidant. So I don't recall what I have told her, what I haven't told her, what we discussed. It's --

Q We will find that out tomorrow, I guess, huh?

A Correct. Yes.

Q Okay. Did you apply for the position?

A I did.

Q Did you get it?

A I haven't heard anything either way.

Q Oh, okay. So it's still ongoing?

A I don't know.

Q Well --

A They may have found somebody.

Q But they haven't told you yes or no yet?

A Correct.

Q Did you interview for it?

A No.

Q Okay. And understanding you have talked to Ms. Gonzalez over the years on probably many issues, I am just trying to find out. You said you talked to her about this deposition. Anything specifically about this deposition that you talked to her about?

A About mine or hers?

Q About yours?

A No. I told her it would be my first deposition, I believe.

Q That's a good question. Is this your first deposition?

A It is.

Q Okay. So you have been in law enforcement for several years and you have never been deposed?

A Correct.

Q You ever --

A Been in law enforcement since December 27th of 1999.

Q Have you ever testified in court?

A I have.

Q How many times?

A I believe District Court was only once.

Justice court, only a couple of times.

Q Do you remember what they were about?

A I do. The District Court one was when I was with Tri-NET and it was on a controlled buy, and it was a trafficking charge. So I testified as an officer that was involved in that.

The ones in Justice Court, there was one, it was a preliminary hearing on a domestic battery, and I had gone to the woman's house on a follow-up and actually the public defendant -- public defender is the one who subpoenaed me because --

Q Okay.

A -- just because of the situation, it was relevant to their case.

Q Okay.

A The other one was with Bum Hess when he was -- during his prelim regarding an assault charge. And actually, there was one more off the top of my head and that was in Carson City. I was subpoenaed by the public defender's office regarding brass knuckles purchased out of Virginia City. And I think that's all. I'm sure I may come up with more if I remember.

Q Okay. Well, if you do, you can supplement if you feel it's -- if you feel it's relevant to what we are talking about.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 6 of 104



You also said you talked to your Aunt Nancy about this deposition. When did you talk to Aunt Nancy about it?

A I have talked to Aunt Nancy for awhile. I have told her what a creep the sheriff is. I have told her that I am miserable in my new position.

Q Did you list her as a witness to your case?

A I don't know if I did or not.

Q Okay.

MR. FLANGAS: Off the record.

(Discussion off the record.)

BY MR. RANDS:

Q But for just for what you talked about this deposition with her, not what you have talked about over the times, the years, or whatever, but did you talk to her specifically about this deposition?

A No. She just told me to be strong.

Q Okay.

A It was more of a supportive thing, you know.

Q Pep talk?

A Yeah. Just to be strong, and everything is going to be okay.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 7 of 104



Q Okay. And I -- there is also a spousal privilege that may come into effect. Did you talk to your husband about anything specifically about the deposition or just that you had it today?
A I did talk to him. I asked him that -- what did I ask him? Well, I asked him specifically his observations and my attitude, my behavior over the course of the two years that maybe I haven't already discussed with him.
Q Okay. And we will get into that from your perspective, anyway --
A Okay.
Q -- as we go through here today.
But -- and then other than your attorney, anybody else you talked to about this deposition specifically?
A Other than just saying that I have a deposition, my deposition is on the 11th.
Q Okay.
A But nothing as far as content.
Q All right. Have you ever talked to Lance Gilman about this case?
A Not particulars. He just -- he asked me how I am holding up. "How you holding up, kid," something like that. I don't know if those are exact

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 8 of 104



words, but it was just mainly that. I'd see him at commissioner's meetings, you know, he'd be getting on the elevator, say "hello" and "how you doing." So --

Q Uh-huh.

A But not specifically about this case, no.

Q You ever discussed the details of the case or anything with him?

A No.

Q And have you ever talked to him about like maybe what you have heard in the depositions or anything of this case?

A No. That's probably the most words that Lance and I have shared.

Q Okay. So you haven't sat down with him and had coffee or anything and said, "Here is how my case is going. How is your case going?"

A No. We talked about his vertigo. I told him to quit taking the Aleve that's causing his vertigo. And he did and it worked, actually. That was it.

Q All right. Let's talk a little bit about your background, then. This is the boring part of a deposition, okay, but --

A Okay.

Q -- but necessary.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 9 of 104



Where were you born?
A Woodland, California.
Q And did you graduate from high school?
A GED.
Q Okay. How many years did you go to high school then?
A I left high school in February of my junior year. That would have been in 1993. And then in '94 I took some adult night classes after my daughter was born, or while I was pregnant with her, I don't recall exactly. And then my GED I took in November of '94, the year I would have graduated high school.
Q So you got your GED, then, in November?
A I believe it was November of '94.
Q Did you get it through an institution or --
A Western Nevada College.
Q Okay. And why did you stop high school? Drop out of high school?
A I was pregnant.
Q Did you get any post-high school education or training?
A I did.
Q Where?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 10 of 104



A Western Nevada College, Argosy University online Phoenix. Northwestern University, Staff and Command. And I believe -- gosh, I think it's in I believe Illinois, I'm not sure. And that was online.
Q Let's just go through them real quick. Western Nevada College, did you get a certificate?
A I did. An associate's degree for criminal justice.
Q Was that in-house or online?
A It was both.
Q Okay. And that's the -- is that the college in Carson City?
A Actually, Fallon.
Q Fallon?
A Uh-huh. The online is through Carson City, obviously, but Fallon is where I attended the classroom.
Q All right. But it's the same university that's Carson?
A Correct.
Q I think they have one in Elko, too, or something. But Argosy, is that an online or --
A It is.
Q Okay. Did you get any kind of a certificate from them?

A I did.
Q What?
A A Bachelor's in criminal justice.
Q Where are they located?
A They have many different campuses. The one that I actually was registered through was through Phoenix, Arizona.
Q Okay. And did you attend in Phoenix or was most of it online?
A All was online.
Q And then Northwestern University, is that the one back in Chicago?
A Yes. I believe it's Chicago. I'm not 100 percent.
Q Okay. Now, you said about Staff and Command, what was that?
A It was for police administration, administrators. While I was a chief deputy with Storey County I attended it online. It's a 22-week course. It covers budgets, disciplinary issues, funding, all administrative things pertaining to law enforcement or law enforcement agency.
Q Now, that's online. Is that an online thing where you view videos at your own thing or is it something where you go to a class and there is a

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 12 of 104



teacher there and there is kind of a live presentation?

A They didn't have live presentations. They may have like a recorded webinar to watch, but it was your standard online where you have Canvas and you go through the Canvas website. You have to work with other students.

Q Uh-huh.

A Projects. You have to submit papers, read material, research.

Q Sure, but the actual presentation was a webinar, it wasn't a live session?

A No live session that I recall.

Q Okay. Did you get a certificate from them?

A I did.

Q What was that?

A It was -- I think it was a certificate of completion of the 22-week course as successful completion.

Q Okay. And you got that?

A I did.

Q And then you said something maybe Illinois or another --

A I believe that one may be in Chicago,

Illinois.

Q All right. Okay. Any other formal post-high school education or training?

A Just through my law enforcement career I have attended training that Nevada Peace Officer Standardized training puts on. Training through POOL/PACT. Things like hostage negotiation, management updates, supervisory. And then your standard equipment, firearms, things like that that you go to.

Q You said that you were -- you mentioned, and we know that you were a chief deputy with Storey County. As the chief deputy, were you involved in any special training that the other officers didn't get?

A The Staff and Command would have been something that probably at my level or above would attend.

Q And was that paid for by the county?

A It was.

Q And as part of your training did you have any training specifically in sexual harassment?

A Yes.

Q Where was that?

A It was through POOL/PACT through the county.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 14 of 104



Sparks?

A Yes.

Q Okay. Why did you move back to Fallon?

A My mother and her husband moved me. I don't know why. Probably because that's where we are from.

Q Okay. You were still, though, I guess, in a position where you didn't have much choice when your family moved you moved, too?

A Correct. I was 16.

Q Okay. When was the first time that you lived outside of your parents' home?

A That would have been March of '93 when I was 16.

Q Where did you move to?

A Dillon, Montana.

Q What was in Dillon, Montana? I have been to Dillon, Montana. There is not much there. But what was there?

A My grandparents and my uncle.

Q Why did you move in with your grandparents?

A I didn't move in with my grandparents. I moved in with my uncle, who is three years older than me.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 15 of 104



Q Why did you do that?
A Because my mom forbid me to live with my grandparents, but I wanted to get out of Fallon.
Q Okay. And the grandparents at Dillon, were they your mom's parents?
A My mom's mother and her stepfather.
Q Okay. She didn't want you living with them?
A No.
Q Why not?
A Because my grandmother is an enabler, and my mother saw me as being 16 and pregnant, and felt that I needed to stand on my own two feet. And if I lived with grandma and grandpa, that I would not be standing on my own two feet and learning the real world since I was going to become a mother.
Q But your 19-year old uncle would make sure that you had to pay your way, huh?
A Yes. Yes.
Q Okay. So I don't want to -- really doesn't make any difference, to waste our time to go through all the jobs you have had from the time you were at A & W, but what type of jobs have you had over the -- over the years when you were, say, in Dillon, Montana?

A Goodness. I have worked in fast food restaurants like Round Table Pizza as a teenager. I worked for Haws Company in their engineering department where I was just a file clerk. And then I would put together work order packets for the assemblers. I worked -- any time I was in Fallon in high school I worked for Jeff's Office Supply in their accounts payable/accounts receivable department.

Q Is that like Jeff Christensen?

A Yes. Yes. Very nice man. And then from there -- I didn't work when I was married to my ex-husband, he wanted me home.

And then when I was 20 I started working. I waitressed for a few months, tried my hand at selling cars. Worked in the detail department of Jetway Chevrolet where I tried selling cars for about two years, and then I applied for a law enforcement at the tribe and was hired.

Q Okay.

A And so then it's been just law enforcement.

Q Okay. Before we get into that, and we will, I want to double back on just some more of your personal information. You mentioned a husband. Are you currently married?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 17 of 104



A I am.
Q How long have you been married?
A It will be 11 years this May.
Q These days you kind of have to ask the question. Were you together before you got married, too?
A Yes.
Q How long?
A We first started dating August of 2005.
Q When did you get married?
A And we got married in May of 2007.
Q Do you have any children of that relationship?
A I do.
Q How many?
A One.
Q What is his name and age?
A His name is Dillon and he is 11.
Q Did you name him after Montana?
A No. We named him after Matt Dillon from Gunsmoke.
Q I remember Gunsmoke. I am that old. All right. And how old is he?
A He is 11.
Q So does he work outside the home?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 18 of 104



Air Force connection with it. Off the record again.
(Discussion off the record.)
BY MR. RANDS:
Q All right. Back on the record.
So you have a good relationship with Ashley?
A I do.
Q Does she have any children?
A No.
Q What was her maiden name?
A Reeser.
Q Okay. Is that your made name also?
A It is.
Q And until she left home as an adult did she stay with you?
A There was a short period of time when she moved with her biological father in Eureka, Nevada. And then she lived in an apartment with my mother for a brief time before she went off to boot camp in 2012 after she graduated.
Q Okay. But she was -- basically you raised her?
A Yes.
Q Okay. Do you have any other children?
A No.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 19 of 104



Q And you have never been married other than these two occasions?
A Correct.
Q So you never -- you didn't marry Ashley's biological father, then?
A No.
Q Okay. Let's get back to your law enforcement career. You said that you started with the tribe. I assume that's in Fallon?
A Correct.
Q What was your -- what was your starting position there?
A Police officer.
Q And who was your employer?
A The Fallon Tribal -- Fallon Paiute Shoshone Tribe was my employer there.
Q And where did you -- where did you work out of?
A I worked out of the colony and we also patrolled the reservation.
Q So tell me a little bit about that. How did you come to know of the position at the Fallon tribe?
A Because I was looking to start out as a dispatcher and then maybe join as a reserve and

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 20 of 104



hopefully go on to full-time position. And so I was looking at the agencies within the area to see if they had any open dispatch positions, and the chief with --

Q Where were you -- let me stop there a second, I apologize. Where were you working at that time?

A Jetway Chevrolet in the detail department.

Q So you were basically, I don't want to put words in your mouth, but you were looking to upgrade your career opportunities?

A That's interesting. Yes. However, I took a pay cut to do it.

Q Sometimes that happens.

A Yes.

Q My law partner took a pay cut to come to our firm because he wanted to get more into litigation and less out of the big firm, you know, rat race. So sometimes you have to do that to get what you want to do.

But anyway, you went to work for -- you said you were looking for a dispatch position. I'm sorry, I interrupted you.

A Correct. And the chief with the Fallon Tribal Police said they don't have dispatchers, they

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 21 of 104



use Churchill County, but they were hiring for police officers.

Q So who did you interview with?

A It was an oral board, and I only remember two people that were on the oral board. I believe the oral board was made up of four or five individuals.

Q Okay. And explain to me -- I am new at this. What is an oral board?

A An oral board is an interview panel.

Q And had you had any prior police experience or training before this?

A No.

Q I assume they knew that?

A Yes.

Q And were you hired?

A I was.

Q You said your first position was a police officer. What did you do as a police officer?

A Well, I rode with another officer, which is a field training officer, and because I had no prior background in law enforcement and because I had not been POST certified then my field training instead of a traditional 12-week was actually a five-month training period.

Q So that's kind of like an on-the-job

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 22 of 104



training?

A Correct. I was always with my field training officer and never acted alone.

Q Were you issued a firearm?

A Yes. I was not issued one. I was required to purchase one and have one.

Q Okay. But you had a firearm?

A Correct.

Q Okay. Is that usual that the officer have to purchase their own firearm?

A I don't know if usual would be the word. It depends on the agency.

Q Some do, though?

A Correct.

Q And if they do -- this is just more my curiosity. If they do, do they issue you a guideline of what you can have and what you can't have? They don't want you to do the Dirty Harry thing with the .45 magnum, or --

A They have parameters generally on caliber and barrel length.

Q Okay. And so you -- but you were carrying a firearm as a trainee officer?

A Correct.

Q And did they give you training including

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 23 of 104



firearm training?

A Correct. I had to qualify with my weapon prior to being able to carry it.

Q What did that entail?

A That included being with a firearms instructor and shooting a certain number of rounds after some brief instruction, and I had to score a certain percentage.

Q Was that at the range out in Fallon?

A It was in Fallon, and Cliff Barnhouse with the Fallon Police Department is actually the firearms instructor that did my qualification.

Q Okay. Is that the outdoor shooting range they have there?

A It's one of them. I don't know how many they have.

Q I just had a lawsuit one time that was out at that range, so I am kind of aware of that situation. But fortunately, it wasn't a shooting accident, it was a car accident. Interesting case. But a kid was riding an ATV, they had a chain across it to keep cars out, and it was at night. Riding his ATV, didn't see it, and smacked into it. And was saying that we were negligent in leaving a chain across the road. But he didn't win. But the jury

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 24 of 104



didn't agree with him.

Anyway. So I am a little bit aware of that situation. So you worked for the -- did they send you to POST or did you go to POST while you were working there?

A They sent me to POST.

Q And where was that at?

A That was in Carson City, Nevada at the Stewart facility.

Q Who operates that? Was that through the NHP?

A No. Actually, I believe that was the first academy that was separated. That was through -- that was through POST itself.

Q Okay. And how long did that take?

A That was 16 weeks.

Q And you said that the tribe paid for it?

A Yes.

Q At the end of 16 weeks you get a certification that says you are POST certified?

A No. You get a certification of completion; however, a recognized agency through POST has to file for your actual certificate, and because Fallon Tribal Police Department was not a recognized tribe or recognized law enforcement agency at the

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 23 of 104



time, then they could only provide me my certificate of completion. When I started with Storey County a few months later, then Storey County submitted for my actual POST certification.

Q So did you leave the tribal police to go to work for Storey County?

A Not for that reason, no.

Q I didn't ask the reason. Is that -- was that the next step in your progression?

A That was my next job, correct.

Q Right.

A My next --

Q And how long did you work for the tribal police?

A From December of '99 through July of 2001.

Q And why did you leave?

A Because there was a council dispute and the Bureau of Indian Affairs in Carson City and Bureau of Indian Affairs in Arizona could not agree who the actual council was for tribe and -- for the tribe, and one council had current law enforcement which I was part of, the other council made their own law enforcement and tried to take over the tribe.

So Bureau of Indian Affairs came in, put

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 26 of 104



everybody on administrative leave and they took over the tribe.

Q Okay. So nothing that you had involvement with?

A No. In fact, I was the only one that was up for rehire.

Q So they would have hired you? The new the Bureau of Indian Affairs would have hired you?

A I don't think Bureau Of Indian Affairs would have, and the tribe probably wouldn't, either. But they did state on my termination form that I was eligible for rehire.

Q Okay. So you weren't fired for cause, anyway?

A No.

Q So did you go next to work for Storey County?

A I did.

Q How did that come about?

A My uncle, the one that I lived with in Dillon, Montana, actually in the beginning of his career was with Storey County, and he told me that Storey County was a small agency that was great because you could start out slow, I guess, for lack of a better term, and you could start a case and end a

case. Meaning that you could be the first on scene, and you were able to work the case all the way up until the time that the disposition of court came through. And he said it was a great place to start. And he said, "However, make sure you give them a minimum of five years."

So I sent in an application, and I don't remember if I saw a job posting or if I just sent an application. And Pat Whitten contacted me. I think it was Pat. Contacted me for an interview. Maybe it was somebody else and then Pat contacted me, offered me the position.

Q What was the position?

A It was a deputy/coroner.

Q And Pat Whitten was the sheriff at that time?

A He was.

Q Who was your immediate supervisor then?

A Sergeant Bill Petty, P-e-t-t-y.

Q And did you have a field training officer with Storey County?

A I had two field training officers.

Q Who were they?

A Bill Petty was one of my training officers and the other one was Kenneth Quirk.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 28 of 104



Q And what -- by that time you were somewhat experienced and you had been through POST; correct?
A Correct.
Q What was the purpose of the FTO to Storey County then?
A It's standard. Whenever a new officer or deputy is hired within an agency there is a standard field training period and it varies in length depending on the agency.
Q How long was it with Storey County when you hired?
A I believe it was 12 weeks.
Q Do you remember anything specific about that field training experience?
A I learned a few things, and there was -- it was kind of odd being in Lockwood. So Lockwood is very small. It was very small at the time. So it was very different than the tribe.
Q So your first posting was in Lockwood?
A Correct.
Q How many officers were there at Lockwood at the time?
A Oh, there was Bill Petty, Ed Salcedo, Ken Quirk, and I believe reserve Pete Twohoose would also

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 29 of 104



assist with some shift coverage, perhaps. And that's all I recall.

Q What shift were you put on when you first started?

A When I first started it would have been day shift with Bill Petty.

Q Were you ever promoted within the Storey County Sheriff's Department?

A I was.

Q And what was your first promotion?

A First promotion, I don't know if you'd call a promotion. I felt it was. Is I was able to go to Tri-NET Narcotics Task Force in Carson City and I was an investigator during that time.

Q Explain to me a little bit about that. I have heard of Tri-NET before, but what was it?

A Tri-NET is a representative from each agency in the surrounding area that participate. When I was there it was Lyon County, Carson City, Storey, Department of Public Safety, the DEA, and I believe that's it at the time. And SLED-Net was a separate one that included Douglas County. But Tri-NET was a major -- they did major investigations for major drug cases, drug trafficking of illegal substances.

Q And when did you -- when were you

assigned to Tri-NET?
A From 2004 to 2005.
Q And how did that come about?
A Bill Leary was a sergeant with Storey County, and he had been assigned there, I believe for four years. And it was my understanding that it was his time to come out and come back to working out of Storey County for the sheriff's office. And so they had an opening for an individual to go to Tri-NET. So we had to submit a request in writing of why we wanted to.
Q And you were chosen?
A I was.
Q Good. After you got done with Tri-NET where did you go?
A Back to patrol.
Q In Lockwood?
A No. I was already stationed to Virginia City before I went to Tri-NET.
Q How many patrol officers were there at that time in Virginia City?
A In Virginia City or with the sheriff's office?
Q In Virginia City?
A In Virginia City itself? I would say

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 31 of 104



five that were deputies, and then we had a patrol sergeant, detention sergeant, two chief deputies and the sheriff.

Q What was the next promotion or -- that you received?

A That would have been in 2007 to corporal within the detention facility.

Q When did you go into the detention facility?

A When I was on light duty with Dillon I was transferred into the jail. Basically, jail and dispatch work combined, to work in dispatch on that light duty position. During that time, James Miller --

Q Excuse me. Was that something you requested or did the sheriff require you to go on light duty in there?

A My doctor required light duty.

Q Okay. And that was the light duty they were able to find within the department?

A I imagine so.

Q Okay.

A And the sheriff at the time, I wasn't sure about him, I hadn't worked under him for very long. My experience with Miller when I was at

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 32 of 104



Tri-NET, because he came in while I was there, it wasn't great contact that I had had with him. So I was a little apprehensive about being on patrol with him there, and so I requested to stay within the detention facility.

Q And why were you apprehensive at that time --

A Well --

Q -- specifically with patrol?

A -- there was a situation where there was a misunderstanding on what Tri-NET actually did, and James Miller at the time, being sheriff, he wanted to clean up the town. There was quite a few drugs in town. And they were mainly just street level, your marijuana pipe, marijuana, maybe some methamphetamine. And any arrest that was made -- I shouldn't say any, but many of the arrests that were made that were street level Miller requested that Tri-NET immediately respond. And I was getting pushback from Tri-NET because that's not what they respond to.

Q Uh-huh.

A And there was one particular time where two individuals were arrested, and they were arrested by a former deputy that no longer works there, was very questionable in his ethics in how he handled his

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 33 of 104



job. And Tri-NET came up there with me, not all of Tri-NET. One of the Tri-NET members from Carson City came up there with me, and we interviewed the passenger of this vehicle to see if they would work as an informant. And listening to how the traffic stop occurred and how this individual was arrested, it was glaring that it was not a good idea to make him an informant, and the arrest itself was questionable.

So Miller was visibly upset that he wasn't going to be an informant because he really wanted to clean up the town. And I would get calls several times a day saying that they felt like the redheaded stepchild, because we weren't up there.

So it was a misunderstanding, and I think Miller just -- maybe I rubbed him the wrong way, so to speak, initially because of that encounter.

Q Uh-huh.

A And so I wanted to get a feel for the agency, a feel for him as many of the deputies were leaving, many of the deputies I knew, and I didn't want to be one of those deputies that left.

Q So you kind of changed paths at that point, went to the corrections?

A Correct.

Q Okay. You said you were promoted in 2007

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 34 of 104



to corporal; was that by Sheriff Miller?
A It was acting corporal by Sheriff Miller, yes.
Q Okay. And I know from this experience and this representation and a lot of other representations I have had with agencies, you know, there is no uniform rank among different agencies. Every agency kind of has their own, you know, rank. Some have patrolman, corporal, sergeant, lieutenant, captain, major, whatever, and some skip ranks and just -- just don't have anything at all, you just go straight to chief deputy or something, you know.
So at the time, what was the rank structure with the sheriff's department --
A It was --
Q -- in the jail where you were working?
A In the jail it was detention deputy, then corporal.
Q Okay. There was no sergeant or captain over the jail?
A I believe that the patrol sergeants, whomever was on duty would oversee, be the sergeant for the jail at the time. And then above that would be lieutenant, undersheriff, sheriff.
Q Okay, at that time. And so if you were,

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 35 of 104



say, working as a corporal and you had a question or something you would just go to the sergeant that was the shift sergeant?

A If they were available.

Q Yeah. Okay. If not, you'd just have to make the decision, huh?

A No. If not, then you could skip that chain of command and ask the lieutenant if they were available.

Q Okay.

A Depending on the --

Q What it was?

A -- the circumstance and the necessity, correct.

Q And if you made one with creamy peanut butter and all you had was chunky, you'd have to deal with that, huh?

A There is a lawsuit somewhere. That's funny you say that.

Q That's why I said that. When was first moved to Nevada that was all going down and I was just rolling my eyes that Judge Reed thought he had to get involved in whether or not the inmates in the prison got chunky peanut butter or creamy peanut butter or if it was violation of their rights to get one or the

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 36 of 104



other. There was actually not only a lawsuit, there was a consent decree on it --
A Funny.
Q -- that Ed Reed signed. So, yeah. Anyway, so at that point you are working at the -- in the jail as a corporal. Where did you go next?
A I tested for sergeant.
Q What did the test entail?
A It was a written multiple choice test. There were two positions open. One patrol sergeant available, one detention sergeant position available. And there were two of us that were taking the written test for sergeant. One was my uncle, Tad Fletcher, and the other one was myself.
Q So you were going against your uncle?
A For whoever scored the highest on the written test and the oral panel, the oral board or interview panel --
Q Sure.
A -- that followed, would get their choice of patrol or detention.
Q Their choice. Okay. So there were two positions, but it was just a -- the test was for who got first pick?
A Correct.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 37 of 104



Q And what happened?
A I scored one point higher, and I knew that Fletcher, my uncle, wanted to stay in patrol so I left at the detention.
Q Good for you. So you became sergeant in the detention facility?
A Correct.
Q When was that? What year?
A It was acting sergeant after the test. I believe it was April 2008, and it became a official position July of 2008.
Q And did that entail a raise in pay?
A Yes.
Q Do you remember what you were making back then?
A I have no idea.
Q Okay. How long did you work as sergeant in the detention facility?
A From acting sergeant in April 2008 until March of 2009.
Q And where did you go from there?
A I went to investigations.
Q Is that with Storey County?
A Yes.
Q And what was investigations?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 38 of 104



A It was the investigations division as a detective sergeant. And at the time it was made up of a lieutenant, a sergeant, myself, a deputy that was in there as the investigator, and I believe a part-time investigator.
Q So is this like the detective bureau?
A Correct.
Q Okay. And at that point were you plainclothes, or --
A Yes.
Q And why did you decide to go that route?
A Ken Quirk had asked me continuously if I'd be interested in it, and because I had Tri-NET experience he felt that it would be a good move for me.
Q So when it came open you applied; is that how it works? Or bid for it? How does the internal movement in the sheriff's department at that time work?
A I don't remember that. I do know that I had sat on a previous interview board made up of two or three when they had a position open prior, but this one, I believe it was a letter of interest and then why you would be qualified to be in that position.
Q Had you ever done investigations before

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 39 of 104



that other than Tri-NET?
A Yes. Not officially as an investigator. However, as both at the tribe as a police officer and as a deputy. Because at the time prior to the investigations bureau it was -- the main investigator was Roger Hartley, who was the chief deputy. So many of the cases that we had were investigated by the deputies themselves. So at the time -- investigations now would investigate felonies. Prior to that, the deputies would be investigating those felonies.
Q And that's why you went with the smaller agency, wasn't that true?
A Yes.
Q Get that experience?
A Yes.
Q So you worked investigations. After that where did you go?
A After that I became the acting chief deputy.
Q And then?
A And then permanent chief deputy.
Q When did you become chief deputy?
A Acting or permanent?
Q Acting.
A Acting, I believe was in September of

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 40 of 104



2014.

Q And then permanent was when?

A Was January of 2015.

Q Why was it acting then permanent? It seems to be kind of a pattern. You know, you go to acting corporal, then you become corporal. Acting sergeant, then you become sergeant. Why, why --

A It could be for various reasons. So just because it's acting doesn't mean --

Q No?

A -- one particular reason.

For instance, the corporal was because the other corporal had resigned so they needed a supervisor immediately.

Acting sergeant was because it wasn't a new fiscal year so I would do it as acting position without pay until the new fiscal, without the additional pay.

Q Okay.

A In this case I don't know exactly why. I believe it probably had something to do with the election.

Q And when you went to investigations who was the sheriff at that time?

A That would have been James Miller.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 41 of 104



Q So when Sheriff Antinoro was elected you were working in investigations?
A Yes.
Q Did you work directly with him in any -- at that time?
A At that time not necessarily on cases; however, we did have discussions on, like, updates.
Q Uh-huh.
A Meetings, that sort of thing.
Q Okay. What do you remember about the election that Sheriff Antinoro was elected in? Do you remember anything specific about it?
A Which election?
Q The first one.
A 2010?
Q Uh-huh.
A I remember that John Tyson I believe was running against him, and another local resident. James Miller supported him. I don't -- I think that's about it as far as that goes. I don't know if you are looking for something specific.
Q No. Just, you know, were you involved in the election at all, or supporting a candidate, or --
A Actually, I had spoken with John Tyson and I had told him that some of the deputies feel that

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 42 of 104



Q So the deputies supported somebody else in that election?
A For various reasons, yes.
Q Who did they support?
A They supported John Tyson.
Q You said "various reasons", what were those reasons?
A I was told reasons afterwards that they wanted him in office because they felt that they could control him. They wanted SWAT and K-9. So they thought they had more options.
Q Okay. They thought Tyson would be easier to control than whoever else was running? Antinoro or the other candidates?
A Correct.
Q So they were voting for their own self-interests, I guess?
A They were.
MR. FLANGAS: Before you go on to another question, about time for a break?
MR. RANDS: Yeah. I was going to take a quick break. So we have been going a little over an hour, so let's take about a ten-minute break.
(Brief recess taken.)
BY MR. RANDS:

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 43 of 104



Q Back on the record.
We were discussing the first election of Sheriff Antinoro. At the time you were in investigations, right?
A Yes.
Q And you said you had talked to John Tyson who was one of the people running against Sheriff Antinoro; correct?
A Yes.
Q Were any of the deputies at that time supporting Sheriff Antinoro?
A I don't know, specifically.
Q Okay. But he won the election; correct?
A He did.
Q And what was your first contact with Sheriff Antinoro after the election?
A I have no idea.
Q Okay. Nothing that stands out? Did he call the whole staff together and say there is a new dog in town, or --
A I don't think so. I don't remember -- I don't know for sure.
Q Okay. At some point, though, you were promoted to acting chief deputy; correct?
A Correct.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 44 of 104



Q How did that come about? Did the position open and you applied or were you asked to apply, or --

A Fletcher was in that position, Tad Fletcher, and he vacated that position I believe in September of 2013.

Q He is your uncle?

A Yes. And I told Fletcher before he left, I said, "I want to know what you do. Show me what you do."

And I also wanted to do some of his tasks prior to that before anybody knew he was going to leave, including myself, you know, to do some of his tasks. And so I asked him, he showed me. There is a lot of things that he showed me how to do. So when he left his tasks were divvied up between us sergeants. We had a meeting with Antinoro, and certain tasks were given to certain sergeants. And I requested the majority of them because I knew how to do them or had been doing them.

Q And what type of tasks are you talking about?

A Oh, this would be media releases. I believe it was training records with POST. I'm not positive about that one, though. It was the schedule.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 45 of 104



I believe that was another thing was scheduling. And the radar annual certifications. And I am not sure what else.

Q Okay. But the sergeants met with Sheriff Antinoro and they divvied up the responsibilities of Fletcher?

A Correct. And I asked Antinoro, I said, "Are you going to bring somebody in from the outside or are you going to promote from within?"

And he told me, "It depends on who steps up to the plate."

And I said, "I'd like that opportunity."

Q What was his response?

A Like a shrug of the shoulders. "Okay", you know. Hand gestures, you know. Just like, "Okay. Yes."

Q So not, "you're spinning your wheels," or, you know, "I'd never hire you", or anything like that? Just, "give it a shot?"

A Correct. Not in those words, but --

Q Okay. So in any event, time went on. When were you actually promoted to acting chief deputy?

A To acting chief deputy was September of 2014.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 46 of 104



Q And how did that come about?
A I don't recall, exactly. I believe that -- I believe it was Tony, actually, Tony Dosen that him and I were discussing it and Tony thought that I was going to be getting the position. And he said that he couldn't -- or that Antinoro told him it wouldn't look right if it was him. But I don't recall the exact wording of it, but it was -- it was mentioned it was out there. Dosen had put it out there that I was being considered, and then I believe Antinoro just asked me. I think he just asked me if it was a position that I was ready to take on.
Q And were you?
A Yes.
Q Now, you've described, at least earlier in this deposition, we will get into more detail, but you had described that Sheriff Antinoro was a creep. When did you first feel that to be the case? From the time you met him? Or --
A No. No, not at all. Actually, we got along very well. It was, I would say, specifically right around the summer of 2015.
Q Before the summer of 2015 then did you have any issues with working with the sheriff?
A I didn't have issues. I had concerns

about some things.

Q Like what?

A I had concerns with his actions, with the Judy Black case, that death and the investigation. Some concerns on how he was obtaining that information, and I would discuss those with him.

Q Uh-huh.

A And then I had concerns when Misty Dosen, Misty McFarland at the time, had told me the reason why Jerry and his long-term girlfriend had broken up.

Q But as far as Sheriff Antinoro's relationship with you and relationship with the department, prior to that time did you have any concerns about the -- about things like sexual harassment or anything?

A No, I don't think so.

Q It was a sheriff's department; correct?

A Correct.

Q Would you agree with me that sometimes in sheriffs' departments especially, there can be some crude language?

A Of course.

Q And maybe even some inappropriate joking back and forth?

A It could be, yes.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 48 of 104



close relationship with Dosen.

BY MR. RANDS:

Q Okay.

A So I don't know. Depending on who it was, he may or may not.

Q Okay. That's fair. But at this time, the question I am getting at, at this time up to about 2015, you had had no problem working with him?

A No. Other than just some butting heads in that situation.

Q And you weren't critical of any of his actions as far as harassment, sexual harassment at that point?

A Not related to sexual harassment. There was an issue with favoritism, and that bothered me quite a bit as far as -- depending on who it was. John Michael Mendoza specifically, Antinoro refused to take action against him as he would with somebody else. I should say it wasn't fair across the board.

Q Sure.

A And, you know, I think I would say most people believed that things should be fair.

Q Uh-huh. But he promoted you to chief deputy; correct?

A Correct.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 49 of 104



Q All right. Let's move on, then.
There came the time that you were to go to the police chief and sheriff -- I don't know exactly, Sheriffs' and Chiefs' or Chiefs' and Sheriffs', I don't know which one it is, but the association meeting; correct?
A Correct.
Q Was that -- had you been to one before?
A No. Not specifically for that.
Q Had you ever been to any kind of a out of town seminar with Sheriff Antinoro before this occasion?
A To Carson City.
Q Had you ridden in the same vehicle with him?
A Yes.
Q During those times were there any discussion of anything of a sexual nature?
A No.
Q Never?
A Prior to that, no.
Q Okay. The Sheriffs' and Chiefs' Association was in Ely that summer; correct?
A Correct.
Q My understanding is it kind of rotates

around to different places. It's not always in Ely?
A Correct.
Q But that was Whitepine County's turn?
A I believe so, yes.
Q And how did it come about? I mean, did he come and say hey, you are welcome to come. Or you need to go. Or --
A It was kind of both. It was, "I am going to this. You don't have to come, but I think it would be good if you did."
That sort of thing.
Q And before this time had he ever made any kind of a sexual proposition to you?
A Not that I was aware of.
Q Okay. Even in joking?
A No, nothing that I -- there was one comment, and this was actually in the investigation that the county did. And Tony Dosen and I, we were going to lunch and we were waiting for Antinoro, and I had asked him if he was coming, and he made the response of, "I am breathing heavy, laugh out loud" type thing.
And my response was, "that's a start."
And when I was looking through the investigative report after the investigator was done

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 51 of 104



and the county finally gave me a copy, my copy, I was looking at that and I thought, it didn't dawn on me at the time that that could have been. It was more or less he was walking to where we were at because we walked to the Palace Restaurant, and, you know, him saying breathing heavy was like okay, he is walking. He is on his way. That's a start type thing.

So now looking in hindsight, it's like I wonder if -- I wonder if he meant anything by that.

Q Uh-huh.

A So it wasn't -- it wasn't at the time. It was afterwards, looking back on things.

Q But I am trying to get specifically, he never asked you on a date?

A Oh, no.

Q He never asked you to go out for drinks after work with him?

A No.

Q If you went to lunch with him it was more of a business, we are going to meet?

And he testified in his deposition oftentimes he would just, "hey, let's go grab a bite", and take you, some number of people to lunch?

A It was often. And it was generally it was like Fletcher and I, sometimes Dosen when Fletcher

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 52 of 104



was there. And then probably the last year that I was there was mainly Dosen and I and him.

Q Uh-huh. Was there anything about that that you found inappropriate?

A There was a circumstance that occurred that I was very uncomfortable with, but it involved Brett Black, and it was -- Brett was -- he had already been arrested, I think, arrested or accused of. I think he had already been arrested and was out on bail. But we were sitting at the Palace in the booth and Brett was having lunch there at the table, and Brett had gotten up and come over to the table, and Antinoro was speaking with him and telling him, "Don't even bother looking at the paper, Julia," which is Judy Black's sister, I don't know if it was to make some comments or something like that, but it was he was telling Brett Black not to look at the media because he'd just get upset. That sort of thing.

And I, by this time, was very confident that Brett Black was a murderer and had murdered his wife. And I was upset about it. And I got up and left the table and went and used the restroom until Brett left.

Q Uh-huh.

A And I think I said something to Antinoro

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 53 of 104



that -- basically like, "I don't want to talk to him." You know, "Why are we talking to him," type thing, "at this time."

And I don't remember the outcome of that. It was just -- it made me very uncomfortable that he was talking to him like a friend and I didn't like it.

Q But that had nothing to do with sexual harassment?

A No.

Q All right. So told you it might be a good idea to go to this Sheriffs' and Chiefs' Association. The county paid for your hotel and everything, didn't they?

A Correct.

Q And was there any time prior to that that your husband was intending on going with you?

A No.

Q You had never asked him to accompany you to that for that particular event?

A I didn't know that he could. I thought that -- I know that in the past ones, I believe Antinoro had taken Adriana with him. Specifically, I think the last time it was in Las Vegas. But I knew that he could, but I didn't know it was something at the time that was an option for me.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 54 of 104



Q Was it an option?
A I imagine it probably was and I kind of figured it was afterwards.
Q Did you ever tell him, though, that your husband was going to drive you there?
A To?
Q To Sheriff Antinoro. To Ely?
A No.
Q How did the ride situation come about?
A Well, I live in Fallon, so obviously, Fallon is closer to Ely than Virginia City is, and Antinoro likes to take his private vehicle, or liked to at the time, because he smoked. And so it was just agreed upon that instead of me driving to Virginia City and then hopping in with him and then driving to Ely, that it would just -- and then, of course, driving back to Virginia City and then me driving to Fallon, it would just be easier for him to pick me up.
Q Had he ever been to your home in Fallon?
A Prior to him picking me up?
Q Yeah.
A I'm trying to think if he had ever stopped by, him and Dosen on their way through. No. No.
Q All right. So he picked you up?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 55 of 104



A Yes.
Q And then you left on to the Loneliest Road in America?
A Yes.
Q Sorry. And drove to Ely?
A Yes.
Q Correct?
What was the conversation on the way out to Ely about?
A There was multiple things. I'm sure we talked about the county. He talked about his girl friend. I think Terry was a runner. Oh. He was taking pictures. Evidently he likes taking pictures of the sky while he drives, or just the sky in general. So he was taking pictures out the windows as we were driving there. So we had a lengthy conversation on me praying while he drives us there, because he was on his phone.
Q Taking pictures with his phone camera?
A Yeah. As we were driving down the road, and texting. As we were in certain areas he was texting. He always texts when he drives.
Q Isn't that against the law?
A It is. I think he talked about skydiving. Just various different things.

Q Did you discuss anything of a sexual nature?

A No. Just about his -- he just mentioned his girl friend, but nothing intimacy-wise other than I think when she stays there that she takes it upon herself to clean his house. So I think she was like washing bedding and just that sort of thing. Just that she stays there.

Q So you got out to Ely, and where was the conference?

A It was at -- it was at a casino, and what was the name of the casino? Starts with a P. I don't remember it. In fact, I don't remember what the name of it was when we went there. I had to look it up afterwards when you were asking for the information in the court documents.

Q While we are there, let's just go ahead and mark that then as an exhibit --

A Prospector?

Q -- since you referenced the court documents.

(Whereupon Deposition Exhibit 1 was marked for identification.)

BY MR. RANDS:

Q I am going to show you what we have had

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 57 of 104



marked as Exhibit 1 to this deposition and ask if you ever seen this.

A These are the interrogatories.

Q Okay. Look on page 23, please.

A Okay.

Q On page 23 there is a what we call a verification. And it's you verifying that you have read this and to the best of your information they are true. Is that your signature?

A It is.

Q It's not dated. There is no county, it is not notarized. So I just wanted to make sure that was your signature.

A It is.

Q And you signed this document?

A Yes. I signed this page. I -- I am assuming, yes, it's with the document. Correct.

Q And the page references interrogatories; correct?

A Yes, it does.

Q Answers to the interrogatories. Right. And I will let you look through it. You can flip through it if you want, but I just want you to confirm that this appears to be the set of interrogatories or answers to interrogatories that you signed.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 58 of 104



A Okay. Prospector Hotel.
Q You are certainly welcome to read the whole thing. I am just asking if these are the ones that you looked at. So if you can flip through them.
A Yes. I mean, word by word, obviously, I am not going to, but this looks, yes, familiar to -- the document, yes.
Q All right. So let's go back, then, to the time that you were in Ely. Your reference in the answers to interrogatories is that on the last night of the convention, or whatever, the meeting. How many days was the meeting?
A I believe it was three days, two nights. I believe it was.
Q So what time did you leave Fallon? Sorry.
A I have no idea what time it was. I want to say -- I am going to assume because it took about, I want to say five and a half hours to get there from Fallon, and we weren't getting there late at night, so I would say that it was right around probably early afternoon.
Q So when you got to Ely, the first day that you arrived in Ely, was it in the evening?
A Yes. I believe so.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 59 of 104



Q Was there an event going on, or, with the convention?

A I don't recall for sure, but I believe that there was socializing. There is a -- the convention is in their room there at the casino-hotel, and directly outside of the door there is, out of the seated portion of it not the eating portion of it, there is a bar directly to the right, and then there is a lounge right in front of the door. So I believe that there was just socializing. Socializing and stuff downstairs.

Q And then there was meetings or events or whatever throughout the course of the time you were there?

A Correct.

Q And you said on the last night that this text -- again, off the record.

(Whereupon Deposition Exhibit 2 was marked for identification.)

BY MR. RANDS:

Q I am going to show you what I have had marked as Exhibit 2 and ask you if you recognize this.

A I have not seen this, but during the investigation Donald Christensen had shown me a picture of the text content itself. I don't know if

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 60 of 104



it was the whole phone, all that other stuff, but yes, I recognize -- I recognize this.

Q Okay. And was this off of your phone?

A No.

Q Did you maintain the text messages on your phone?

A No.

Q What did you do with them?

A They were deleted.

Q Why?

A During that time there was -- there was two things that happened. One, was I was having issues with my phone so I was dumping a lot of messages, a lot of e-mails. Because I have e-mails and text messages coming to it. And so it was both. I was deleting stuff, my phone was deleting stuff. So they were gone with a lot of other things.

Q So you -- you apparently deleted these off of your phone, then?

A Yes.

Q And when was that in relation to when they came in?

A Probably -- I would say probably right around within a month or so. Maybe a few weeks. I don't remember exactly.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 61 of 104



Q But you didn't make a copy of them or save them to a computer disk or anything?

A No.

Q Any specific reason why you did or didn't do that?

A I didn't save anything to a computer, and it's -- I don't know that even at the time, I mean, even being an investigator, I don't know if I knew exactly how to transfer them from my phone. Any content from my phone to the computer or vice-versa.

Q But you didn't take like a photocopy of the phone or anything?

A No.

Q So how did the -- how did the text message thing get going? What happened?

A Well, I had gone back to -- I had gone to my room, and his room was across the hall, and washed my face, got ready for bed, pajamas, that sort of thing. And then I received a text message from Antinoro.

Q And what was the one you remember receiving?

A The first one that I recall is, "about that blowing thing."

Q What did that relate to?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 62 of 104



A Well, I had told him that I had blown 80 bucks gambling, and I don't gamble very often, and 80 bucks was a lot. So he said, "About that blowing thing." Then I was like, no, actually, I probably blew about 100. Between the couple days that we were there it was, you know, it was even more than the 80.

Q But at the time before the text messages started you were downstairs in this lounge area or the bar?

A Correct. It was -- well, there is the lounge area and then the bar is on one side, the lounge area on the other side, and then there is a walkway at the end of the bar, and there is -- there are some slots right there next to the walkway still in the bar side of the casino. And then there is a virtual poker machine, big virtual poker machine right at the entrance to the lounge and the bar where it's all kind of open, one setting right there.

Q And that's where you were?

A Yes.

Q And who was with you?

A Antinoro. And there was -- I don't think anybody else was sitting there playing it, too. I want to say it was just -- I want to say there was multiple seats that you could sit at, but I think it

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 63 of 104



was just him and I that were playing it and there was a couple of people that were attending the Sheriffs' and Chiefs' that were kind of milling around communicating, talking. Talked to us, talked to other people, off in that general area.

Q Up to that point where you were sitting there had Sheriff Antinoro done anything you consider inappropriate toward you?

A No. No.

Q It was just two colleagues, I don't want to say wasting time, but --

A Wasting money, yes.

Q Spending time and money?

A You can say it.

Q And then you said, "I am done. I am going to bed."

A Yeah. It was late. And so it was -- we had to get up early the next morning. So yeah, I was -- I am going to go to bed.

Q What was the next morning?

A The next morning it was -- I believe it was an 8:00 o'clock conference time, and it was just a half day. But it was early, and my bedtime is early.

Q Okay. So it looks like, according to what was on Exhibit 2, the time stamp says that, "and

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 64 of 104



about that blowing thing" with the emoji came in about 11:20. Do you see that front page?

A Yeah. No, I am looking at -- on this one where it came in, yes.

Q Uh-huh. And then your response to that was, "blowing 80?"

Is that right?

A Yes, it looks that way.

Q With an "LOL". What does LOL stand for?

A Laugh out loud.

Q And then what was "try 100?"

A Because I had lost $100.

Q Okay. And then his response to that was, "Nice. I always thought you could. LOL." And then, "We should have another drink," and, "now I am bored stiff. LOL".

Correct?

A Correct.

Q And your response to that was what?

A "Laugh out loud. Five minutes ago I would have drank another. Now I washed my face and the world can't see me. Pumpkin hour. Go to sleep."

Q And his response to that was, "LOL" right."

A "LOL. Right." Correct.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 65 of 104



Q And what was your response?
A "See you in the morning party animal."
Q What was the reference to party animal about?
A Because he was still awake and talking about having another drink.
Q And then your response was, "oh, hey" -- it's his response was, "oh, hey. It's almost morning, LOL."
Correct?
A Correct.
Q And yours was, "LOL. No shit."
A Yes.
Q And then he responded, "Just saying, in the event you wanted to avoid the rush. LMAO."
I am not a kid, but I think I know what that means.
A Laughing my ass off, yes.
Q Okay. Frankly, just on the record, I just think it's funny when people my age try to use the little emojis and the LOL's, I mean, but I am that way.
And then you said, "You are a fucking comedian."
Right?

A Correct.

Q What did you mean by that?

A It's just a term that I use when somebody thinks they are being funny, and I am, like, yeah, you are an F'ing comedian. You are funny, all right. Type thing.

Q Uh-huh. And then you said, "Sleep. It does a body good."

A Yes.

Q And then his response was, "Yes indeed. You are too serious all the times. LO" something?

A LOL, correct.

Q Then he said, "Good night party pooper. LOL."

A Correct.

Q And your response to that was, "I know. Someone's got to keep an eye on you. That's my job." With laughing emoji?

A Correct.

Q And just "LOL". Was that the end of the conversation as far as you remember that? The text conversation?

A As far as I remember, yes.

Q And your complaint says that you felt this was a sexual advance on you?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 67 of 104



A I did. And initially it was like, I thought, what is this? You know, when I first got the text message, it's like, what is this? And -- and then when it was talking about "I am bored stiff," it just -- the contents of it all together was like, no, this isn't right. What's he doing type thing. And --

Q Was there anything directly in there that I didn't read? Or first, was there anything in there that you remember from that text message conversation, I guess, that's not in here in Exhibit 2?

A No. In fact, I didn't even recall some of the things that were in here. It's been -- I haven't seen these, some of these. I only saw a few of the text messages from the investigation. But it had been -- you know, it's been a little over two years since I have actually seen the text messages.

Q Are you denying that Exhibit 2 is correct?

A I am not denying that -- that these are incorrect. I believe that these are correct.

Q And is there anything specifically in here that says, "Hey, I want to have sex with you?"

A No. I took it as grooming. Testing the waters.

Q And did you shut him down, say, "ain't

going to happen?"

A I didn't say it ain't going to happen. I said it's my job to keep an eye on him. In other words, this isn't -- this conversation isn't going to go anywhere.

Q And did you tell him anywhere in here that, "I am done." I am going to -- you know, you participated in the conversation; is that correct?

A Yes.

Q Okay. And I guess at the end you said, "I am going to bed. And you are a comedian. Sleep, it does a body good."

And then, "good night party pooper" from him. And so it was -- eventually the conversation quit; correct?

A That's correct.

Q When was the next time you had any conversation with Sheriff Antinoro?

A The following morning.

Q And let's go back. Other than this particular text conversation was there any other text conversation that you had that weekend that you felt was inappropriate?

A No.

Q Because there are some things like, you

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 69 of 104



know, up above it on here, you know, earlier that evening, "You downstairs?"
"Heading right down now."
You were texting him, "where are you", you know?
A Correct.
Q And then, "where are you?"
"21."
So you were kind of using your text messages, anyway, to coordinate your activity, or where I am going to meet you?
A Correct.
Q Other than these were there any text messages that weekend that you remember? Or that time? I don't know if it was a weekend or not, but during that time that you felt were inappropriate?
A No.
Q Prior to that had you ever had any text messages from him that you felt were inappropriate?
A No. Not at the time that I got them other than the one that I described.
Q The one --
A Correct. After the fact.
Q Okay. And at the time you got these text messages contemporaneously with the time, this is

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 70 of 104



back, I know, several years ago, you know, 2015, July, so almost three years ago, did you tell anybody else about these messages? You know, did you text somebody else and say, "hey, you won't believe what I got from the sheriff."

A I didn't text anybody else and say that, but I did relay that I had received these text messages to -- initially, to two people. Sergeant Jeff Bowers, and to my husband.

Q And when was that?

A It was within -- so when I got back to Fallon, it was either that night or the night afterwards, my husband and I had a date night with another couple. And I didn't share these text messages with him that weekend because I didn't want to -- I didn't want to upset him. I wanted to be able to enjoy our weekend together. And so it was the following week that I told him and I told Sergeant Bowers.

Q And who was Sergeant Bowers at the time?

A He was the detective.

Q Was he your supervisor?

A No. I was his.

Q Did you report these text messages at that time to anybody other than Sergeant Bowers and

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 71 of 104



A I know that you could report it, obviously.
Q And did you know at that time that if you didn't feel comfortable reporting it to your supervisor, who at the time was Sheriff Antinoro, that you could report it to other persons within the county, Austin Osborne or HR Department or the District Attorney?
A Yes. I knew it did not fall in the chain of command situation.
Q Okay. So at some point at that time in 2015 you had enough knowledge to know that if you wanted to, you could have -- you could have reported this?
A Correct.
Q And you did not?
A That's correct.
Q Other than to Bowers, who was your -- were you his superior at the time?
A I was.
Q Okay. Why did you talk to him?
A Because Bowers and I have worked together. We had worked together quite a bit as investigators. Because when I became acting chief deputy then he was going to be the one that would be

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 72 of 104



the investigator. So him and I communicated regularly on cases. And I felt comfortable speaking with him, and I kind of wanted another thought. It was venting and it was, you know, I don't know how to handle this.

Q And I appreciate your answer, but before we maybe get into that area let's -- let's finish the -- the weekend or the time that you were in Ely.

A Okay.

Q At some point you -- the meeting ended and you went back to Fallon; correct?

A Correct.

Q And you drove with Sheriff Antinoro?

A To Fallon, correct.

Q And was there anybody else in the vehicle at that time?

A No.

Q And as you started back, you left Ely. And I have driven that road many times, I know how, you know, it's the Loneliest Road for a reason, but as you started back what happened?

A There was conversation. Just conversation like when we were driving up there, various conversation.

Q Was he taking pictures of the sky?

A I don't think so at that time. I don't

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 73 of 104



think he was taking pictures of the sky. He actually went into narrative mode. And the narrative mode basically was him telling -- he started talking about Terry and his lifestyle. That he felt he needed to tell her, but he didn't think that that she would -- I don't know if he didn't think she would approve, or he was concerned about telling her. And was vocalizing that concern.

Q And where were you along the ride home when this started?

A Oh, gosh.

Q Had you got to Eureka yet, or Austin? Or --

A I want to say that it was -- I am trying to remember. I don't remember exactly where we were at. I don't recall exactly where. I want to say that we were around Eureka, but I don't know for sure. I'm sorry.

Q Anyway, prior to this occurring did you make any kind of a comment to the sheriff that you were his friend?

A No. There was a comment when he was going through his breakup, he was talking about just how he was upset about it, and -- and I told him -- I told him it was okay if he -- if he wanted to --

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 74 of 104



basically it was okay that he was telling me that he was upset about the breakup.

Q Uh-huh.

A And I believe that we were outside having a smoke. Because at this time I was still smoking. I had quit in May and we were out there on the back balcony, and he was upset. And I don't know if he -- I don't know if he was getting teary-eyed or what talking about his breakup, and I just -- I made the comment that, you know, it's okay. Basically, that he's got that reaction in front of me, and I told him it's okay. And then it was a like a pep talk. It was like, you know, "you are successful. You have a good, good career. You know, you are still young. Everything is going to be okay. You will move on."

Type thing. And that was about the extent of it. So it was --

Q Did you ever tell him like, "if you need someone to talk to I am here for you?"

A No. No, I don't believe I ever said that.

Q Did you ever say it in the car or on the way to Ely or on the way home?

A No. Because I didn't see it as friends, per se. It was -- and I will explain that. I am very

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 75 of 104



separate when it comes to work and home. And that's part of the reason why I live in Fallon and never lived in Virginia City. And I don't like to socialize with people that I work with outside of work.

Work, you have I guess work friends, you have people that you get along with or you see more often, and you may know more about their kids or their spouse or their hobbies, but your friends, or I should say my friends, they know more about yeah, this is going on with my child. Or this is going on with my spouse. Or -- so it's very separate. I view work as it's work friends. It's boundaries, I should say.

Q Okay. So you never made any kind of comment to Sheriff Antinoro that he could share personal matters with you or that you would be willing to listen to his personal matters?

A Not to that extent, no.

Q Did you ever ask him on the trip or suggest that you had heard about a swinging lifestyle and ask him any questions about that?

A No. He told me he was a swinger.

Q You never suggested that "hey, I have heard this. Is there any truth to the rumors?" Or --

A No.

Q He just out of the blue started talking

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 76 of 104



about his relationship?
A His relationship with Terry. Because I had met Terry.
Q And then you've put -- or your attorney has put many graphic stories, whatever, I don't know what you want to call them, that he had told you about his relationship with various people or things that he had done.
A Well, I could call them narratives that he gave me, yes.
Q Narratives, okay. And this just started out of the blue?
A No. It was in relation, I believe, to his -- his conversation regarding Terry.
Q Okay. And I don't want to, for a lot of reasons, just go through each individual one in the record. That's the thing your counsel likes to do. I don't like to do that. But -- so there were, as you said, narratives, and in your complaint you have several sections of narratives. Did they occur just as a one stream of consciousness, one after another, or did it --
A No. There was one period, and we were on -- now, grant it, the whole road is a long stretch of nothing there. But I remember in particular there

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 77 of 104



Q I am going to show you what I have had marked as Exhibit 5.

MR. FLANGAS: I have seen this a few times.

BY MR. RANDS:

Q Just ask you to kind of flip through that and tell me if you recognize that.

A I do recognize this.

Q Okay. And it appears to be a -- well, tell me, what is this?

A This is a typed complaint that I provided for Austin Osborne.

Q And when did you prepare this complaint?

A It was right around the time that I made the report to him, I believe.

Q And did anybody instruct you to prepare this?

A I don't recall exactly, but I think Austin wanted me to put it down in writing.

Q Now, it appears that every page is signed. Yeah. Is that your signature?

A Yes, it is my signature.

Q Okay. And this was prepared maybe not exactly contemporaneous with the events, but it was probably about February of 2016?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 78 of 104



A Yes.
Q Okay. And would you agree with me that you may remember things in 2016 or did remember things in 2016 better than you might remember them right now as far as details?
A Yes, probably.
Q Because as things go over, we get older, we forget things.
A Correct.
Q All right. So at some point you arrived at Fallon in July and got out at your house. And you have testified already, I think, that you didn't want to talk to your husband immediately just because of the weekend's plans?
A Correct.
Q So some time in the next week you told him, and then you also told Tony Dosen?
A No. I told Jeff Bowers --
Q Jeff Bowers. I'm sorry, Jeff Bowers.
A Yes.
Q Did you tell anybody else immediately?
A I don't believe so, immediately.
Q Who was the next person that you remember talking to about it?
A I want to say probably Dosen.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 79 of 104



Q So when did you talk to Tony Dosen about it?
A You know, I know that it's documented in my complaint, but I don't recall now exactly when it was.
Q Well, and we have got the complaint, and that's fine. But what I am asking you for right now is more your recollection. It's not -- you know, I don't want to waste the time to go look things up. I just want to know what you remember at this time. But was it like within a month of the occurrence, or --
A I would say it was within a couple of months.
Q Okay. And why did you talk to Dosen about it?
A Because I was upset with Antinoro's behavior.
Q The behavior that you are talking about was the discussion that you had on the way back from the --
A There was numerous things that -- that I was getting upset about.
Q Like what?
A Well, there was obviously the discussion coming back from Ely. The messages. Antinoro's --

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 80 of 104



the things he was saying as far as just the words he was using. Him watching these odd videos on YouTube. Just strange behavior, you know, putting his boots on my desk, and just kind of putting me off like he wasn't listening. Didn't want to engage in conversations that we needed to have regarding the operations of the sheriff's office.

Q Was there any more behavior, though, after this, the trip, that you would consider sexually harassing to you?

A Yeah. Actually, there was. There was an incident with this willow reindeer with lights, and with this incident it was the reindeer's cord. I was trying to figure out where to put it. It wasn't long enough. He said, "put it on the counter and plug it in there." And I told him that the cord wasn't long enough. And I made the comment that that's a problem with guys, and they have been lied to their whole lives.

And then he told me, he goes, "Now you can't sue me."

And after that conversation was over I walked off, went in my office, and he had popped his head in the office. And the way that I sit is face the wall, the office door was here, to my right.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 81 of 104



Q Okay.
A And my computer screen, the monitor was actually at an angle at the desk to where the back of the monitor faced the door, and obviously the front faced me. So when I would turn, look at the monitor, I am looking at the door. And he popped his head in and told me -- I don't remember the exact words, but, "Just so you know, I could fold it in half and it would be long enough."
And I didn't say nothing. He just kind of laughed and shut the door.
So there is that. Gender-based, with that, is that also a --
Q Sure.
A Okay. We had a deputy that was shot during a situation the first part of January, January 2nd. And afterwards it's customary to obviously have a debriefing. And I had asked one of the local therapists, counselors, to come and do a group counseling session for anybody that wanted to participate. And so many members came from the sheriff's office. And initially when -- Erik Schoen was the counselor's name. When he asked if anybody wanted to share, nobody shared. And so I piped up. And during this sharing I made the comment about it

Q And by "his behavior", you mean just this event or the overall thing you talked about earlier where he was starting to act weird?

A Overall.

Q Okay. So not just this event, but the other behavior things you talked about, the computer and the being short with subordinates?

A I don't know that I told him about -- the folding in half comment came after I told Dosen.

Q But it was more than just this event that you were concerned about that you talked to Dosen about?

A I believe so, yes.

Q And then did you report this event to anyone else until you talked to the county about it?

A Now report, no. Other than -- other than Quirk and Dosen, Bowers, my husband, I believe that I told Kari Gonzalez about it. I'm not positive. I don't remember all who that I would have relayed it to, and I don't recall at what point I relayed it to.

Q But it was nobody other than -- nobody within your chain of command?

A No.

Q You didn't talk to Austin Osborne or Anne Langer or Sheriff Antinoro about it?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 83 of 104



A I had a conversation with Pat Whitten. And I went to Pat, and -- it was probably mid to late January, and I went and sat in his office and I told him that there was a lot of things that had happened and were going on that were wrong that I was concerned about, and that I needed to come to him when the time was -- when the time that I could, was. And basically putting him on notice that I was going to be coming and speaking to him more in-depth in the future.

And what's funny is because when I did make the report, Anne Langer made a comment to me. I said, "Well, I -- I told Pat a month ago that, you know, that I was going to be coming forward with some stuff, but I didn't give specifics."

And Anne Langer made the comment, "Well, yeah, but we didn't know it was going to be on a Tuesday."

But anyways. I came to Pat about a month prior, and --

Q But you didn't tell him the details?

A No, not the details of the messages or anything like that.

Q And did he suggest that you tell him what's going on? Or --

A No. He said that -- I think his comment

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 84 of 104



basically was, "When you are ready then you can come talk to me, and depending on what you tell me there are certain things that I have to take action on."

And I believe he knew there was issues going on in the department or the office, but because he kind of -- kind of mentioned that, like, well, yeah, you know, we know things aren't going well over there, that sort of comment.

Q Okay. But nothing specific?

A No.

Q All right. So in any event, let's go back in December of -- around Christmastime. Did you have a conversation at the sheriff's office with a representative of the Sheriffs' and Chiefs' Association who was in the office visiting?

A Bob Rorschach, is that his name?

Q Uh-huh.

A I believe so. You know, he was creating -- he wanted to create a plaque for Antinoro because his term of president, I believe, was going to be over with, and he wanted to get my input on that plaque.

Q Do you remember telling him that you enjoyed working with Sheriff Antinoro and hoped he would run again because you wanted to stay working for

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 85 of 104



him?
A I may have said something like that, yes.
Q And that was in December of after the event in Ely; correct?
A I don't remember which month it was in, but yes, it was after. Was it after? I don't know for sure. But I do remember him asking me for my input, yes.
Q And telling him that you enjoyed working with the sheriff?
A Yes, I did, probably.
Q Okay. So you decided to talk to the county about what was going on in the sheriff's office; correct?
A Correct.
Q And was that just the issues that you claimed were sexual harassment or was it all the issues you wanted to talk to him about?
A It was all the issues.
Q Okay. And so who did you talk to first?
A I talked to Anne Langer.
Q And was Sheriff Antinoro in the office when you talked to Anne Langer?
A No. He was at Sheriffs' and Chiefs' convention.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 86 of 104



Q And why did you choose that time to go talk to Anne Langer?

A Because he was gone, and I felt it was a safe time to talk to her.

Q Why did you choose a Tuesday?

A Right. I don't know. I don't even know if it was a Tuesday.

Q Just kidding. Anyway, you went and talked to Ms. Langer; what did you tell her?

A Gosh. I don't remember word for word what I told her, but I told her about the trip to Ely and about the comments. And I don't remember specifics. I was very emotional when I was telling her. And I remember sitting in her office and she was sitting in the chair next to me by the windows that go out to the balcony, and I just remember talking to her. But I don't remember everything that I told her. I know I told her about the trip to Ely and about the narrative that he said to me, and the text messages.

Q What was her response?

A Her response was positive. She said that I needed to let Austin know right away. In fact, she called Austin from her office and told me to go right over there. But I don't know what her comments were specifically. I don't remember.

Q Okay. So you went, but you went over to Austin's office?

A I did.

Q And that's Mr. Osborne?

A Correct.

Q And he is the HR person for the county?

A Slash planning director, yes.

Q So you went over and talked to him. Do you remember anything about that conversation?

A I remember being in his office and basically purging to him, emotional, telling him this is going on, this is going on. The messages. Boots on the desk. Treatment towards deputies. His narrative on the way back from Ely. His comments during Hammond's -- Deputy Hammond's -- the trip to deputy Hammond's house.

Q Prior to you talking with Austin Osborne did you feel like you were in danger of perhaps losing your job at the sheriff's department?

A I felt that -- I felt I was doing an excellent job, but I was afraid of what Antinoro could do to me.

Q Because you were an at-will position; correct? If you know.

MR. FLANGAS: I guess objection. Calls

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 88 of 104



for legal conclusion. Speculation.

THE WITNESS: I was afraid because I was getting ready to go to Staff and Command, and being a law enforcement administrator was really what I wanted to be, and that Staff and Command was supposed to start -- it was due to start in September. And I knew in June that I was going. In fact, we paid for it -- the county, excuse me, paid for it from the previous years' training budget.

So we -- they paid for it in advance and I knew it was going to be starting in September. And I was really afraid that -- that I was not going to be able to attend that or that I would not be able to finish that.

BY MR. RANDS:

Q Uh-huh.

A So that really worried me.

Q As the chief deputy were you involved in the budget process?

A I was involved as far as I got a copy of the budget, I would help -- I would help Antinoro with what we needed for the upcoming fiscal year. As far as amounts for ammunition, supplies, things like that.

Q It's been a while since I have read Exhibit 5, but your note or your report, I think there

was something in there about SUV's versus four by four's versus patrol cars. Is that kind of what you are talking about?

A Correct.

Q Your input?

A Yes.

Q Okay.

A And then I did a staff study. It was actually a project for Northwestern Staff and Command, but I had given that to Antinoro for the upcoming budget.

Q Okay. But you were -- you had some concern about your position at the time?

A Some concern about my future, absolutely.

Q Okay. So you went and talked to Anne and Austin. What happened next?

A I had a training class that I had set up, and what was the training? The training was -- I think it was a Fred Pryor training. It was a two-day training. And it was basically related to like active shooter or confrontation in the workplace. And so there is two different classes two different days, and that was going to be on the 17th and the 18th. And I believe Antinoro was returning on the evening of the 18th, because he was going to be present on the 19th.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 90 of 104



So I made the report on the 16th, and then the 17th and the 18th I handled that class. And Austin said he wasn't quite sure what he was going to do yet, but Antinoro was out of town, so there was some time to determine what to do.

And I got a call, I want to say it was the evening of the 18th on my way home from work. And I work an hour away. Or I live an hour away from work.

Q Uh-huh.

A And there was a call that -- from Austin, I don't remember if it was a message or telephone call. But anyways, he said that in the morning I was to report to his office, and that I wouldn't be going to the sheriff's office that day, I would be reporting to his office. Excuse me.

Q Okay. So what happened then? You went to his office?

A I went to his office on the 19th. And actually I was in Pat Whitten's office, HR/commissioner's office.

Q It's kind of one in the same?

A Yeah. Correct. And so I was in Pat Whitten's office and Pat was -- I want to say he was in Washington, D.C. I don't know if he was -- and I

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 91 of 104



was at an annual conference thing that commissioners can go to or something of that nature. And so I was in that office for that day. Austin had told me that he was going to notify the sheriff that I was not going to be there that day, and that I wasn't going to be disciplined basically for not showing up. They have got -- he's got me working on something else. And I don't remember exactly what the nature of it was, but I do remember Austin saying that the sheriff had called him. "He is already calling here."

And I don't know exactly what happened that day. I believe that day -- that morning I wrote like a five page -- five page paper on everything that I was working on in the sheriff's office because I -- nobody knew what was going to happen other than I wasn't going back there that day, and I had no indication of when I was going to go back there, and we had deputies getting ready to go to the academy. We had -- I believe we had a psychological evaluation waiting for Hammond so he could return to duty. We had backgrounds in process. We had joint enforcement grants that I was working on and monitoring. So I wrote down everything I was working on and the next step that needed to be taken so that Antinoro would -- would be able to take care of those things, and the

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 92 of 104



A I actually started counseling in January of 2016. And that was, well, counseling therapy with Ron Murrujo. M-u-r-r-u-j-o.

Q And was that provided by the county?

A Yes. I believe that was through EAP.

Q Okay. And are you currently undergoing counseling?

A Yes.

Q How many visits have you had with the counselor?

A I do not recall how many visits. It's been -- I would say overall it generally works out to be about every two weeks to every month. There are some spaces in there because I couldn't afford a counselor, so I would have to wait for the EAP to re-up, so to speak. You get three, and then you have to wait for -- until the six months is up, and then you get three more.

Q Okay. And did the county give you any of those EAPs in addition to what you were entitled to? Did they give you any extra ones?

A No.

Q And is the reason you believe you are going to counseling exclusively limited to the issues involved in this litigation?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 93 of 104



it?

A Correct. And the text messages.

Q And the text messaging?

A Yes.

Q Anything else on that?

A I believe I shared with her the boots on the desk, and her notes would probably be best because I -- I just really don't recall.

Q Her notes just basically say that's sexually inappropriate, so I am just trying to figure out what you are were talking about there.

A Okay.

Q If there is anything that we didn't discuss at the deposition that we need to add.

A No. No.

Q Okay. She said in her notes that you were told by one of the county commissioners that the county's hands were tied because he is an elected official. Which commissioner was that that you talked to?

A That was Pat Whitten. He wasn't a commissioner so I am assuming that she misunderstood.

Q So it would be Pat Whitten, it wasn't one of the commissioners?

A Correct.

Q Have you ever talked to any of the county commissioners about this incident or situation?

A Jeff McGuffey approached me not too long ago, and it was -- I think it was right around the time that they filed for who was running, and he's -- he was up for re-election also as a commissioner, and he approached me down in the museum at the desk and he asked me what the status was. If it was going to be done, or -- this whole litigation. And -- and I told him that I didn't know exactly what -- what was going to occur, but, no, it wasn't done.

And he had made reference to wanting it over with before the primary. And that was it.

Q Okay. He didn't discuss the details of the -- of the complaint or anything?

A No.

Q Okay. In the notes, again, with Ms. Riehm she said that she asked about your level of depression from 1 to 10 and you didn't give her a number, you said you couldn't quantify it that way; do you remember that?

A I don't remember that question, no.

Q What -- let's just -- what, for want of a better term, symptoms of depression were you suffering or are you suffering?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 95 of 104



A It was varying level of degrees throughout the last two and a half years.
Q Okay.
A And actually, the last three years, considering this started in 2015, anxiety was a huge part of it. Just very much on edge.
Q How does that manifest itself physically?
A It's -- well, again, it's very different. For me, it was lack of sleep. Just I would get physically -- my stomach -- a lot of things go to my stomach. If I'm upset my stomach is the first place to show it. And driving up Six Mile to work every day after all this, you know, after the trip to Ely, and it's actually happened continuously since then, you just get sick to your stomach. I would get sick to my stomach driving up the hill. And --
Q Is that like every day, or --
A I would say a good 90 percent of the days.
Q Uh-huh.
A Just not knowing what the next day was going to hold, and that added to the anxiety. Weight gain, especially after -- after I reported the incident to the county. There was substantial weight gain over the next period of few months.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 96 of 104



Q And by "substantial" what do you mean?
A It was probably about 30 pounds.
Q I don't want to be crude, but what range are you talking about? From like 95 to --
A Oh. I was -- well, you mean weight-wise numbers?
Q Yeah.
A I was right around 150, and I got up to 186 at my highest. And then started coming back down. But initially it was -- it was just right out of the gate, it was a lot of weight gain.
Q In your medical records and your psychological records that I reviewed there was some discussion about eating right, eating better, maybe even some issues with IBS, irritable bowel syndrome. And the doctor or the psychologist, I forget which one, was saying that may be related to some -- to some sort of a, you know, lactose intolerance or something, and that you were trying to eat better. Do you recall that, or telling somebody that?
A I don't recall the lactose intolerance or anything like that. Obviously -- well, I don't have a gallbladder so when I eat garbage sometimes it tends to affect me a little bit more.
But July of 2016 I had joined Weight

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 97 of 104



Watchers because I saw the weight just, you know, getting up there, and so I joined Weight Watchers which is cleaning up my eating, and changed my diet.

During that time I also started a whole vitamin program, trying to -- trying to get myself healthy.

I believe that you are -- if you put good stuff in then obviously it helps you physically, mentally, everything. And doing the therapy, and eating correctly and vitamins, and I started exercising, all of those things together to -- to try to get myself, you know, straight. Because it was --

Q Okay. And Kay or Ms. Riehm --

A Uh-huh.

Q -- talked also about that you said you were maybe even overeating as a way of dealing with the stress, too. Is that something that you recall?

A Yeah, absolutely. I mean, you don't gain weight by drinking water.

Q She said, "she also recently stopped -- stopped drinking."

A Yeah. Actually, I started drinking wine at nighttime. I would come home, and just a glass of wine to try to calm my nerves. And one glass ended up turning into three glasses or four glasses. And that

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 98 of 104



July when I started Weight Watchers I just realized that that wasn't -- obviously, alcohol is a depressant, and --

Q And it's a lot of points, too.

A It is. It's like 4 or 5 points, correct. So, yeah, absolutely. It was just -- I was trying very hard to completely put good things in my body so that I could keep my mind right.

Q Uh-huh. In the records of -- Ms. Riehm's records she said that you were seen three times by another therapist. Is that Mr. -- I forgot his name.

A Murrujo.

Q Murrujo?

A Yeah. That would be -- that would be the only one.

Q You didn't see anybody else other than Mr. Murrujo?

A No.

Q Always have to try and take these records and interpret them a little bit, and I don't know if it's three times a therapist, or you were seen by three other therapists.

A Yeah. That makes sense. I understand that question.

Q Okay. Diagnosis was adjustment disorder

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 99 of 104



with depressed mood and anxiety. Did she tell you that?

A She told me that -- I believe she told me that it sounds like I have high anxiety and the depression, but there was no clinical terms, I don't think, other than those.

Q And at that time when you saw Ms. Riehm were you getting any medication for depression?

A No.

Q Okay. Did she recommend any medication?

A I don't think so at that time. I'm not sure, though.

Q Okay. And she said her treatment plan was, "identify triggers and coping strategies. Work on relaxation skills. And exercise three times a week or more."

Did she suggest that you exercise?

A I don't remember, but I'm sure it came up, and nobody ever says don't exercise, it's bad for your health.

Q Yeah, that's true. Unless you ruin your knee, then you just change your kind of exercise, I guess.

You created a treatment plan or a treatment regimen with her, correct? You started

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 100 of 104



issues with your husband?

A I was having issues with everything to do with our relationship because I wasn't functioning well within the relationship. I wasn't functioning well at home.

Q And there are some references in the notes, and I don't want to get too personal, that you were having, you know, sexual -- not having sexual relations with your husband during a period of time, anyway, and that was a stress, too?

A It was. It was. I don't know if you have ever had depression in your life, but when you suffer from it that anxiety and, you know, the emotional upset within you, it's very difficult to -- to function, and to -- to feel things other than just upset and -- and negative.

So obviously, healthy married relationship and an intimacy, when you are emotionally not connected with your life, then it causes major problems with that.

Q So you continued to see, during this August 2017 period we are talking about, I know you can't -- I don't expect you to remember everything that happened in August 2017 because I certainly couldn't, and -- you know, but there are -- you know,

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 101 of 104



October 2017 it says you have a new attorney that you think is competent, and I don't know about that, but --

A Mr. Flangas, yes.

Q Kidding. Kidding.

MR. FLANGAS: I think he's real competent.

BY MR. RANDS:

Q It says right here, "she feels he's competent."

But that's not what I want to talk about on that visit. It says that you continue with an antidepressant. Were you taking an anti-depressant at that time?

A I began taking an antidepressant in February of 2017.

Q Uh-huh.

A I don't know if it's anti-anxiety or antidepressant. It's Wellbutrin. Or generic form of Wellbutrin.

Q Uh-huh. And who prescribed that?

A Dr. Michelle Le, with -- I believe she's through Banner Churchill located in Fernley. And her name is Michelle, but her given name I think is U-Y-E-N.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 102 of 104



Q Uyen Thuk?
A Something to that nature, yes.
Q And you saw her at the Banner Health Clinic in Fernley?
A Correct.
Q And how were you referred to her?
A My mother's ex-husband who was my stepfather for five years when I was a juvenile, that was or is, I believe, his -- his primary care physician. Or one of them. And he had mentioned to me that that's who it was. And he doesn't -- he is very particular, and so I knew that if he thought she was thorough and did a good job and helped him then I -- I just took it as she was probably very good.
Q Uh-huh. And why did you start seeing her?
A Well, in February when I went on the medication it was -- I was having major episodes at home that were causing a great deal of issues between my husband and I, and obviously, as my, you know, my child still at home, it wasn't good for him to be exposed to my outbursts and --
Q Which child is that?
A Dillon.
Q And how old was he at that time?

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 103 of 104



A At that time he was ten.
Q Okay.
A And so --
Q So he is still at home with you?
A Yes. And so I went to -- went to the doctor, to Dr. Le to talk about my outbursts and I told my husband, I said the exercise, the vitamins, the eating right, the therapy, I felt I had done everything that I physically possibly could on my own, and it wasn't keeping my emotions under control and dealing with the stress 100 percent and so I felt I needed some assistance with that.
Q And again, were you referred to Dr. Le by your therapist or did you seek that out yourself?
A I sought that out myself.
Q Did your therapist suggest Wellbutrin or another anti --
A No. No. Afterwards she -- I had told her that I was prescribed Wellbutrin, and she just stated that that's good.
Q Okay. So she had no -- nothing to say either way?
A Not beforehand. I mean, afterwards I think she -- she had told me it was good that I had sought the additional assistance if I needed it.

Case 3:17-cv-00498-RCJ-CBC Document 48-2 Filed 01/14/19 Page 104 of 104



STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, MICHELLE BLAZER, a Certified Court Reporter for the State of Nevada, do hereby certify;

That on Wednesday, the 11th day of April, 2018, at the hour of 1:13 p.m. of said day, at the offices of Rands, South & Gardner, 9498 Double R Boulevard, Reno, Nevada, personally appeared Melanie Keener, who was duly sworn by me, was thereupon deposed in the matter entitled herein, and that before the proceeding's completion the reading and signing of the deposition has been requested by the deponent or party;

That the foregoing transcript, consisting of pages 1 through 160, is a full, true, and correct transcript of my stenotype notes of said deposition to the best of my knowledge, skill, and ability.

I further certify that I am not an attorney or counsel for any of the parties, nor relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

DATED: At Reno, Nevada, this 23rd day of April, 2018.

Michelle Blazer

MICHELLE BLAZER, CCR #469 (NV) CSR #3361 (CA)