Exhibit 3

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/14/19 Page 2 of 13



UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-oOo-

| | | |
|---|---|---|
| MELANIE KEENER, Plaintiff, vs. GERALD R. ANTINORO, an individual; STOREY COUNTY, a political subdivision of the State of Nevada; DOES I-V, inclusive, and ROE ENTITIES VI-X, inclusive, Defendants. | : | CASE NO. 3:17-CV-00498-RCJ-VPC |

==================================================

DEPOSITION OF PATRICK WHITTEN

Wednesday, March 21, 2018

Reno, Nevada

REPORTED BY: MICHELLE BLAZER CCR #469 (NV) CSR #3361 (CA)

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/14/19 Page 3 of 13



Page 9

question; do you understand that?
A Yes.
Q During the course of this deposition your counsel is going to be registering some objections for the record. Unless you receive an instruction from your counsel not to answer the question you are going to have to answer it. Okay?
A Okay.
Q And I am assuming Mr. Rand is your counsel today?
A Yes, sir.
Q And you are here on behalf of Storey County?
A Yes, sir.
Q I hate to ask these questions and I always preface it when I do depositions like this, but I do need to ask them. Are you on any type of medication today that would affect your ability to answer my questions or answer them accurately?
A No, sir.
Q Have you ever been convicted of a felony?
A No, sir.
Q Have you ever been convicted of a misdemeanor for a crime that involved dishonesty,

Page 10

fraud, theft?
A No, sir.
Q Is there any reason why this deposition cannot go forward today?
A No, sir.
Q Okay. Mr. Whitten, what is your present occupation?
A I'm County Manager for Storey County.
Q Okay. And before we start going into your work history let's talk about your education. Obviously, high school graduate?
A Yes, sir.
Q Where and when?
A John F. Kennedy High School, Sacramento, California, June 1970.
Q Any post-high school education?
A Yes, sir. No degrees. Three years at Sacramento State, now California State University Sacramento. And then various employee-related employment-related job-related training throughout the subsequent decades.
Q Okay. Now, that three years that you studied at Sac State, what were you studying?
A My goal was to become a teacher, so I guess I would call it education.

Page 11

Q What years were you at Sac State?
A 1970 through 1973.
Q And then you mentioned you had some employment training. You want to tell me about it?
A I worked -- I went to work for Bank of America in 1974. I was accepted into their management training program on the operations side of the house at first, and I worked for the bank in various capacities from May of '74 until January of 1994.
Q And where were you working for Bank of America?
A Primarily in Northern California, Sacramento area, Roseville, Yuba City, Redding, Eureka, Dunsmuir, South Lake Tahoe, and then for the last three years of my career I took a job in New Mexico division of the bank based in Albuquerque.
Q Is going to work for Bank of America the reason you didn't finish your degree?
A No, sir.
Q All right. What other education did you have post-high school?
A Just the training affiliated with both working for Bank of America and Storey County.
Q Okay. What kind of training did you get

Page 12

with Storey County?
A Fiscal training.
Q Fiscal?
A Fiscal, yes, sir. Human resource, HR personnel training. Emergency management training. Law enforcement training. That was actually probably not directly -- well, no. There was some law enforcement affiliated with my employment, too, but I also went to a reserve academy in Douglas County, Nevada.
Q Any other?
A I'm sure there are, but none come to mind, sir.
Q All right. Maybe during the course we might get some more out of you on that. All right.
MR. RANDS: I don't like the way you said that. Object to the form of the question there.
BY MR. FLANGAS:
Q It was kind of funny. All right. So let's go back.
You are the County Manager for Storey County, right?
A I am now, yes, sir.
Q How long have you been the County

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/14/19 Page 4 of 13



Page 57

Q So what did Sheriff Antinoro do?
A He came in saying he was going to fire the deputy.
Q Did he fire him?
A No, sir.
Q He tried to, though?
A He proposed to.
Q How come the deputy didn't get fired, then, if Mr. Antinoro was the sheriff and could do what he wants as far as his people go?
A I guess I will say he re-thought it. We had a very heated discussion and I told him in no uncertain terms something that I have subsequently learned that I probably could not have done, and that is that he would have to then get his own personnel office, his own comptroller, his own insurance. I just laid a whole gamut out, and it was basically a game of poker.
Q When you said you had personnel issues with him, so what type of personnel issues did you have?
A Well, that was one.
Q Just level of discipline? Have you had issues now, other than Ms. Keener, where people are suing the county now as a direct result of, or as a

Page 58

result of Mr. Antinoro's actions?
A I've -- I mean there have been suits. So yes would be the answer. Yes.
Q All right. How many suits have there been?
A I can't answer that specifically, but I would say several.
Q Okay. More than -- obviously, more than one?
A Yes, sir.
Q More than five?
A Yes, sir.
Q More than ten?
A You are in the ballpark, I think, but again, I don't know.
Q And basically what are those suits involving?
A One suit was a -- one suit was a wrongful discharge, as I recall. One suit was a -- a -- I am trying to think what the specifics were on him. I guess basically a -- I'm not going to pick the right legal foundations for it, but it was the, you know, a violation of rights, if you will. Whether they be rights to free speech or whatever the merits were.

Page 59

Q How about sexual harassment suits?
A I can't think of any, but there may have been at least one or two included in those allegations, but I don't know for sure.
Q Has there been complaints that didn't go to a lawsuit involving Mr. Antinoro since he's become sheriff?
A I guess I would say there's been complaints, but I don't know complaints that didn't go to a lawsuit. Because if they didn't, then we were either able to get them resolved or not.
I --
Q Do you know a Adrian Vanessa or Vanessa Adrian?
A Vanessa Adrian. I'd ask if your client could tell me if that was the -- I know of her, I just don't remember which circumstance. I believe she was a jailer.
Q But she brought suit against Mr. Antinoro, right?
A Yes, sir.
Q Would you say that since Mr. Antinoro's become sheriff that there's been an increase in lawsuits against the county because of him?
A I'd have to statistically prove that.

Page 60

And I would caveat it with there were a number of lawsuits I believe with my predecessor which was a foundation that I ran for office under after he left office, but --
Q But you ran back in, I believe, in --
A '98.
Q -- 19 -- what?
A '98 and '02.
Q All right. Since the time you have been sheriff -- let's go this route. Since the time you have been sheriff, Mr. Miller's been sheriff, has there been an increase in lawsuits against the county since Mr. Antinoro's been sheriff?
A I would think yes.
Q Has there been an increase in number of complaints that are -- that didn't go to lawsuits as well?
A Generically, I mean, relative to like grievances and whatnot?
Q Yes.
A Yes, sir.
Q When these lawsuits happened does it increase the amount of money that Storey County has to pay to the pool?
A There are many factors in there, but I

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/14/19 Page 5 of 13



Page 69

you that Mr. Antinoro has some associations with the Hell's Angels, right?
A Yes, sir.
Q Did they tell you that these associations weren't good?
A Sure. Yes.
Q And that's why they are coming to you, right?
A Yes.
Q Now, if you got former deputies coming to you, do you think that's enough maybe to spark some form of investigation as to Mr. Antinoro's associations with the Hell's Angels?
A I wish it were, but I could find no path to legally do that.
Q Okay. If you had a path legally to do it would you undertake that path?
A Yes, sir.
Q Now, you have probably, as county manager, because I think you told me you are kind of the primary person that deals with lawsuits when the county gets sued?
A It's primarily counsel, but I am the -- I am a key player from the local government's standpoint.

Page 70

Q Yeah, and that's what I meant. I didn't expect you to be litigating it yourself personally and everything, but you have to keep on top of that, right?
A Yes, sir.
Q Both as county manager and risk manager, right?
A Yes, sir.
Q And so there's been other instances where you heard other than Ms. Keener where he's been involved in some form of harassment of either some of his employees or other people within the county; am I correct in that statement?
A I would say yes.
Q And if you had a pathway to investigate that further you would do that as well?
A Trying to think of the circumstances. Yes, I would. If I may, I will give you my example.
Q Okay.
A We had a senior appointed department head. It was alleged that certain things happened and we had it independently investigated. So my answer would be if I had a path, I'd follow the consistent path that we do for department heads and anybody else in the organization.

Page 71

Q Now, you obviously know Melanie Keener, right?
A Yes, sir. I hired her.
Q How long have you known Ms. Keener?
A Could be embarrassed to say I don't remember exactly when she came to work. Let me back into this. I'm going to guess it was about 2002, and I could be off anywhere from a year to two years. So I would say 16 years.
Q Do you find Ms. Keener an honest person?
A Very.
Q Dedicated to her job?
A Yes, sir.
Q Mr. Miller testified that same way yesterday, said she's very dedicated, very hard working. Do you agree with Mr. Miller?
A Yes, sir.
Q You have had a chance, I believe, over the last -- since early 1916 to -- excuse me, 2016 to watch -- yeah, you are -- I am not going to assume you are that old.
But since 2016 you have had an opportunity to watch Ms. Keener directly yourself?
A Yes, sir.
Q And again, hard working and very honest?

Page 72

A Yes, sir.
Q Now, you are familiar with this lawsuit, I am assuming?
A Yes, sir.
Q And I am going to kind of go through some of the nitty-gritty of this lawsuit with you for a moment, and I will apologize in advance to the court reporter on some of language that's going to be used here. All right.
I am going to talk about some of the things that occurred that are set forth in this complaint.
A Yes, sir.
Q Now, you are aware that a great bulk of this complaint revolves around what occurred when Ms. Keener went to Ely, Nevada with Mr. Antinoro for the sheriff's convention, right?
A Yes, sir.
Q And according to the complaint which you have read, and let me make sure I have got it, it's the Nevada Sheriff's and Chief's Association Convention, right?
A Yes, sir.
Q That's the appropriate term. And this was about July 2015, according to the complaint?

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/14/19 Page 6 of 13



Page 73

A Yes.
Q I will represent that that's what the complaint says.
A Okay.
Q And you know there were some text messages going back and forth?
A Yes, sir.
Q And you have had an opportunity to look at what those text messages said, correct?
A Yes, sir.
Q Both in the complaint and in investigations, right?
A Yes, sir.
Q I think you have seen copies of the text messages, if I am not mistaken?
A I have. Either released to the media or contained in the report, or somewhere.
Q Do you still have copies of those?
A No, sir.
Q Who has copies of those?
A I would think and hope that our HR director would under locked file.
Q Okay.
A I can't swear to that.
Q Should those have been turned over to

Page 74

your attorney for this case, do you think?
A I would have thought they would have been. I don't know.
Q All right. So let's kind of -- and I am going to have you put on your sheriff's hat occasionally when I ask some of these questions as well.
A Okay.
Q Now, you know that they were -- before I go on to that, you have been to one of these conventions, haven't you?
A Several, yes, sir.
Q All right. And they are a way to kind of network and interface with fellow law enforcement officers?
A Absolutely. Yes, sir.
Q Got seminars during the day?
A Yes, sir.
Q And socials afterwards?
A Yes, sir.
Q And so it wouldn't be unusual on the last night where people might be hanging out together and engaging in some social drinking and general camaraderie?
A Yes, sir. Both -- I have done that with

Page 75

Sheriff Balaam and Sheriff Skinner. Former sheriff Balaam, former sheriff Skinner.
Q So according to the complaint, I will paraphrase so we don't have to read it in there, Ms. Keener and Mr. Antinoro, it was the last night of the convention, were at the hotel that they were staying at which is a hotel-casino in Ely, Nevada. You read that in the complaint?
A I knew it was in Ely, yes.
Q And they were -- Ms. Keener was playing a little bit of blackjack and Mr. Antinoro was as well. And eventually it got late and they both went to their respective rooms, right?
A That's what I understand, yes, sir.
Q And then I will just pick it up from there, you know, and this will be paragraph 11 of the complaint: "At around midnight that evening Ms. Keener and Mr. Antinoro left the casino area to head for their respective rooms which were across the hall from one another. During the walk to their respective rooms Ms. Keener mentioned to Mr. Antinoro that over the past two days she had lost some money gambling, blowing some $80. Ms. Keener subsequently" -- in paragraph 12 it says, "Ms. Keener subsequently said goodnight to Mr. Antinoro, went to

Page 76

her room to go to sleep.
"13. After going into her room Mr. Antinoro began to make inappropriate unwelcome advances towards Ms. Keener via text messaging."
Off the record real quick.
(Discussion off the record.)
BY MR. FLANGAS:
Q "Item Number 14." Or excuse me. Paragraph 14 of the complaint says, "After getting ready for bed Ms. Keener received an unsolicited and inappropriate text message containing sexual innuendo from Mr. Antinoro which said, quote, 'about that blowing thing', unquote. In addition, he attached an emoticon with a smiling face or something similar to that text message."
You have heard this, I am assuming?
A Yes, sir.
Q And you are aware that there was a -- I think you had a person by the name of Christensen --
A Yes.
Q -- an attorney investigate this?
A Yes, sir.
Q And he determined that that was sexual in nature?
A I haven't seen the report in a few

Page 101

member of his office. The drive back occurred because Keener attended a work-related conference. The drive was the only available means for Keener to get back to her home. The conduct described went far beyond any mere general reference to merely engaging in sexual relations, and the descriptions were provided by a superior officer to his next in command. The conduct complained of falls squarely within the prohibition against offensive verbal communications."

Now, did I read that correctly?

A Yes, sir.

Q And you have read this before, obviously?

A Yes, sir.

Q And you have no reason to doubt what was put in that report, correct?

A No, sir.

Q Am I correct?

A Yes, you are.

Q Okay. I got to ask this again because we had a double negative on the record. You have no reason to doubt what is set forth in this report; is that correct?

A That is correct.

Page 102

Q Let's look at the next paragraph. I am just going to go to the last sentence on here. It says, "Antinoro was the superior and Keener was his subordinate employee. As such, it was up to Antinoro to act in accordance with the policy and he failed to do so in connection with this conduct."

Did I --

A I apologize. I lost you, Mr. Flangas.

Q All right. Certainly. The second paragraph from the bottom.

A Okay.

Q It starts with, "the idea that Antinoro perceived", do you see that?

A Okay. I now have, "Antinoro was the superior."

Q Go to the last sentence. I am going to read it again.

"Antinoro was the superior and Keener was his subordinate employee. As such, it was up to Antinoro to act in accordance with the policy and he failed to do so in connection with this conduct."

Did I read that correctly?

A Yes, sir.

Q Do you agree with that sentence?

A Yes, sir.

Page 103

Q Let's turn to the next page, which is MK 15, and it's the third paragraph. It's a short paragraph from the bottom. It's right above, "The January 2, 2016 comment."

You see that?

A I am there, sir, yes.

Q Says, "For the foregoing reasons, it is my opinion that Sheriff Antinoro's conduct in describing personal sexual incidents to Melanie Keener during the drive from Ely violated the provisions of Policy 202 as described above."

Did I read that correctly?

A Yes, sir.

Q You know what Policy 202 is, right?

A Yes, sir.

Q Would you agree with that comment?

A Yes, sir.

Q All right. You can put that aside for a moment.

Now, you've had a report that the county commissioned, and I think it was commissioned by you and by the D.A., and by Mr. Osborne to be performed by Mr. Christensen --

A Correct.

Q -- that validates things that Ms. Keener

Page 104

said, right?

A That is right.

Q You testified Ms. Keener is a very honest person as well; correct?

A Yes.

Q You also testified she's hard working and dedicated as well, right?

A Yes.

Q So as a pretty good -- so, you know, you agree and you also agree with what was said in the report that validated everything, right?

A Yes.

Q Now, would you agree with me that Mr. Antinoro's behavior was malfeasance?

MR. RANDS: Objection. Calls for a legal conclusion.

THE WITNESS: And I have to be honest, I don't know the specific definition of what malfeasance is.

BY MR. FLANGAS:

Q Just bear with me. Off the record a moment.

(Off the record, briefly).

BY MR. FLANGAS:

Q Okay, if we can go back on the record.

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/24/19 Page 8 of 13



Page 105

I -- just to be completely frank on the record, I looked up malfeasance on Google real quick to get a definition, and the definition for malfeasance is wrongdoing, especially by a public official. Okay.

With that definition for malfeasance would you agree with me that Mr. Antinoro engaged in malfeasance?

MR. RANDS: Same objection.

THE WITNESS: And I guess I am -- even if Mr. Rand had not objected, I -- I don't think that's my call to determine malfeasance or not. I look at it as an -- as an employer --

BY MR. FLANGAS:

Q Okay.

A -- and, you know, the last person that I mentioned that we have an investigated, and it's a matter of public record so I will even state names and positions if you wish, but the last person that we investigated, malfeasance was not in there. It was -- it was done on based on violations of policy.

Q All right. Would you agree with me that Mr. Antinoro's conduct was wrong?

A Based on the report, yes, sir.

Q Okay. Would you agree with me that Mr. Antinoro is a public official?

Page 106

A Yes, sir.

Q Okay. Now, would you agree, then, based on that definition I gave you for malfeasance, that Mr. Antinoro engaged in malfeasance?

MR. RANDS: Okay. Calls for legal conclusion.

THE WITNESS: And I have to agree with my counsel. I am having a hard time not wanting to act like an attorney.

BY MR. FLANGAS:

Q Like what?

A I don't want to act like an attorney. No offense. But, you know.

Q Well, as the county -- excuse me. As the County Manager you have people who are public officials that work underneath you, right?

A I would say yes, that we are all public officials to some degree.

Q Right. You know you have got department directors, right?

A Yes, sir.

Q And you have got people working underneath them as well?

A Yes, sir.

Q What's the budget for the county every

Page 107

year?

A Probably all sum total through multiple funds, it's around $20 million.

Q So it's a significant amount of money, obviously, that the county operates under, right?

A Yes, sir.

Q And as county manager you are kind of responsible for the overall budget?

A Together with the comptroller and the board of commissioners, but yes.

Q And so -- and in that -- in that vein, it's probably important that you have to guard against malfeasance; would you agree with me?

A I -- I don't know that I can. I don't disagree. I see malfeasance in the legal world as something that the district attorney should answer. I look for wrong -- for violations of policy and -- and wrongful acts, but I don't think I am qualified to call it malfeasance.

Q Okay. But you look for wrongful acts, right?

A Yes, sir.

Q And you are looking for wrongful acts by public officials, correct?

A By any employee, yes, sir.

Page 108

Q All right. And if you observe a wrongful act you need to take action; correct?

A When I can, yes, sir.

Q All right. When you can. And I think the reason you are qualifying that with "when I can" is you feel that you don't have the ability to take action against an elected official, am I right?

A That's what I have been told by counsel, sir.

Q Okay. I don't want you telling me what your counselor tells you.

A I understand.

Q You know, and you can -- you can volunteer what your counsel tells you because it's your prerogative, but I can't, you know, compel you to answer that.

A I understand.

Q Just so we are clear.

The -- so I guess back to my question is, you qualified your answer a little bit ago, you know, you would -- you want to do, you know, what you can. And I think you qualified that because you feel you don't have any say over what an elected official can do; am I right?

A That would be correct. I could not find

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/24/19 Page 9 of 13



Page 145

take care of her. But there were no guarantees of anything.
Q Did you --
A I -- I did, though, however, say the county would do everything possible along those lines to take care of her.
Q All right. Did you tell her not to worry about going to the EEOC or anything like that, or not to make a complaint?
A No. No, sir.
Q Never did?
A No, sir.
Q Now, you mentioned Ms. Keener's honest, right?
A Yes, sir.
Q If she was to say that you advised her not to go to the EEOC, that, you know, "we were going to handle it through different channels," would she be mistaken or dishonest?
A I would -- I would say yes. I would never advise anybody to do that under any circumstances. I think that's an abrogation of rights. And furthermore, at some stage in this process I think it's been stated somewhere in -- in some statement, you know, I actually said, "if I

Page 146

can't do anything and your only recourse is to litigate, that will, again, have no effect with your standing with Storey County."
Q Did you tell anybody -- let's assume -- put Ms. Keener aside. Did you tell anybody that you had advised her not to go to the EEOC, but that the county was going to try and take care of things?
A No, sir. To my knowledge.
Q So if some of those folks come forward and say that you said that, they'd be not telling the truth or mistaken?
A To the best of my memory, yes, sir. I don't see myself doing that.
Q Is it possible you might have?
A I don't see it.
MR. RANDS: Objection. Calls for speculation. Asked and answered.
THE WITNESS: I don't see myself doing that.
BY MR. FLANGAS:
Q You don't see it. Okay. So did you tell Ms. Keener you were going to run a county investigation, let's go that way, so not to worry about the EEOC or the NERC or anything like that?
A I would have told Ms. Keener that we

Page 147

were running a county investigation. I don't believe I said, nor do I recall any mention of EEOC or NERC. EEO, anyway. Her civil remedies. Because I would not do that. That's why, actually, I referred her to Ms. Jenkins.
Q But you don't know when you referred her?
A I do not.
Q You mentioned Ms. Keener -- you talked to her about counseling?
A Yes.
Q Ms. Keener was very upset about this, right?
A That certainly is my memory, yes, sir.
Q Would that be an understatement to say that she was upset about what Mr. Antinoro did?
A I don't know Ms. Keener well in that gray area of personal, as impacted by family, work, and whatnot. But I would -- I would certainly not argue your statement that it's probably an understatement. She struck me as very emotionally upset, both in that she was trying to come to the determination that she needed to report, and then I remember a very strong, powerful, emotional meeting with her and her husband.

Page 148

Q What happened at that meeting?
A We talked -- we talked pretty much about the same types of things that you and I are talking about right now. About the fact that, you know, she would be protected from any further potential, you know, acts, and that I and the county would do everything we could to take care of her and make sure that didn't happen.
And then I believe there were also some -- a lot of candor in the areas of "I don't know what we can or can't do," you know. You know, I'll --
Q You said that the meeting was very emotional; who was emotional?
A Mostly -- mostly Melanie, understandably.
Q Crying?
A Sometimes. And just upset, as -- as I would understand her to be.
Q Upset by Mr. Antinoro's behavior?
A I think undoubtedly. In the circumstances, I would -- Ms. Keener is probably only a few months or a year older than my daughter. I don't look at her as my daughter, but I look at those people like Ms. Keener in that -- in that group, and

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/14/19 Page 10 of 13



Page 201

A Yes, I do.
Q All right. Go ahead. I'm sorry. I'm sorry.
A You know, in usual situations where we are not dealing with an elected official with statutory limitations or protections or whatever you want to call it, the Public Works Director, the minute the allegation was made we put the public work -- the former Public Works Director on paid administrative leave. I do not have that option with Sheriff Antinoro.
Q All right. So now we have got the report, Ms. Keener is still roughly in a -- at that time frame the report comes out is still in a somewhat undefined role, yes or no?
A Yes and no. A role that had partial defining that's still being further refined and defined.
Q All right. So then at that point in time what other actions were taken now in regards to both Mr. Antinoro and Ms. Keener?
A With Ms. Keener we pretty much kept with the plan to keep her on as our Director of Security/Bailiff, and continued to seek additional either responsibilities or ownership or projects. The camera project or others.
With Mr. Antinoro, my actions were focused on consultations with multiple counsels that said, "What options do I have? Here is the report."
Q After this investigation was completed -- well, scratch that.
During the course of this investigation several individuals gave testimony, provided documents, et cetera, right?
A To Mr. Christensen?
Q Yes.
A Again, I think that would be the first 31 pages, assumably. But I believe so, yes.
Q Were there recorded statements given? Because you can't put a recorded statement on the paper unless it's a transcript.
A I honestly don't know because I haven't seen the report in 18 months or so.
Q Has Ms. Keener ever been provided those written -- those written statements or recorded statements or any of the documents?
A I can't answer that. Mr. Osborne possibly would. I don't know. I don't believe so.
Q Did Ms. Keener request to receive those?
A I believe so, yes.

Page 203

Q Okay. I am going to have this marked as Plaintiff's Exhibit 3, please.
(Whereupon Plaintiff's Exhibit 3 was marked for identification.)
BY MR. FLANGAS:
Q I am showing you what's been marked as Plaintiff's 3, and it apparently has two -- three pages to it. It's missing the first page, but if you go back to -- I am going to come back to that because when they made the copies they left the first page off. So -- and next break I will get that.
So after this report comes out we know we have talked about where Melanie was -- Ms. Keener was at that time. The report's out, she's requested some of the materials. The materials have not materialized yet, or she didn't get the materials as requested. So what happened next in all this?
A As I recall, we were still trying to determine what materials could and couldn't be provided to you.
Q And who was making that decision?
A Combination of counsels. Ms. Langer, and I believe at that stage probably still Ms. Parks, and Austin and I. But ultimately, legal counsel. And there is another element of counsel in there. When I mentioned Ms. Langer, to the best of my memory our Chief Deputy District Attorney, Keith Loomis was also providing input.
Q What did -- what actions did Ms. Langer take during all this?
A Primarily provided us legal advice as to her opinions as to what we should and shouldn't do under -- under law.
Q Did Ms. Langer ever undertake a criminal investigation of Mr. Antinoro?
A I don't believe so.
Q Did she undertake any type of investigation of Mr. Antinoro?
A Not that I am aware of.
Q How many people work in the DA's office?
A Four, plus a victim's advocate. So four plus.
Q Are they all attorneys?
A No. No. Only two are.
Q So Ms. Langer. Who is the deputy?
A Chief Deputy District Attorney Keith Loomis.
Q And then the others are what other positions?
A We have a -- not sure of their actual

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/24/19 Page 11 of 13



Page 205

positions. One might be an ad -- a high level administrative assistant or administrative manager, Deborah Burns. She may or may not have a paralegal, I don't know. And then we recently hired Theresa Sergeant, again, who may or may not have a paralegal. I don't know. And then I neglected to mention she also uses outside contract counsel.

Q This report, which is Exhibit 1, the findings by Mr. -- by Mr. Christensen, was it ever provided to the county commission?

A No, sir.

Q Who was it provided to?

A To the best of my knowledge, to our District Attorney, to -- to me to review, not to copy or disseminate. I think it came from Ms. Parks. So that's an obvious answer, and then portions were released to Ms. Keener.

Q The portions that are found in Exhibit Number 1?

A That would be my guess, sir.

Q How come it wasn't provided to the county commissioners?

A I would tell you that was advice of counsel.

Q Which counsel?

Page 206

A Either Ms. Langer and/or Ms. Parks, I believe.

Q I am going to ask, and you can object, Mr. Rand.

What was their -- what was the intent of not providing it to the county commission?

MR. RANDS: Objection. That calls for -- I am going to instruct you not to answer. That's attorney-client privilege.

THE WITNESS: Okay.

BY MR. FLANGAS:

Q I am going to certify the question, please, because I don't -- I am not quite sure that that falls under attorney-client privilege.

Has the county commission ever been made aware of these charges of Ms. Keener about Mr. Antinoro?

A Not through a formalized open meeting. There have been discussions. I'm sure some of those are limited upon the advice of counsel. There has been public releases of probably this portion of the document. There's been a lot of press and media coverage.

Q Let's talk about that press and media coverage. Mr. Antinoro put out some type of press

Page 207

release saying that he and Ms. Keener resolved their differences or something?

A I recall seeing or hearing something, yes, sir. It might have been in an interview.

Q You didn't like that, did you?

A As I recall at the time, I, again, still trying to preserve and protect Ms. Keener's status, I didn't believe it to be true. I confirmed it wasn't true, or Ms. Keener confirmed it with no uncertainty to me that it wasn't true. And, yes, I did not like it.

Q And you also are protecting the county in that type of situation as well, right?

A No, sir, I'm not.

Q So as the risk manager and county manager you are not doing much to protect the county?

A I am saying I --

MR. RANDS: Objection. Argumentative. Go ahead and answer.

THE WITNESS: I am saying I felt like I had no control over what Sheriff Antinoro said or didn't say.

I can't tell him what to do.

BY MR. FLANGAS:

Q Can I have that marked as number 4?

Page 208

(Whereupon Plaintiff's Exhibit 4 was marked for identification.)

BY MR. FLANGAS:

Q Sir, I am showing you what's marked as number 4. This is Bates stamp number MK 0079. It's an e-mail from yourself to Ms. Keener, right?

A Yes, sir.

Q Dated March 14, 2017?

A Yes, sir.

Q Is this an e-mail that you did draft and send to Ms. Keener?

A It would certainly appear so, so I will say yes.

Q And this is because Mr. Antinoro wrote -- or not wrote. Did -- you know, made some type of statement that they had settled their differences?

A That's what it appears in here and that's what I recall, yes, sir.

Q How long after Mr. Antinoro made his statement did you write this e-mail?

A I would think within days, and days being a few. I seem to recall Ms. Keener being upset. I understood that, and to the best of my knowledge I had no belief that there was an

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/14/19 Page 12 of 13



Page 213

seems like we had a -- probably an in-depth supervisor -- I am not going to call her subordinate. Employer-employee discussion as to the angst that this had created probably the night before. I may have offered, she may have asked, I can't recall, to say, "let me try to help you by maybe drafting up something."

I am not going to say unsolicited or solicited.

Q But you did draft it, right?

A Undoubtedly, yes, sir.

Q At this juncture in time, where we have been going, did -- was there any action taken against Mr. Antinoro?

A Not against Mr. Antinoro. We did not authorize initially -- and I can't say when. We did not authorize replacement of Melanie's position as Chief Deputy.

Q Well, you couldn't anyway, could you?

A Well, we could have, but we didn't.

Q Have you ever heard of a form of sexual harassment -- well, scratch that.

But didn't it interest you as the County Manager and the risk reduction officer for the county that Ms. Keener is no longer the Chief Deputy and now

Page 214

Mr. Antinoro's good buddy, Tony Dosen ends up in her spot?

A I will say yes, sure.

Q Makes you wonder, right?

A Yes.

Q All right. So as we proceed along this rough timeline there was no action taken against Mr. Antinoro whatsoever?

A I could not find any action to take.

Q You couldn't find any, right?

A Yes, sir. Nor could my counsel.

Q Nor could your counsel. Okay. So you guys all felt that you had no ability to take any action against Mr. Antinoro; is that a correct statement?

A Yes. But depending on time frame.

Q At any time since this happened have you -- has Mr. Antinoro been disciplined for what he did to Ms. Keener?

A No.

Q Has there been any action taken against Mr. Antinoro since this occurred with Ms. Keener?

A No, because I can't find any action to take legally.

Q So now we've got a -- we know Ms. Keener

Page 215

is honest, we know she's hard working, we know she's dedicated, right?

A Yes, sir.

Q We know that she has passion for law enforcement, right?

A Yes, sir.

Q By your own writing you knew that she wanted to be the chief deputy, right?

A Yes, sir.

Q We know she was chief deputy; correct?

A Yes, sir.

Q We know she worked hard to get to be chief deputy, right?

A Yes, sir.

Q We know she performed her duties as chief deputy well, correct?

A I have no reason to say otherwise.

Q No reason to say otherwise. We know by the report that Mr. Antinoro harassed her, right?

A Yes. The findings sustain that.

Q Findings sustain that. So as the dust settles, Mr. Antinoro has no discipline, no action taken against him, right?

A Not by the county.

Q Not by the county, by anybody. Has

Page 216

anybody done anything to him?

A Well, I would say at some point in this process the recall election, and I recall a conversation I believe I had with Ms. Keener. You know, part of my job as the county manager, if you will, is to look and assess options if a recall election is successful or not.

Q What was the county's role in the recall election?

A Limited only to procedures identified through the Secretary of State's office.

Q Yeah.

A But my role is should the -- the timeline, as I recall it, is if the recall would have come out positive there is a very short window period of time, and we needed another sheriff. So my involvement, self-acknowledged, was to go to multiple people and say, "do you have any interest in considering being the sheriff" until the -- the next term."

Q So what you are telling me, the county did nothing and you relied on outside parties to -- to generate a recall election, right?

A I am telling you the county could find no path that was legally established to do anything.

Case 3:17-cv-00498-RCJ-CBC Document 48-3 Filed 01/24/19 Page 13 of 13



Page 241

don't know what that is, sir.
BY MR. FLANGAS:
Q And you don't agree with Mr. Miller that Ms. Keener's law enforcement career is over?
A I think we've covered that. I would say I don't want to believe it is. I would -- I asked her, as I have stated earlier, to consider moving to the county for a short period of time to succeed the sheriff if the recall was effective.
MR. FLANGAS: Y'all's indulgence for a minute.
I don't think I have any further questions.
MR. RANDS: All right. I don't have any questions.
THE WITNESS: Thank you, sir.
MR. RANDS: We will take the original and make sure it's presented for signature.
MR. FLANGAS: What's that?
MR. RANDS: Original.
MR. FLANGAS: Transcript, yeah.
MR. RANDS: Yeah.
(The deposition adjourned at 3:31 p.m.)
-oOo-

BONANZA REPORTING & VIDEOCONFERENCE CENTER (775) 786-7655

Page 242

-oOo-

I, Patrick Whitten, hereby declare under penalty of perjury that I have read the foregoing pages 1 through 242; that any changes made herein were made and initialed by me; that I have hereunto affixed my signature.

Dated: ____________________

____________________
Patrick Whitten

Page 243

ERRATA SHEET/CORRECTIONS

| PAGE | LINE | |
|---|---|---|
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |
| ___ | ___ | ________________ |

Page 244

STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, MICHELLE BLAZER, a Certified Court Reporter for the State of Nevada, do hereby certify;

That on Wednesday, the 21st day of March, 2018, at the hour of 9:07 a.m. of said day, at the offices of Bonanza Reporting & Videoconference, 1111 Forest Street, Reno, Nevada, personally appeared Patrick Whitten, who was duly sworn by me, was thereupon deposed in the matter entitled herein, and that before the proceeding's completion the reading and signing of the deposition has not been requested by the deponent or party;

That the foregoing transcript, consisting of pages 1 through 244 is a full, true, and correct transcript of my stenotype notes of said deposition to the best of my knowledge, skill, and ability.

I further certify that I am not an attorney or counsel for any of the parties, nor relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

DATED: At Reno, Nevada, this 26th day of March, 2018.

____________________
MICHELLE BLAZER, CCR #469 (NV) CSR #3361 (CA)