Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 1 of 96

Exhibit 4

IN THE FIRST JUDICIAL DISTRICT COURT
OF THE STATE OF NEVADA
IN AND FOR THE COUNTY OF STOREY, NEVADA

-o0o-

MELANIE KEENER, :
: Case No.
Plaintiff, : 17 TRT 00001 1E
:
vs. :
:
GERALD R. ANTINORO, an individual; :
STOREY COUNTY, a political :
subidivision of the State of :
Nevada; et al., :
:
Defendants. :
=====================================================

DEPOSITION OF

GERALD ANTINORO

February 8, 2018

Reno, Nevada

Reported by: DIANNE M. BRUMLEY, NV CCR #205
California CSR #6796

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 3 of 96



A Again, organizational management.
Q What year did you graduate and get your master's?
A I think it was -- I think that was the one in 2009 and the bachelor's would have been in 2007, somewhere right around there.
Q And this was on-line again?
A Yes.
Q Where were you located when you did --
A Virginia City.
MR. RANDS: Let him finish his question before you answer. It just makes it easier for everybody.
BY MR. FLANGAS:
Q Thanks, I was getting ready to say that. That just reminded me of another thing, too. Occasionally your attorney will, and I'm not going to say most likely, but absolutely will object at one point in time. Unless you're instructed not to answer, you're going to have to answer the question. Do you understand that?
A Yes.
Q The next bachelor -- excuse me, master's degree, where did you get it from?
A Chicago School of Professional Psychology.
Q What year?
A I think that was 2011 or 2012.

Q On-line course again?
A Yes.
Q Where were you when you did the course?
A Virginia City.
Q With your master's degree in -- did you get it in psychology?
A Yes.
Q With your master's degree in psychology, does that give you any other certifications to do certain types of occupations or anything like that?
A No.
Q Just to kind of get a timeline, when did you graduate high school?
A 1982 is when I finished.
Q Where did you finish high school?
A San Juan County High School.
Q California?
A Blanding, Utah.
Q Can you spell Blanding?
A B-l-a-n-d-i-n-g.
MR. RANDS: I've been to Blanding.
BY MR. FLANGAS:
Q Can't say I have. What is your present occupation?
A Sheriff of Storey County.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 5 of 96



Q How long have you been sheriff?
A For seven years.
Q It's an elected position?
A Yes.
Q What year were you first elected or appointed or however the case may be?
A I was elected in 2010, took office in January of 2011.
Q Prior to your election as sheriff of Storey County -- before I go into that, do you have any other occupations now other than sheriff of Storey County?
A No.
Q Prior to your election as sheriff of Storey County, what did you do?
A I worked for the sheriff's office in Storey County.
Q In what capacity? And then I'm going to be asking you from when to when.
A Started working there in 2006 in the positions of deputy, corporal, lieutenant, chief deputy and assistant sheriff during those years.
Q When you started with the Storey County Sheriff's Office, you started as a deputy?
A Correct.
Q And how long were you a deputy?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 6 of 96



A About a year-and-a-half, I believe.
Q Who was your supervisor while you were a deputy?
A There were a few of them, so I think Ken Quirk and Jason Dias were the patrol sergeants when I first started.
Q Jason Diaz, D-i-a-z?
A D-i-a-s, I believe.
Q And then about a year-and-a-half later you got promoted to corporal?
A Yes.
Q From when to when?
A I think it was 2007 to 2008 I was a corporal and Quirk and Dias would have been sergeants and Christopher Parsons would have been second in command.
Q When you started with the sheriff's office of Storey County, who was the sheriff?
A Jim Miller.
Q When you became a corporal, was Mr. Miller still sheriff?
A Yes.
Q Was he still sheriff the entire time you were corporal?
A Yes.
Q Then it sounds like you moved up from corporal

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 7 of 96



A No.
Q Why not?
A She was terminated during a layoff process and then she came back as a reserve, but found other employment, other full-time employment.
Q Are you aware of an allegation that she had sex with Anthony Dosen?
A I have heard that, yes.
Q When you heard that, what was your position?
A I was the sheriff.
Q And when you were told that, did you do anything?
A Yes.
Q What did you do?
A I believe I spoke with both of them.
Q And what did you discover?
A I was told that it was a consensual thing and I told them make sure it did not occur on duty or anywhere about the sheriff's office.
Q Were you told that it occurred on duty?
A No, I was not.
Q Do you know an officer by the name of Valdez?
A Yes.
Q What's his first name?
A Frank.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 8 of 96



Q Were you told that Mr. Valdez walked in on them?
A I don't recall being told that, no.
Q Did Miss Morgan ever go to the A.G.'s office or the D.A.'s office or anything?
A Not to my knowledge.
Q About you?
A Excuse me?
Q Let me rephrase my question. Did she ever go to the A.G.'s office or the D.A.'s office about you?
A Not to my knowledge.
Q When she was let go, were you sheriff?
A No.
Q When she came back, you were sheriff?
A Yes.
Q When she was let go, what was your position?
A I believe it was either chief deputy or lieutenant.
Q And she was laid off basically?
A Yes.
Q What are your duties as sheriff? And I know there's a lot, so kind of go slow.
A Basically to oversee the operations of the sheriff's office, providing public safety, enforcement of the law.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 9 of 96



Q What else?
A Service of civil process.
Q Go ahead.
A Investigation of crimes, the standard law enforcement.
Q Anything else?
A I'm sure there is. I don't know, I should have brought a job description, but it's standard law enforcement and running the office.
Q You mentioned you oversee operations of the office, right?
A Correct.
Q Does that include supervision of employees?
A Yes.
Q When I say employees, I mean supervision of employees of the sheriff's office; is that correct?
A Yes.
Q And that would mean supervision of all employees of the sheriff's office, correct?
A Yes.
Q Do you also oversee the jail?
A Yes.
Q So there's another duty from your job description, right?
A Yes.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 10 of 96



Q And the folks that run the jail, they're employees of the sheriff's office as well?
A Yes.
Q As the supervisor of the employees, you have policies, right?
A Yes.
Q And is it your job to make sure the policies are being enforced?
A Yes.
Q And a lot of these policies are written, would you agree?
A Yes.
Q And some of the policies come down from the county itself, is that a correct statement?
A There's a deference to the county on some policies, yes.
Q And this deference to the county on some policies, can you give me some examples?
A The federally mandated things, employment issues, ADA, EEOC stuff.
Q That comes down through the county?
A Yes.
Q And as the sheriff of the -- as the sheriff and supervisor of all the employees of the sheriff's office, it's your responsibility to make sure that those

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 11 of 96



policies are enforced?
A Yes.
Q Would you agree as the sheriff the buck stops with you as an enforcement of these policies?
A Yes.
Q And if you find that people in your department aren't complying with these policies, you need -- as the supervisor and the sheriff, you need to do something about it, is that a correct statement?
A Yes.
Q And the gamut can run from simply counseling to termination?
A Yes.
Q And the severity probably of the consequence for violating the policy would probably coincide with the egregiousness of the violation?
A Yes.
Q As the sheriff, are you responsible for making sure your employees know the policies?
A Yes.
Q Now, as the sheriff, you're the leader of your department, right?
A Yes.
Q And as the sheriff, you would want your -- you'd want to set the example for your employees,

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 12 of 96



correct?
A Yes.
Q So if you're engaging in -- if you're conducting yourself -- let me scratch that.
You then would probably want to conduct yourself in an above-board manner because you are the sheriff, right?
A Yes.
Q Because if you're violating the policies, that could be construed to be a green light for others to violate the policies, would you agree?
A Yes.
MR. RANDS: Objection, calls for speculation.
BY MR. FLANGAS:
Q Some of the policies you told me about is you had some of the county policies that come down federally mandated, ADA, EEOC. Now, when you mentioned EEOC, that would involve sexual harassment?
A Yes.
Q And does the county have its own policies pertaining to sexual harassment?
A Yes.
Q And that policy is binding on the sheriff's department, correct?
A Yes.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 13 of 96



Q And you mandate that all of your employees comply with that policy, is that a correct statement?
A Yes.
Q If I'm not mistaken, that policy requires sexual harassment training?
A Yes.
Q How frequently?
A I think the county requires it every two years, every other year basically.
Q Who is responsible for conducting that training?
A The county usually provides it.
Q And who is responsible for insuring that the employees of the sheriff's office attend or participate or get that training every couple of years?
A My staff makes sure that everyone attends.
Q Who is ultimately responsible for making sure that happens?
A I am.
Q Because you're responsible for making sure that your employees are complying with the policies, that would involve you knowing what the policies are, is that a correct statement?
A Yes.
Q And because you're a conscientious sheriff, you

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 14 of 96



read and understand all the policies that affect your department?
A Yes.
Q Most of the policies that we've been kind of talking about especially, and let's just go specifically, the sexual harassment policies are pretty clear, would you agree?
A For the most part, yes.
Q And they define -- the sexual harassment policies define what behavior is appropriate and what behavior is not appropriate, is that a correct statement?
A Generally speaking, yes.
Q And the message conveyed by those policies are roughly zero tolerance, is that a correct statement?
A Pretty much, yes.
Q And being a conscientious sheriff, have you communicated that to your people that there is zero tolerance for violation of sexual harassment policies?
A I believe that's been communicated.
Q Have you -- other than this case right now, have you ever been accused of sexual harassment?
A No.
Q Have you ever been accused of engaging in unwarranted sexual advances?

A Not to my knowledge.
Q When you say not to your knowledge, can you elaborate what you mean by saying not to your knowledge? Because common sense would dictate if somebody is accusing you, it would probably be brought to your attention, would you agree?
MR. RANDS: I'm going to object, it's argumentative. Not to my knowledge is self-explanatory, but go ahead and answer.
THE WITNESS: I think it's pretty much self-explanatory, yes, but living in a political world, there's always lots of allegations and lots of rumors that are abounding. As far as any kind of formal allegation or realistic based allegation or anything like that, not to my knowledge.
BY MR. FLANGAS:
Q All right. So has there been political allegations involving sex, sexual harassment, unwarranted sexual advances or anything of that nature?
A Tons of them.
Q Okay. Give me the most recent ones. Who made the allegation, what was the allegation and what was the allegation about?
A I was accused of rape by a woman in Sparks which was a bogus allegation.

Q When was that?
A When was the allegation made?
Q Yes.
A In 2014.
Q When was the alleged rape alleged to have occurred?
A It must have been 2006 or 2007.
Q And what was the lady's name?
A Daisy Duke according to the complaint.
Q Was that a fictitious name?
A Yes.
Q To protect her identity?
A That's my understanding, yes.
Q What was the lady's real name?
A Jennifer something or another, I think. I won't swear to that.
Q What was the final result of all this accusation?
A Nothing.
Q Were you contacted by law enforcement?
A I was not. I contacted them to see if they wanted to talk to me and they said they didn't want to.
Q When you say "they" --
A Sparks Police Department.
Q Thank you. Was anybody else accused of rape by

Miss Duke or Jennifer, however you want to describe her?

A Not to my knowledge, but I don't know the woman. I don't know who all she's made allegations against.

Q Had you ever met the woman?

A Yes.

Q Where did you meet her?

A On a couple of different occasions I met her socially.

Q Where did you meet her socially and when?

A I couldn't tell you the specific date, but I believe she was at a Christmas party that the sheriff's office had in 2006 or 2007, and then I believe that I met her once socially with a group of people at some restaurant maybe in Sparks. I don't recall the specifics of it.

Q Did you ever date her?

A No.

Q Did you ever end up with her in a one-on-one situation?

A Yes.

Q Where did that occur?

A At her residence.

Q What year was that?

A I believe it was 2006 or 2007.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 18 of 96



Q What were you doing at her residence?
A Engaging in a one-on-one situation.
Q Did you have sex with her?
A Yes.
Q And then she accused you of raping her?
A Seven years later.
Q Over that encounter?
A Yes.
Q Did you have sex with her more than once?
A No.
Q So you met her at the Christmas party and then with a group of people at a restaurant. At one of these two social situations, when did you end up back at her residence, or was this a third type of --
A That would have been a third time.
Q Did you all go out first?
A No. I was just invited to her residence.
Q Did you rape her?
A I did not.
Q In your opinion, why was she accusing you of rape?
A Politics.
Q Can you elaborate on that, please?
A Yeah. Storey County has a history of dirty politics and when you start looking at all of the people

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 19 of 96


involved and all the allegations and when they're made and what they're made, it's pretty self-explanatory. It's dirty politics.

Q That's kind of conclusory, so maybe you can tell me who do you think in your opinion was behind this to try to get her to come forward and say that you raped her?

A That I couldn't tell you.

Q Then how do you base your conclusion that it was dirty politics of Storey County?

A Because I know Storey County politics.

Q But you don't know who would have spread this story or who would have been behind the story or who would have tried to facilitate the outing of this story or anything like that?

A There's a lot of people who have been involved in the spreading of the story, but who was behind it, I could not tell you.

Q Who was involved in spreading the story?

A Stuart Handte, Jim Miller, Lance Gilman.

Q And you saw them do this or heard them do this?

A I've heard of it, yes.

Q And who did you hear this from?

A Some of it is in the report that the Sparks Police Department did. Some of it is just word of

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 20 of 96



A Lore Vanderbusse.
Q Excuse me, before I go into Miss Vanderbusse, where does Miss Hutchins live these days?
A Salt Lake City, Utah.
Q Do you have her address?
A I do not.
Q Phone number?
A I do not.
Q I didn't mean to interrupt you. Go on to the next lady.
A Lor Vanderbusse.
Q L-o-r-i?
A L-o-r-e, V-a-n-d-e-r-b-u-s-s-e.
Q When were you married to her?
A In total, from --
Q Let's go in chronological -- I'm assuming she's the one you married twice?
A Yes.
Q So the first time you were married to her?
A 1993 or '94 is when we got married initially and that lasted until I think 2004, and then we got divorced for 30 days and got remarried and that lasted until, I believe, 2009.
Q Okay. And then you got married again?
A Yes. I got married last April.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 21 of 96



Q Her name?
A Laura.
Q What was her maiden name?
A DeSimone.
Q Can you spell that, please?
A D-e-S-i-m-o-n-e.
Q Still married?
A Yes.
Q Who is Anthony Dosen? I kind of touched on him a little while ago, but I need to get a little more background on him.
A He's an employee of the sheriff's office.
Q What's his position?
A Currently he's the chief deputy.
Q How long has he been your chief deputy?
A About a year-and-a-half.
Q Did he take over after Miss Keener?
A Yes.
Q What was Mr. Dosen prior to becoming your chief deputy?
A He was jail sergeant for a period of time, he was an investigator for a period of time, was deputy for a period of time.
Q Are you and Mr. Dosen friends?
A Yes.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 22 of 96



Q Who is John-Michael Mendoza?
A He's one of the deputies with the sheriff's office.
Q How long has he been with the sheriff's office?
A Pretty much forever. I think he was --
Q Was he there when you came?
A He was hired by Bob Del Carlo if I remember correctly which would put it back prior to 1998.
Q And Bob Del Carlo was the sheriff?
A Yes.
Q And who was sheriff subsequent to him?
A Pat Whitten.
Q And that's spelled W-h-i-t-t-e-n; is that correct?
A Yes.
Q Mr. Whitten is now the county manager?
A Yes.
Q We'll come back to him in a minute. Who is Kenneth Quirk?
A Former deputy with the sheriff's office.
Q How did it come to pass that you first started with the sheriff's office?
A I was looking for a job and Ken told me that the sheriff's office was hiring.
Q And prior to coming to Storey County Sheriff's

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 23 of 96



Office, what did you do?
A I worked for the State of Nevada.
Q Where at?
A Transportation Services Authority is what it's called now.
Q Back then it was called?
A Now it's called Nevada Transportation Authority. It was the Transportation Services Authority when I worked there.
Q And you worked there from when to when?
A From January of 2005 until about the middle of 2006.
Q Where were you located?
A In Las Vegas.
Q What was your position?
A I was the chief of enforcement.
Q Who did you report to?
A The Commission, the Transportation Commission. There were three commissioners.
Q Did you say eight commissioners?
A There were three.
Q Who was the chief of the Commission or chairman or however you describe it?
A Well, there were three different chairs, I believe, if I remember correctly during my time there,

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 24 of 96



but the main one -- the one who appointed me would have been Sandy Avance and then the one who invited me to leave was Kimberly Rushton.

Q Why did Miss Rushton invite you to leave?

A Couldn't tell you. She never gave me a reason. She just said my services were no longer necessary.

Q Was there an incident or series of incidents where you kind of did a cocaine bust and then put the evidence in a drawer at the TSA?

A No.

Q So if Miss Rushton were to testify to that, she would be untruthful?

A It may have been involving some of my investigators. I was not directly involved with it. To my knowledge, everything was handled according to procedure.

Q You didn't store cocaine in one of the desk drawers at the NTA's office?

A No, I did not.

Q You didn't break the chain of command on that? Excuse me, the chain of custody on that?

A No, I did not.

Q Was it true that Metro was very irate at you because you crossed into their cocaine investigations or something to that effect?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 23 of 96



A Not to my knowledge. I met with the sheriff of Clark County on a regular basis and never was a word said to me about it.
Q Were you aware that Governor Guinn wanted you gone because you had done those things?
A News to me.
Q So no reason, she just said she wanted you to leave?
A It was an appointed at-will position.
Q Did she call you into your office?
A Yes.
Q Who was present when she said your services were no longer necessary?
A She and I.
Q Do you know Keith Sackelhide?
A I do.
Q And who is Mr. Sackelhide?
A He was a former Commissioner with the Transportation Authority.
Q Was he on the Transportation Authority when you were the chief enforcement officer?
A He was one of the -- I believe he was the in-house legal counsel or something of that nature. He was not a Commissioner at that time.
Q Did you ever have any -- let me see how to

phrase this, any issues with Mr. Sackelhide between you and he in how you were doing your job?

A No. I believe he left the agency right around the same time I became the chief of enforcement and didn't come back until after I was gone, so I knew who he was, but we only worked together for a very brief period of time.

Q Did Mr. Sackelhide have anything to do with you having to leave your job as chief enforcement officer for the Transportation Authority?

A Like I said, not to my knowledge. He wasn't even involved with the agency at that time.

Q Going back to Kenneth Quirk, you were no longer -- I guess you were let go by the Transportation Authority, just told your services were no longer necessary and you were looking for a job. Who helped you find the job at Storey County?

A Ken said they were hiring, so I guess Ken did.

Q Who did?

A Ken.

Q Mr. Quirk?

A Yes.

Q So he called you or what?

A I came out to test for another position in this part of the state and he at that time told me that

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 27 of 96



Storey County was also hiring, so I applied there, also.
Q And who hired you at Storey County?
A Jim Miller.
Q Are you aware that Jim Miller was mad at Mr. Quirk for recommending you because you had things in your background that he covered up?
A News to me.
Q Had you ever heard anything to that effect?
A Just the rumors.
Q What rumors have you heard?
A Just that, that Ken supposedly covered up things from my background. I don't know what things because there's nothing in my background.
Q You changed your name, right?
A Yes.
Q What was your original name?
A Gerald Cook.
Q Why did you change your name?
A I retook my family's Italian last name.
Q And when did you do that?
A In 2002-ish, give or take a year.
Q Is the reason you changed your name is because there were things in your background under the name Gerald Cook?
A No.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 28 of 96



Q Did she tell you that he was harassing her?
A I don't know what the exact wording was.
Q What was the exact wording?
A That's what I just said. I don't know what the exact wording was. I would have to go back and look at any notes that I still have on that.
Q So you took notes on this?
A I did.
Q Did you open up a file?
A I did not.
Q Do you take it as serious charges that your deputies might be stalking or harassing a woman?
A I take it very serious.
Q So what you looked at is what she said and it didn't line up with what Frank Valdez said, so you didn't let it go any further; is that correct?
A She never requested it to go any further. We talk several times, as I said. She presented her side, I talked to Frank and got his side and she said she just wanted him to leave her alone, and to my knowledge that's what happened.
Q Was Mr. Valdez ever counseled, written up or anything like that?
A Like I said, there was no policy violation in there and the matter was discussed with him and I was

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 29 of 96



assured that it was going to -- there wouldn't be any more issue and apparently there was not.

Q All right. Let's talk about policies here. If I could have that marked as Plaintiff's Exhibit 1, please.

(Exhibit 1 was marked.)

BY MR. FLANGAS:

Q I'm showing you what is marked as Plaintiff's Exhibit 1. Do you have that in front of you?

A Yes.

Q I'm going to direct your attention down to the lower right-hand corner. There's some numbers there. You'll see MK 048 and you're going to see MK 049 and then MK 050. Do you see that?

A No.

Q In the lower right-hand corner?

A There's 0048, 0049. You missed a zero.

Q Okay, that's fine. So we're clear, we got MK 0048 and we got MK 0049, right?

A Yes.

Q And then we have MK 0050, is that a correct statement?

A Correct.

Q Those are all Bates stamp numbers. Do you understand that now?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 30 of 96



A Yes.
Q That's kind of what's used to identify documents. Now, in the center bottom of the page, it says Storey County Administrative Policies and Procedures. Do you see that?
A Yes.
Q And it says that MK 0048 is Page 18 of 166, right?
A Yes.
Q And the next one is Page 19 of 166, is that a correct statement?
A Yes.
Q And the next one is Page 20 of 166, is that a correct statement?
A Yes.
Q Is this part of the Storey County Policies and Procedures?
A It appears to be.
Q All right. And the subject is anti-harassment, is that a correct statement?
A Yes.
Q And then it has the policy listed on there, right?
A Yes.
Q And it says, "The employer promotes a

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 31 of 96



productive work environment and does not tolerate verbal, physical, written or graphical conduct/behaviors that harass, disrupt or interferes with another's work performance, or that creates an intimidating, offensive or hostile environment based on that person's race, color, religion, age, gender, sexual orientation, national origin, ancestry, disability, veteran status, genetic information, domestic partnership, or any other basis that's inappropriate or offensive." Did I read that correctly?

A Yes.

Q Now, as sheriff of Storey County, you're responsible for instituting that policy, is that a correct statement?

A Generally speaking, yes.

Q Let's clarify that statement. You're responsible for instituting that policy for the employees of the sheriff's department of Storey County; is that a correct statement?

A Generally speaking, yes.

Q Why do you say generally as opposed to you are the one that's supposed to insure that this is done?

A Well, ultimately the buck stops with me being the sheriff, but I don't necessarily deal with each individual employee one-on-one. That's why I have

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 32 of 96



Q Then 20 says, "Offensive written communications including notes, letters, notices, e-mails, texts or any other offensive message sent by electronic means." Do you see that?

A Yes.

Q And again, this is listed under prohibited conduct, right?

A Yes.

Q As the sheriff of Storey County, you are responsible for insuring that this conduct is not occurring with employees of the sheriff's department, is that a correct statement?

A As I say, generally speaking, yes.

Q And again, 21 under prohibited conduct says, "Offensive gestures, expressions and graphics, including leering, obscene hand or finger gestures, sexually explicit drawings, derogatory posters, photographs, cartoons, drawings or displaying sexually suggestive objects or pictures." Is that what it says?

A Yes.

Q And again, as the sheriff of Storey County, you're responsible for insuring -- ultimately responsible for insuring that your employees aren't engaging in that type of behavior, is that a correct statement?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 33 of 96



A Again, as stated, generally, yes.
Q Let's look at MK 0050 which is the third page of this document. I'm going to direct your attention to the top under where it says subsection III, supervisor/manager responsibilities. Do you see that?
A Yes.
Q It's got a paragraph and the last sentence in that paragraph starts, "A supervisor or manager's failure to immediately report such activities, complaints or allegations will result in discipline, up to and including termination." Is that a correct -- did I read that correctly?
A Yes.
Q Okay. So let's say your chief deputy had become aware of that and failed to report it, that chief deputy could be subject to termination, correct?
A Yes.
Q That would also involve probably your patrol sergeants as well, right?
A Yes.
Q Because they're in a supervisory position, is that a correct statement?
A Yes.
Q Now, if your chief deputy -- I'm giving you a hypothetical. If your chief deputy was to have heard of

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 34 of 96



improper sexual conduct on the part of an employee in the department and failed to report it, who would have the authority to fire that chief deputy?

A I would as the sheriff.

Q Let's look under investigation here for a minute which is subsection IV on the same page, MK 0050. Let's go down to the fifth paragraph, and you can read along with me.

It says, "If it is determined that a violation of this policy has occurred, the employer will take remedial action against the perpetrator commensurate with the severity of the offense. Such remedial action may include, but is not limited to, a counseling, verbal warning, written reprimand, transfer, demotion, suspension without pay, and/or termination. The employer will also initiate action to deter any future prohibited conduct/behaviors from occurring." Did I read that correctly?

A Yes.

Q And as the sheriff of Storey County, this is a policy that needs to be enforced within your department, correct?

A Yes.

Q And you're responsible ultimately for enforcing that type of policy, is that a correct statement?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 35 of 96



A Yes.

Q All right. Now, you mentioned earlier you read the complaint in this action?

A Yes.

Q Let's go ahead and just for purposes of having it in front of him, let's mark a copy of this complaint as Exhibit 2.

(Exhibit 2 was marked.)

BY MR. FLANGAS:

Q What's in front of you has been marked as Plaintiff's Exhibit 2. It's a copy of the complaint. Would you please look through it and see if this is a copy of the complaint that you reviewed?

A It appears to be.

Q And look at the first page of it. This one is not Bates stamped because it's really not an exhibit that's exchanged between counsel, but if you look up in the upper right-hand corner, it says filed July 13, 2017, Storey County Clerk, right?

A Yes.

Q And it says in the First Judicial District Court of the State of Nevada, right?

A Yes.

Q In and For the County of Storey County, correct?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 36 of 96



A Yes.
Q And it's got a case number and a department number, right?
A Yes.
Q So that would also militate that this is the complaint that was filed in this action, would you agree?
A Yes.
Q Let's look at some of the allegations. Let's look at some of the more simple ones. On the first page, allegation number two, it says -- it alleges that you're a resident of Storey County. Are you in fact a resident of Storey County?
A Yes.
Q How long have you been a resident of Storey County?
A Since 2006.
Q Since 2006 have you ever lived outside of Storey County?
A No.
Q And the residence you live within is within the geographical confines of Storey County?
A Yes.
Q All right. Let's just go to number six. These are very mundane questions, but however I just want to

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 37 of 96



get them verified.
As the sheriff of Storey County, you're the head of the sheriff's office for Storey County, right?
A Yes.
Q And the sheriff's office is a department of Storey County, is that a correct statement?
A No.
Q What is the sheriff's department?
A The sheriff's office is an office of Storey County.
Q So you don't call it a department, you call it an office?
A Yes. It's an elected office. It's not a department of the county government.
Q Okay. You're an elected office, but your sheriff's office is a -- let's go back to number six here. Staying on number six, it says, "The sheriff of Storey County, Mr. Antinoro is the head of the sheriff's office for Storey County," and then it has in there, "Hereinafter the sheriff's office." Do you see that?
A Yes.
Q All right. So do you call yourselves the sheriff's office, or do you guys call yourselves the sheriff's department, or what do you call yourselves?
A The sheriff's office.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 38 of 96



Q Now, is the sheriff's office a department? Not your elected position, but is the sheriff's office as defined here a department of Storey County?

A Technically I guess it would be correct. I view it as being the office of the sheriff which is a part of Storey County Government, but it's not a department of the county government.

Q All right. Number seven, it basically says, and I think you've already answered this, you're responsible for making employment and management decisions for the sheriff's office, right?

A Yes.

Q And you're the ultimate decision maker there, correct?

A I think so, yes.

Q Now, Miss Keener, she was your chief deputy at one time?

A Yes.

Q And I think you said for about a year-and-a-half, I believe?

A Pretty close.

Q Excuse me, I don't think I've even asked you how long. Let's start over on that. Miss Keener was your chief deputy, correct?

A Yes.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 39 of 96



Q And from when to when?
A I'll have to go back and look at the dates, but there was a period of time that she was in an acting capacity and then there was a period of time where she was in the official capacity, so altogether it was a year-and-a-half, two years.
Q You can go ahead and put the exhibit down because I'm going to ask you a few questions and then we'll come back to it. So she was in an acting capacity. Can you kind of elaborate on that a little bit more?
A Basically doing the function of the chief deputy, but not officially titled as chief deputy.
Q Why was it set up that way?
A Well, it wasn't anything that was necessarily set up. It was just the way that things worked out, and whether it's fiscal reasoning or just hadn't gotten around to making the actual switch yet, still had to have the function filled, but wasn't ready to make it a permanent assignment.
Q So obviously the spot came up, right?
A Yes.
Q Who was in the spot prior to Miss Keener?
A Tad Fletcher.
Q T-a-d?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 40 of 96



A Yes.
Q Tad Fletcher. And how long had Mr. Fletcher been the chief deputy?
A I'll have to go back and check for sure, but I think about three years.
Q Why did Mr. Fletcher leave as chief deputy? Was he fired, did he leave on his own volition, et cetera?
A No, he left on his own volition to advance his career.
Q Where did he go?
A To Carson City Alternative Sentencing.
Q Is he still there?
A Yes.
Q Is he still working for Alternative Sentencing?
A To my knowledge, yes.
Q What kind of position did he take at Alternative Sentencing?
A He took over as the chief.
Q And that was a step up from being chief deputy?
A Yes.
Q So the position came open and you put Miss Keener in there?
A I went for awhile without doing anything and then she was put in. As it turned out, she was filling

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 41 of 96



that role, so we formalized it to the extent of being an acting capacity, and then I believe it was based on budget and the election cycle as to why we waited to make a permanent position.

Q Now, who put her in that role?

A I did.

Q How many deputies, et cetera, did you have working for you at that time?

A Including the jail staff, 20.

Q So you chose Miss Keener out of all the 20 to fill that role?

A Yes.

Q So the reason, because you are a conscientious sheriff you had her fill that role because obviously she was a good law enforcement officer, right?

A I thought she was, yes.

Q And she was a good person to put in that role, is that a correct statement?

A I thought so, yes.

Q And she was doing so well in filling in the role that you made it permanent eventually, right?

A Yes.

Q Now, let's go ahead and pick up Exhibit 2 again, the complaint, and we'll start on Page 2 of the complaint. I just had you turn there so you can look at

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 42 of 96



it if you need to.

Now, there was a sheriffs and chiefs association convention held in Ely, Nevada in July, 2015, right?

A Yes.

Q And you and Miss Keener attended that, correct?

A Yes.

Q And you drove to Ely together, is that a correct statement?

A Yes.

Q And you guys drove back from Ely, is that a correct statement?

A Yes.

Q Miss Keener lives in Fallon?

A Yes.

Q And so you picked her up in Fallon and you went?

A Correct.

Q And then after you guys were done, you dropped her off in Fallon, right?

A I believe that's what we did, yes.

Q And the two of you were the only ones from Storey County attending?

A Yes.

Q Who else, just examples, was it -- let me

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 43 of 96



scratch that. People who are attending that convention were law enforcement officers from around the state?
A Yes.
Q Is it generally reserved for, as the title suggests, for sheriffs and chiefs?
A It's sheriffs and chiefs and oftentimes their second or third in command. It's not uncommon for undersheriffs, chief deputies. Some of the smaller agencies that don't have those, they bring a sergeant.
Q And what was the purpose of that convention, meaning why -- what was the purpose of the convention?
A The sheriffs and chiefs convention, they provide training to the sheriffs and chiefs, they have meetings to formulate what we're doing as an organization and set policy basically throughout the state.
Q Who would attend this, just mainly Nevada folks, or would it be law enforcement officers from other states?
A This particular one is Nevada exclusive pretty much.
Q And this is kind of an important convention to go to?
A Pretty much, yeah.
Q Putting out a lot of information to the

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 44 of 96



different departments, it's also a place to share information?

A Yes.

Q Also to network?

A Yes.

Q All right. Let's kind of go down these allegations here. We know that Miss Keener accompanied you there, and how long was the convention?

A I think that's generally like a two-and-a-half or three-day thing.

Q Where did you all stay?

A The name of the place was the Prospector Lodge in Ely.

Q Is that the same place where the convention was held?

A Yes.

Q Let's go down these allegations. That's probably the best way to get to this without beating around the bush too much.

Let's start with number ten, "During the evening of the last night of the convention, Miss Keener was in the casino area of the hotel where she and Mr. Antinoro were staying, playing virtual blackjack with Mr. Antinoro and socializing with other convention attendees." Is that a true statement?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 45 of 96



A To the best of my recollection, yes.
Q Item number 11, "Around midnight that evening, Miss Keener and Mr. Antinoro left the casino area to head for their respective rooms." Is that true so far?
A Pretty much, yeah.
Q And your rooms were across the hall from one another, is that a correct statement?
A I don't recall what the layout was. They were in close proximity. It's a small place.
Q During your walk to your respective rooms, Miss Keener mentioned to you that over the past two days she had lost some money gambling, right?
A She did.
Q She said blowing some $80, is that a correct statement?
A Sounds about right.
Q And she said good night to you and went to her room, right?
A Yes.
Q Then after going into her room, you began to start texting her, is that a correct statement?
A Yes.
Q And this was an unsolicited text, is that a correct statement?
A Yeah.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/24/19 Page 46 of 96



Q And the text that you wrote said, "About that blowing thing," is that a correct statement?
A I don't recall the specifics of it, but something to that effect.
Q Now, you kept copies of these text messages, is that a correct statement?
A They were still on my phone, yes.
Q And you had copies made, right?
A Yes.
Q And you had copies of other text messages that you made as well that were going back and forth between you and Miss Keener, is that a correct statement?
A Yes.
Q Did you provide copies of these text messages to your attorney?
A I did not.
Q Do you still have these text message copies in your possession?
A I still have the phone that has the text messages, yes.
Q Okay. So if I do a request for production for copies of that, you'll be able to provide that to your attorney, is that a correct statement?
A I believe they were provided to the attorney who did the county's investigation, so yes, they're all

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 47 of 96



in printed form at some location.

Q Now, those copies of those text messages are on file at the county as well; is that right?

A I don't know where they're at. I'm sure they exist someplace.

Q Okay. Now, when you said "about that blowing thing," you sent an emoticon, right?

A I don't recall if I did or not.

Q If the text message shows that it would probably show a smiling face emoticon, right?

A It may. I don't recall what specifically it said.

Q Now, you meant by sending that text to have some kind of sexual innuendo, is that a correct statement?

A I don't believe that I had any specific intent. It was just a conversation.

Q So you said "about that blowing thing" and nothing else, so that's a general conversation that you just said out of the blue, said about that blowing thing?

A There was more conversation back and forth than that and where that particular text message fit into things, I don't know. There was discussion back and forth about going back and having another drink.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 48 of 96



Q So basically what you told me just a little while ago, the two of you were walking to your room, not your room, to your respective rooms, right?

A Yes.

Q And a conversation took place that she was telling you she had blown some $80 gambling, right?

A Yes.

Q You guys said goodnight, correct?

A Yes.

Q Went to your respective rooms, right?

A Yes.

Q And then you told me that you sent her a text message, right?

A There were several text messages.

Q But the first one you sent was "about that blowing thing"?

A I couldn't tell you if that was the first one. That's what I've already answered. I don't recall what order. There was a general conversation back and forth, not necessarily leading off with that.

Q All right. The text messages will speak for themselves. So what conversation are you claiming that you had that preceded your statement "about that blowing thing"?

MR. RANDS: Objection, asked and answered and,

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 49 of 96



as you said, the text messages will speak for themselves.

BY MR. FLANGAS:

Q Go ahead and answer.

A That's what I've been saying. I don't know that that was the first text message that I sent. There was a conversation about going back and having another drink.

Q So there was a conversation about going back and having another drink. Was there any other conversation prior to that text message about that blowing thing?

A I don't know. I don't know how many times I have to say that. I don't recall the order of the text messages.

Q Okay. The conversation that you're referring to was all via text?

A Yes.

Q So there was no verbal conversation, it was text messages after you guys went to your respective rooms, right?

A Yes.

MR. RANDS: I'm just going to object as to time. There were verbal conversations clearly earlier when they were -- before they went to their rooms.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 50 of 96



MR. FLANGAS: I'll make sure it's clear because I thought I was fairly clear on that.

MR. RANDS: Thank you.

BY MR. FLANGAS:

Q After you went back -- after you guys went to your respective rooms, there was no more verbal conversation, is that a correct statement?

A Correct.

Q All the conversations subsequent to you going to your room was by text message, right?

A Yes.

Q Okay. I just wanted to make sure it's clear.

Now, Miss Keener -- let's go back to "about this blowing thing." Again, my question about that is, "about that blowing thing," was that sexual innuendo on your part?

A I don't believe it was. I wasn't viewing it that way.

Q So what would you be viewing "that blowing thing" as to?

A I was joking with her about the amount of money that she had spent.

Q All right. And Miss Keener responds -- let's look at 15. Miss Keener responded to you, is that a correct statement?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 51 of 96



A There were several responses back and forth, yes.

Q I'm trying to go in chronology here, so if you feel that there was something else in there, will you please let me know?

According to the allegation in the complaint, the next message was she responded to you saying she had actually blown about 100 bucks altogether. Did she send you that?

A Sounds like it would be a proper response, or it would have been a likely response.

Q And you responded as, "I always knew you could 100," and, "I'm bored stiff over here," with other smiley face emoticons. You sent that back?

A I don't recall the specifics of the messages, but those would have been along the lines of the text conversation back and forth.

Q So were you -- was this sexual innuendo on your part to make these statements?

A It was not.

Q So you were bored stiff over here --

A I use that term frequently.

Q Let me finish. You said, "I'm bored stiff over here," and you also said, "I always knew you could 100." So what did you mean "I always knew you could 100"?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 52 of 96



A Because in the past we talked about gambling and the amount of money that could easily be gone through, and just with the amount of time we had been there, I figured that $80 wasn't much because I think I had already lost more than that.

Q And Miss Keener finally told you it's getting late and she was going to bed, right?

A It sounded something like that.

Q And then you responded telling her that she was a party pooper and something to the effect that she was being too serious; is that right?

A I don't recall what the text was. I'd have to look at it.

Q And then she responded to you telling you it was her job to keep you out of trouble and that she would see you in the morning, right?

A It could have been something in that regard, yes.

Q Now, this was reported by Miss Keener eventually, correct?

A Yes.

Q And there was an investigation done, right?

A Yes.

Q And I think the investigation was done at the behest of the county, is that a correct statement?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 53 of 96



A Yes.
Q And the investigation was done by Donald L. Christensen, Esquire?
A I believe so.
Q If we could have this marked as Plaintiff's Exhibit 3.
(Exhibit 3 was marked.)
BY MR. FLANGAS:
Q I'm showing you what's marked as Plaintiff's Exhibit 3, and going back to the lower right-hand corner, I'm going to just dispense with reading all the zeros, but there's an MK 9, correct?
A Yes.
Q And the document goes all the way to MK 18, is that a correct statement?
A Yes.
Q Let's look at the last page here which is MK 18. It's signed by Donald L. Christensen; is that right?
A Yes.
Q So that will indicate that he's the author of this report, right?
A That's what it would indicate, yes.
Q And I think you told me a little while ago that there was an investigation and that Mr. Christensen

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 54 of 96



be reasonable for her to be upset about that?

MR. RANDS: Objection, calls for speculation and also an incomplete hypothetical, but go ahead.

THE WITNESS: I can't tell you what would be reasonable for her.

BY MR. FLANGAS:

Q Let's put it this way: You're married now, right?

A Yes.

Q Let's say your wife's boss, it's not Miss Keener in this position, it's your wife and her boss. Would you be upset that her boss sent you that stuff?

A Whose opinion are you asking me about?

Q Yours.

A Mine or my wife's?

Q I'm asking you, would you personally be upset if your wife's boss sent you the same text messages that you sent Miss Keener?

A Would I be upset about it?

Q Yes.

A It would depend on the context of it and what I knew about the nature of their relationship.

Q We know what the context is because we've gone over in gross detail. All I've asked you to do now is I've asked you in this hypothetical to put your wife in

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 55 of 96



Miss Keener's shoes and her boss, her hypothetical boss in your shoes.

My question for you, would you be upset if your wife had received the exact same text messages, exact same circumstances that Miss Keener received from you?

MR. RANDS: Same objection.

THE WITNESS: I can't say that I would be upset. I can say that I would probably want to know more information about it.

BY MR. FLANGAS:

Q Okay. Let's look at allegation number 18 on Page 3 of the complaint which is Exhibit 2. Off the record.

(A discussion was held off the record.)

BY MR. FLANGAS:

Q So let's look at line 18 which is the very next one. It says, "The very next morning near the entrance to the conference room where the convention was being held, Mr. Antinoro told Miss Keener that he hoped he hadn't offended her." Is that what that says?

A That's what it says.

Q Did you say that to Miss Keener, that you hoped you hadn't offended her?

A I'm sure I said something to her. I don't recall if that was the exact verbiage or what exactly

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 56 of 96



was said.

Q But the message that you were conveying was you hoped you hadn't offended her, is that a correct statement?

A I couldn't tell you what I was intending to convey if I don't recall what I said. I don't recall saying I hope I hadn't offended you. I may have said something, I hope I wasn't bugging you last night, I hope I wasn't bothering you last night. I can't tell you what was in my head at that point in time.

Q You must have felt that you offended her then, right?

A That's the verbiage that's in here. That's not necessarily what I felt.

Q We better stop here.

MR. RANDS: Why don't we take a break then.

(The noon recess was taken.)

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 57 of 96



***

RENO, NEVADA, THURSDAY, FEBRUARY 8, 2018, 1:15 P.M.

***

EXAMINATION (RESUMED)

BY MR. FLANGAS:

Q Mr. Antinoro, we just took a short break. We're back on the record. You understand you're still under oath?

A Yes.

Q When we left off, we were talking about the complaint that was filed in this action which is Exhibit 2. Can you make sure you got Exhibit 2 in front of you? We left off on section 18, and so I think probably the best thing to do is just pick up on 19 and ask you questions directly on this.

Now, the next day after the texting went down in Ely, Nevada, you and Miss Keener drove back to Fallon, Nevada; is that correct?

A Yes.

Q And that's where Miss Keener lives, is that a correct statement?

A Yes.

Q And I believe you live closer to Virginia City or something?

A Yes.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 58 of 96



Q Did you on the way back start telling stories about your intimate sex life to Miss Keener?
A No, not to my recollection.
Q All right. Let's look at A right here. Did you tell Miss Keener that your ex-wife wanted money from you and that you would give her money for screwing other guys in front of you?
A I probably said something to that regard.
Q Did you also tell her that one black guy was pounding your ex-wife and you knew that the guy's dick was choking her because you could hear her gagging?
A I don't recall if I said that or not.
Q Did you tell her anything remotely similar to that?
A I may have. I don't recall.
Q Did you tell Miss Keener that he was choking her because his penis was so long it was choking her from below?
A I don't recall saying that at all.
Q Did you say anything like that?
A Not that I recall.
Q Did you talk to Miss Keener about the Green Door?
A I may have.
Q What is the Green Door?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 59 of 96



A It's a swingers club in Las Vegas.
Q Do you frequent the Green Door?
A I have been there, yes.
Q And you're a swinger?
A I have been.
Q That's not quite my question. Are you a swinger?
A I have been.
Q Oh, you have been. I'm sorry, I thought you said -- my mistake, I apologize. I thought you were telling me you've been to the Green Door, sorry.
Did you tell Miss Keener about the sex rooms at the Green Door?
A I may have mentioned them.
Q And this is on the drive, we're talking about the drive coming back from Ely, Nevada to Fallon, right?
A Not to my recollection.
Q Okay. Let's back up again.
Now, you may have told Miss Keener that your ex-wife wanted money from you and that you would give her money for screwing other guys in front of you. I think you said you might have told her that?
A That's correct.
Q Did you tell Miss Keener that on the trip from Ely to Fallon?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 60 of 96



A Not to my recollection.
Q When would you have told her that?
A I believe that conversation we had took place on the tip from Fallon to Ely, not on our way back from Ely.
Q But you're not sure which way it was, either there or coming back?
A I believe it was on our way there.
Q And you also told her that one guy was pounding your ex-wife, right?
A I may have said something to that effect. I don't recall what specifically was said.
Q Was that said in conjunction with the trip to Ely?
A All the conversation would have taken place on the one drive.
Q And you're saying it was on the way there?
A I believe so, yes.
Q And did you tell her something to the effect that the guy's dick was choking her?
A I don't recall saying that.
Q Did you tell her that the guy's dick was choking her because you do could hear your ex-wife gagging?
A I don't recall those specifics of the

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 61 of 96



conversation.

Q Did you tell -- is it something that you would have told her on that trip?

A It could have been something to that regard, but I don't recall the specifics of the conversation.

Q Did you tell her something like he was choking her because his penis was so long it was choking her from below?

A I don't recall the specifics of the conversation.

Q Did you say something similar to that to her?

A I may have.

Q And then that would have been in conjunction with the trip to Ely, right?

A Yes.

Q And I know it's going to be repetitive on that, but I want to make sure it's on the transcript. Did you tell Miss Keener about the Green Door?

A We may have discussed the Green Door.

Q And that was in conjunction with the trip to Ely?

A Yes.

Q And that's a place where people go to have sex with other people?

A Yes.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 62 of 96



Q A swingers place, right?
A Yes.
Q And did you tell Miss Keener about the sex rooms there?
A I may have said something about them.
Q On the trip to Ely?
A Yes.
Q Did you tell her that your ex-girlfriend liked going there?
A I don't recall if I specifically said that or not.
Q Who is your ex-girlfriend?
A Adriana Kovacevich.
Q You're going to definitely have to spell that for the court reporter, first and last name.
A Off the top of my head, I couldn't spell it for you.
Q Give it your best shot phonetically.
A Adriana is A-d-r-i-a-n-a.
Q And her last name is what?
A Kovacevich.
Q Can you give that a shot?
A I believe it's K-o-v-e-c-a-v-i-c-h.
Q Okay. Did you go to the Green Door with Adriana Kovacevich -- I'll just refer to her at Adriana.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 63 of 96



Did you go to the Green Door with Adriana?
A I don't recall if we went there or not.
Q Have you taken girls to the Green Door before?
A I have been there, yes.
Q And my question is have you taken girls with you to the Green Door?
A Yes.
Q Have you taken girls from Storey County to the Green Door?
A No.
Q Did you take anybody that worked in the sheriff's department to the Green Door?
A No.
Q Male or female?
A No.
Q Did you take anybody that was a volunteer for the sheriff's department to the Green Door?
A No.
Q If you've taken a girl to the Green Door, would it most likely have been Adriana?
A I may have taken her there, but I know I went there with my ex-wife, also.
Q And I'm sorry, which ex-wife would this be?
A Lore.
Q Lore?

A Yes.
Q Can you give the last name again just for the record?
A Vanderbusse.
Q Did you tell Miss Keener about going to strip clubs with your ex-girlfriend?
A I believe I did make a comment about that.
Q And that's on the trip to Ely?
A Yes.
Q And did you tell her that she would sit at the bar near the stage without underwear and show her tits to guys who tipped the strippers?
A I probably said that.
Q And your ex-girlfriend would have been who?
A Adriana.
Q Did you tell Miss Keener that your ex-girlfriend Adriana would let guys fondle her under her skirt while you watched from the bar?
A I may have said that.
Q On the trip to Ely?
A You're asking if I said that on the trip to Ely?
Q Yes.
A I may have.
Q Did you tell Miss Keener that your

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 65 of 96



ex-girlfriend would take some of these guys to a place towards the bathroom and have sex with them?

A I don't recall if I said that or not.

Q Did you say anything similar to that?

A I don't recall.

Q Did you say that you would like to watch your ex-girlfriend have sex with other guys?

A I may have said that.

Q Would that have been on the trip to Ely?

A Yes.

Q And that would have been Adriana again?

A Yes.

Q Was Adriana a willing participant in these activities?

A Yes.

Q Now, did you confide in Miss Keener on this trip that you were going to tell your girlfriend at the time about your lifestyle, but you weren't sure whether or not she would accept it?

A I don't recall if that was part of the conversation or not.

Q Who was your then girlfriend around that time frame?

A I don't recall for certain who I was seeing at that point in time.

Q We know it was sometime in July of 2015, correct?

A Yes. I was dating a couple of different girls at that point in time and I'm not sure exactly who it would have been. If I made a comment to that effect, I couldn't tell you who it was I was referring to.

Q You eventually broke up with Adriana; is that correct?

A Yes.

Q And is it true that you broke up because she was mad at you for allowing her to get gang raped by a bunch of other individuals?

A No, it's not.

Q Did she get mad at you because you allowed a bunch of other folks -- other men to have sex with her that she didn't want to have sex with?

A No.

Q What was the reason for your breakup with Adriana?

A She broke up with me because she didn't think I was going to ever marry her.

Q Had you ever heard the rumor, or had you ever heard any rumor or scuttlebutt or however you want to define it that Adriana was angry at you because you allowed her to be gang raped?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/24/19 Page 67 of 96



A Adriana Kovacevich.
Q So you talk to her about every two weeks?
A That's not what I said. I said the last time I spoke to her was about two weeks ago.
Q And prior to that, when was the last time you spoke to her?
A Couldn't tell you.
Q Weeks, months, years?
A Probably within five, six weeks.
Q When you speak to Adriana, do you speak with her on your cell phone?
A I have spoken with her on the cell phone. Mostly it's text messaging or e-mails.
Q Using your cell phone for the e-mails as well?
A On occasion, but mostly I use the computer.
Q Do you still have the text messages that you've shared with Adriana?
A What shared text messages?
Q She sent you a text message and you sent her a text message. I may have just used the wrong words. You've had text messages with Adriana, right?
A Yes.
Q Do you have copies of those text messages?
A If they're still on my phone, I would have them.

Q They have not been erased?

A Not to my knowledge.

Q When you e-mail Adriana, is that using e-mail off your phone or off your computer?

A Off my computer.

Q What computer? Where would that computer be located?

A In my house.

Q Is it your own private computer, or is it a business computer or both?

A It's my own personal computer.

Q How long have you had that computer?

A I don't know, since it was new. I don't recall when I bought it.

Q I can't tell you -- no one will be able to read the transcript and know when it was new, so approximately how long ago did you get that computer?

A Five, six years ago.

Q Have you had any other computers other than that one computer that you purchased five or six years ago?

A Not that I recall.

Q Is that same computer still in your house?

A Yes.

Q Any other computers in your house, laptops,

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 69 of 96



computers?
A My wife has hers.
Q Do you have a laptop?
A Yes.
Q Business laptop?
A No.
Q Personal laptop?
A Yes.
Q How long have you had that laptop?
A That is my computer. That's the only computer I have.
Q That's the one we just talked about?
A Yes.
Q Now, let's go back to the complaint and go to Page 3. We're going to start again on paragraph 20. We'll start with 20-A. Now, some of these things you mentioned you may have said or you did say, and I'm not going to go back and ask you every single one, but I'm just going to ask you certain questions on there.
Would you give your ex-wife money to screw other guys in front of you?
A Well, I gave my ex-wife money.
Q To screw other guys in front of you?
A That was the game that we played, yes.
Q Did that actually occur that a black guy was

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 70 of 96



pounding your ex-wife?

A I don't recall for certain.

Q Did it ever -- did that ever actually happen where the guy's dick was choking her?

MR. RANDS: Objection, asked and answered.

MR. FLANGAS: I think I asked if he had told Miss Keener that before and now I'm asking if it actually occurred.

THE WITNESS: I couldn't tell you if she ever was choked by anybody or not.

BY MR. FLANGAS:

Q Did your girlfriend, and I think we identified her as Adriana, did she actually sit near the stage without underwear and show her tits to guys who tipped the dancers?

A Yes.

Q Would your ex-girlfriend let guys fondle her under her skirt?

A That's what it appeared to me.

Q And would this happen while you were watching from the bar?

A That happened one occasion that I can recall.

Q Would you watch your then ex-girlfriend -- not then ex-girlfriend. Would you watch your ex-girlfriend have sex with guys?

A I have.
Q Did you ever watch your -- let me rephrase that. Did you ever have your ex-girlfriend put you on the phone so that you could hear her having sex with other men?
A I don't recall doing that, but I may have.
Q You mentioned that you had a couple of girlfriends, possibly two girlfriends at the time of the Ely trip. Did you tell either one of them about your lifestyle?
A I don't believe so.
Q As we established, you're the sheriff of Storey County, right?
A Yes.
Q Miss Keener was your chief deputy, right?
A Yes.
Q So obviously you were her boss, correct?
A Yes.
Q And she was your subordinate, right?
A Yes.
Q Was that appropriate for you to engage in that type of conversation with Miss Keener?
A If you look at it from purely an employment standpoint, no, it was not.
Q It would have been a violation of the policy

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 72 of 96



for sexual harassment, right?

A It could have been, yes.

Q And if you'll look at Exhibit 1 here, please. Let's go down here. Let's talk first -- let's go back to the prohibited conduct portion which is on MK 48 skipping the zeros. Are you there?

A Yes.

Q That's the first page of Exhibit 1, and it says, "Prohibited conduct behaviors: Employer will not tolerate any form of harassment, including any conduct/behaviors on the part of employees, volunteers, clients, customers, vendors, contractors, et cetera, that impairs employee's ability to perform his or her duties. Examples of prohibited conduct behavior include, but are not limited to, offensive verbal communication, including slurs, jokes, epithets, derogatory comments, degrading or suggestive words or comments, unwanted sexual advances, invitations or sexually degrading or suggestive words or comments."

Would you agree with me that your text messages, assuming that they have a sexual innuendo, would have been prohibited by this provision?

MR. RANDS: Objection, calls for a legal conclusion.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 73 of 96



BY MR. FLANGAS:

Q Go ahead and answer.

A I can't make that assumption because I know what the text messages were, and so I can't make the assumption you're asking me to make.

Q How about the conversation you had telling Miss Keener many of the things on the Ely trip that you told her, would that be a violation of that provision, section 19 under Roman numeral II?

MR. RANDS: Same objection.

THE WITNESS: And as I've already said, if you look at it from purely an employment relationship, then it would probably constitute a violation. However, there's much more to it than that.

BY MR. FLANGAS:

Q Okay. Let's hear what's much more to it that you're referring to.

A Much more to it is that she's the one who implemented, instigated the conversation.

Q So she said tell me about your ex-girlfriend having sex with other people?

A No, that's not what was said.

Q Well, tell me how this went down.

A We were driving and she made the comment that she knew that a breakup was hard on me and she knew that

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 74 of 96



being in the position of sheriff, I didn't have a whole lot of people I could talk to, but that she was more than just an employee, she was a friend, she was a confidant, and any time that I needed someone to talk to, that she was available for me to talk to, and after that, she said that that's what the rumor was, was that I was a swinger and she asked if it was true.

Q And that's how this whole thing started?

A Yes.

Q Miss Keener sees it differently; you're aware of that, right?

A Yes, I am.

Q So let's assume that she did say I heard you're a swinger. Is it still appropriate for a supervisor to be telling their subordinate those things that you told her?

MR. RANDS: Objection, calls for a legal conclusion.

THE WITNESS: Again, nothing is ever as simple as the attorneys make it sound. There's more conversation than that that takes place and I've never denied at all that we have had conversations. I'm just arguing the context in which they took place.

BY MR. FLANGAS:

Q Your statement that it's never as simple as the

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/24/19 Page 75 of 96



attorneys make it sound, so let's look under subsection two again, prohibited conduct. Behaviors, it says, "The employer will not tolerate any form of harassment." Is that what that says?

A Yes.

Q Okay. There's been a few objections about legal conclusions, so let's talk to you about your job as sheriff. As we've established right now, you're the person ultimately responsible for implementing the policy, correct?

A Yes.

Q And that's the policy that's set forth here in Plaintiff's Exhibit 1, is that a correct statement?

A Yes.

Q And as the sheriff of Storey County, reading that it says the employer will not tolerate any form of harassment, you're the one that has to figure out what that means and apply it to your work force, is that a correct statement?

A Yes.

Q Let's look on the first page, again, of Exhibit 1 which is MK 48. It's got prohibited conduct behaviors, and under there it's got -- under number 20, it says, "Examples of prohibited conduct include, but are not limited to, offensive written communications

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 76 of 96



including notes, letters, notices, e-mails, texts, or other offensive messages sent by electronic means."

Let me see if you'll agree to a central premise based on that. A supervisor sending a sexually suggestive text message to a subordinate would be a violation of that provision, would you agree with me?

MR. RANDS: Objection, calls for a legal conclusion. Go ahead.

THE WITNESS: In your hypothetical example, I would have to concur that it probably did violate it.

BY MR. FLANGAS:

Q Okay. Let's go back and pick up Exhibit 3 again. Exhibit 3, just for the record, again, is the report of the investigation that was commissioned by the county and performed by Mr. Christensen, correct?

A Yes.

Q Let's go ahead and turn to Page 36 of that paper which is Bates stamped MK 13. Are you there, sir?

A Yes.

Q Okay. Halfway down, a little bit more than halfway down, you got the heading Description of Sexual Matters on the Drive from Ely to Fallon. Then it says, "Melanie Keener related a number of sexual incidents described by Antinoro to her while he drove the two of them from Ely to Fallon. Before the Ely trip, she

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 77 of 96



including notes, letters, notices, e-mails, texts, or other offensive messages sent by electronic means."

Let me see if you'll agree to a central premise based on that. A supervisor sending a sexually suggestive text message to a subordinate would be a violation of that provision, would you agree with me?

MR. RANDS: Objection, calls for a legal conclusion. Go ahead.

THE WITNESS: In your hypothetical example, I would have to concur that it probably did violate it.

BY MR. FLANGAS:

Q Okay. Let's go back and pick up Exhibit 3 again. Exhibit 3, just for the record, again, is the report of the investigation that was commissioned by the county and performed by Mr. Christensen, correct?

A Yes.

Q Let's go ahead and turn to Page 36 of that paper which is Bates stamped MK 13. Are you there, sir?

A Yes.

Q Okay. Halfway down, a little bit more than halfway down, you got the heading Description of Sexual Matters on the Drive from Ely to Fallon. Then it says, "Melanie Keener related a number of sexual incidents described by Antinoro to her while he drove the two of them from Ely to Fallon. Before the Ely trip, she

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 78 of 96



stated that Antinoro had never discussed the type of sexual details he described to her on that drive and she had never asked him for any details about his personal sexual activities.

So let's break down that last sentence here a little bit. Did you ever have discussions about sexual details -- your sexual details with Miss Keener prior to the Ely trip?

A Not to my recollection.

Q And then the second part of that sentence says, "She had never asked him for any details about his personal sexual activities," and I think from your previous testimony, you disagree with that?

A Prior to this time, there had been no conversations of that nature.

Q And prior to the trip to Ely, she had never asked you for any details about your personal sexual activities, is that a correct statement?

A Yes.

Q Now, what the investigator says, "When Antinoro was asked whether there was any discussion by him during that drive back about his intimate sex life with his prior wife and his prior partner, he stated, I'm sure there was."

So I guess my question for you is, you stated a

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 79 of 96



little while ago that it was on the way there, but according to this report, you said there was something happening on the way back.

So my question is two part. One, did you engage in sexual talk with Miss Keener on the way back from Ely?

A I believe, as I've stated, that it was on the way to Ely.

Q Let me rephrase my question. Did it happen on the way and on the way back?

A To my recollection, there was sexual conversation one way.

Q All right. So do you think the investigator got it wrong here when he says it was on the way back?

A I believe he did.

Q And you told the investigator, you had these conversations because she had asked you about your swinger lifestyle; is that correct?

A Yes.

Q And then you claim she shared her sexual matters with you. Is that what that says?

A That's what it says.

Q Did she share her sexual matters with you?

A Not necessarily on this trip, but over the course of the time that we have worked together, she's

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 80 of 96



Q Go down to the very bottom. About three lines up into the far right of that line, it says, "Finally Antinoro." Are you there?

A Now I see it.

Q It says, "Finally Antinoro also asserted that the relationship between himself and Keener was more than an employer/employee relationship and that it was up to her to let him know if anything he said offended her."

So is it your assertion that if you engaged as a supervisor with a subordinate in a matter of sexual -- in a sexual nature and it offends that subordinate, that subordinate is supposed to tell you that it offends her?

A Again, I refer to my previous question. Attorneys make it all sound much easier than it really is because my position is that I was talking to my friend at the time, not to an employee.

Q But let's focus on my so-called simple question. Is it your position that if a superior talks to a subordinate in a sexual nature that makes the subordinate uncomfortable, the subordinate is supposed to inform the superior that it's offending that person?

A As a general guideline, yes. If something is offensive in the workplace, they're supposed to make some kind of complaint. If you don't know you're being

offensive, how do you know if you're doing anything wrong?

Q Let's look at that. Let's look at Exhibit 1. That's the policy and procedures, right?

A Yes.

Q It lays down some pretty specific guidelines, doesn't it?

A It does.

Q So you can read that and tell if your behavior is inappropriate pretty much, right?

A If you're looking at a specific workplace environment.

Q It's a workplace environment, isn't it?

A Well, I believe that in my car driving down the road talking to whom I thought was my friend on personal matters on a conversation that she instigated knowing the things that she had shared with me for the previous ten years, no, I didn't look at it as a workplace situation.

Q You're going to a sheriffs and chiefs convention, right?

A Yes.

Q And that was work related, right?

A Yes, it was.

Q Okay. You had to get there, correct?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 82 of 96



A Yes.
Q And you drive there to go to a work related event, right?
A Yes.
Q Miss Keener drove with you to a work related event, right?
A Yes.
Q So she was essentially working from the time she got in your car and drove to Ely, correct?
A Yes, I guess so.
Q When she was at that convention, she was working as well, right?
A Yes.
Q When you drove back, she was working as well, correct?
A Yes.
Q When you dropped her off at her house, the workday ended for her pretty much, correct?
A I suppose so.
Q You also are police officers obviously, or law enforcement officers, right?
A Yes.
Q And I think the term is you're on duty for 24 hours?
A That's a little bit of an exaggeration, but

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 83 of 96



yes, that's an adage.

Q Let me put it this way, you're never off duty, right?

A Correct.

Q And you're her boss 24/7, correct?

A Yes.

Q That doesn't change just because she's not clocked in, is that a correct statement?

A Yes.

Q Let's look at MK 14. It says, "It's our opinion that Antinoro's descriptions of intimate sexual conduct during the drive back from Ely related by Keener did occur."

So we know that there was some form of intimate sexual discussions, right?

A And I've never denied that.

Q It says, "Keener has described in detail the extent of the descriptions that occurred during the extended drive." That's what that says?

A Yes.

Q And it says, "She told Sergeant Bowers, Sergeant Quirk and Melissa Fields about that experience." Is that what it says?

A That's what it says.

Q I think we've identified Sergeant Bowers and

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 84 of 96



we've identified Sergeant Quirk. Who is Melissa Fields?
A A former employee.
Q A former employee of the sheriff's department?
A Yes.
Q What did Melissa do?
A She was an administrative assistant.
Q Did any of these three individuals ever tell you that Miss Keener was very upset about what occurred on the drive to Ely or on the drive back from Ely?
A No.
Q Then the report goes on to say, "Antinoro does not deny that he could have engaged in this conduct during the drive and admits that he has spoken of these incidents with Keener. All of these facts lead me to form the opinion that Melanie Keener is telling the truth about what happened during that drive."
Now, this part of the report, was that ever presented to you?
A I believe I did see this portion of it.
Q Then it says, "It is also our opinion that these descriptions amount to offensive verbal communications that would offend a reasonable person under the conditions at the time." Do you agree with that statement?
A I agree that's their opinion.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 85 of 96



Q How about the substance of that statement, do you agree with it?

MR. RANDS: Objection, it calls for a legal conclusion.

THE WITNESS: No, I don't agree with the substance of their opinion.

BY MR. FLANGAS:

Q Then it says, "Keener was subjected over an extended time period to a detailed description of sexual activities in which Antinoro was involved." Would you agree that that happened?

A Well, we had an extended conversation, yes.

Q And that extended conversation included a detailed description of sexual activities in which you were involved, is that a correct statement?

A In essence, yes.

Q It says, "No employee should have to be subjected to this type of conduct and the evidence indicates that Antinoro did not have this type of conversation during work activities with any male member of his office." Do you agree with that statement?

A I agree that's their position.

Q No, I'm not asking if you -- I didn't ask you if that's their position. I'm asking you, do you agree with that statement?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 86 of 96



A What is it you're asking me to agree with? They write a statement, and sure, that's their statement.

Q Let's break it down. Do you agree no employee should have to be subjected to this type of conduct?

MR. RANDS: Calls for a legal conclusion, objection.

BY MR. FLANGAS:

Q Do you agree?

A I think I already answered that question.

Q I don't think you have. You just told me that you agreed that this is their opinion. I'm asking you, do you agree with that portion of the sentence, no employee should have to be subjected to this type of conduct?

A If it is unwelcome and undesired, if you put that caveat in there, then sure, I would agree with that.

Q "And the evidence indicates that Antinoro did not have this type of conversation during work activities with any male member of the office." Do you agree with that part of the statement?

A No, because as far as I know, they never asked about any conversations I may have had with anybody else.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 87 of 96



Q So if they put that in there, the drafter of this report, if they put that in there, they're just making it up?

A Mr. Christensen discounted a lot of things that I told him, so I don't know where he's coming from in the drafting of this report.

Q What things did he discount that you told him that's not in that report?

A I couldn't tell you specifically without going over everything that we discussed, which I don't have the notes or a transcript of or anything else, but Mr. Christensen's investigation appears very one-sided based on reading this.

Q Okay. What notes or transcripts would you be referring to that you don't have in front of you?

MR. RANDS: I think that mischaracterizes his testimony. He said he didn't have transcripts or notes. He didn't say he just didn't have them in front of them.

THE WITNESS: I couldn't tell you the specifics of the conversation. I can only tell you from what I have seen of his findings, that they appear to be very one-sided and he didn't follow-up with any of the people that I told him he should discuss, or at least if he did, it was never mentioned in any of the reports that I have seen.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 88 of 96



BY MR. FLANGAS:

Q That's what I'm asking, do you agree or disagree with that, and you don't agree with it, is that a correct statement?

A That is correct.

Q It then goes on to say, "Keener and Antinoro met through their employment with the county. They have no relationship with each other outside of work." Is that a correct statement?

A I would not say so.

Q You have a relationship with each other outside of work?

A I believe that we did.

Q Did you go to each other's houses?

A We had been to each other's houses.

Q For social reasons?

A Melanie came to my house when I was going through my breakup. She came by to check on me. I went to her house obviously when I picked her up to go to Ely. There had been invitations back and forth for social gatherings that for whatever reason didn't occur. We met in mutually neutral places over the course of the ten years.

Q All right. Let's talk about her coming to your house for the breakup. This was the breakup you had

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 89 of 96



with Adriana, is that a correct statement?

A Yes.

Q And when Miss Keener came to your house because of the breakup, Tony Dosen was with her, is that a correct statement?

A I believe so.

Q Tony Dosen is your friend, right?

A Yes.

Q So they came there because you had not been showing up to work, is that a correct statement?

A I had not been to work for a couple of days, yes.

Q And so they're actually doing a wellness check on you, is that a correct statement?

A I suppose it depends on how you look at it.

Q And when they left, they took your firearms with them, didn't they?

A They took a firearm with them, yes.

Q Mr. Dosen, your friend, took your firearm, right?

A Yes, at their request.

Q Because they were worried you were suicidal, is that a correct statement?

A That was their concern.

Q You denied that previously in a deposition,

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 90 of 96



didn't you?
A I did, and I still deny that I was suicidal.
Q No, you denied that they had to come get your weapons.
A They didn't have to come and get my weapons. They asked to take it. I still had a dozen more in the house after they left.
Q So why would they just take one weapon?
A I couldn't tell you. They were worried, so to give them a sense of comfort, I gave them my gun.
Q Now, you mentioned that they took your guns, but it was actually Tony Dosen that took your guns, right, gun or guns?
A I don't recall who actually took them, but yes, they left with a gun.
Q Miss Keener was not with Mr. Dosen when he took your gun, is that a correct statement?
A I believe they were both there at the same time, but I'm not sure.
Q Let's look on MK 14. Let's go with the last paragraph here and it says, "Likewise, the idea that Keener failed to inform Antinoro that she found his conduct to be offensive does not excuse his conduct."
Now, I know this is what the investigator is saying, so we can keep the transcript a little cleaner.

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 91 of 96



Q That's because she doesn't want anything to do with you?

A I could not tell you.

Q Is it true that you took her -- you've already told me you've gone on a couple of out of town trips with Miss Enlow, right?

A Yes.

Q Is it true that you tried to get her to sleep with three black guys?

A No.

Q Is it true that you tried to get her to sleep with other guys so you could watch or hear about it?

A No.

Q So if Miss Enlow was to say that, she'd be lying?

A She would.

Q Does Miss Enlow still work for Storey County?

A No.

Q Have you ever been accused of sexual harassment before other than this lawsuit? And I believe you have a lawsuit with Vanessa Adrienne, right?

A I don't believe I was accused of sexual harassment.

Q By Miss Adrienne?

A I may have been named in the suit, but not the

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 92 of 96



one who was harassing.
Q Has anybody other than Miss Keener ever accused you of sexual harassment?
A No.
Q Do you want to take a break?
MR. RANDS: Yeah.
(A recess was taken.)
BY MR. FLANGAS:
Q We're back on the record. We just took a short break. Do you understand you're still under oath?
A Yes.
Q After this trip to Ely, did you start going into Miss Keener's office and start putting your boots up on her desk?
A No.
Q Did you ever put your boots up on her desk?
A Yes.
Q Did she ask you not to do that?
A No.
Q Did you still do it anyway?
A I was never asked not to do it.
Q She put gum on the bottom of your boot one time?
A Yes.
Q Did you scrape it off and then throw it at her?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 93 of 96



A I did.
Q Why do you think she put the gum on your boot for?
A Couldn't tell you.
Q Maybe to pass a message to quit putting your boots on her desk?
A I don't understand gum.
Q What's that?
A I don't understand gum.
Q Did you hit her when you threw the gum at her?
A I don't recall. I think it missed her. I made the comment I was trying to get it stuck in her hair.
Q What's that?
A I made the comment I was trying to get it stuck in her hair.
Q Why were you doing that?
A Because it was a goofing off in the office that always happened.
Q Just bear with me a minute, Mr. Antinoro.
You have an African American deputy or sergeant or anything working for you?
A I had.
Q What was his name?
A Vernon White.
Q Did you refer to him as your little black boy?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 94 of 96



A No.

Q Did Miss Keener ever tell you -- did you ever refer to him as that black guy?

A I did make a comment about him being a black guy, or made reference to that black guy.

Q So when you were referring to him, you were referring to him as that black guy?

A Yes.

Q Did Miss Keener tell you that was not a good idea?

A Yes.

Q Did you stop calling him that black guy after she told you that?

A Yeah. I called him that white guy.

Q That's because his last name was White?

A That is correct, and I did not know his name was White at the time I referred to him as black.

Q Excuse me for using this word, but did you ever use the word nigger to refer to white people?

A I may have. I don't recall doing it at work.

Q Did you ever use the word nigga?

A I may have. I generally don't use that.

Q Did you ever tell Miss Keener that you were going to spouge on the county manager and the District Attorney as well?

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 95 of 96



A I may have.
Q And that was in conjunction where you were saying you were going to try to public embarrass the commissioners, and while you were at it, you were going to spouge on the county manager and the District Attorney as well?
A I don't recall that being the conversation, but it could have been.
Q But you do remember saying about spouging on the county manager and District Attorney, right?
A I said I could have said that.
Q You're not denying you said it?
A I may have said it.
Q Now, you're aware that Miss Keener filed a complaint against you with the county, right?
A Yes.
Q February, 2016?
A Yes.
Q Now, she first filed a report with the District Attorney's Office, right?
A I couldn't tell you.
Q But it eventually went to the HR guy, right?
A Couldn't tell you.
Q You were put on notice of this complaint by Miss Keener about the same day that she filed the

Case 3:17-cv-00498-RCJ-CBC Document 48-4 Filed 01/14/19 Page 96 of 96



STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, DIANNE M. BRUMLEY, a Certified Court Reporter for the State of Nevada, do hereby certify:

That on Thursday, the 8th day of February, 2018, at the hour of 9:00 a.m. of said day, at the offices of Bonanza Reporting, 1111 Forest Street, Reno, Nevada, personally appeared GERALD ANTINORO, who was duly sworn by me and thereupon was deposed in the matter entitled herein, and that before the proceedings' completion, the reading and signing of the deposition has been requested by the deponent or party;

That the foregoing transcript, consisting of Pages 1 through 192, is a full, true and correct transcript of the stenographic notes of testimony taken by me to the best of my knowledge, skill and ability.

I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Dianne M. Brumley

DIANNE M. BRUMLEY, NEVADA CCR #205
CALIFORNIA CSR #6796