Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 1 of 18

Exhibit 7

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 2 of 18



IN THE FIRST JUDICIAL DISTRICT COURT

OF THE STATE OF NEVADA,

IN AND FOR THE COUNTY OF STOREY, NEVADA

-oOo-

MELANIE KEENER,

Plaintiff,

vs.

GERALD R. ANTINORO, an individual; STOREY COUNTY, a political subdivision of the State of Nevada; et al.,

Defendants.

Case No. 17 TRT 00001 1E

================================================

DEPOSITION OF ANTHONY DOSEN

Wednesday, February 14, 2018

Reno, Nevada

REPORTED BY: SUSAN E. BELINGHERI, CCR #655

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 3 of 18



A. Correct.
Q. So there's no affirmative duty on the part of the person who's allegedly being harassed to tell the harasser to stop. Would you agree with me?
A. Well, number 25 states: "If the employee feels uncomfortable in speaking." But yes.
Q. Okay. Now let's go back to some of these allegations, here.
MR. RANDS: Before we get into that, could we take a quick break? I need to make a phone call.
MR. FLANGAS: Certainly.
(A short break was taken at this time.)
MR. FLANGAS: We're back on the record.
BY MR. FLANGAS:
Q. Mr. Dosen, you understand you're still under oath?
A. Yes, I do.
Q. Okay. Now let's, let's kind of go down some of these things here that I just went down with -- you know, went over before. And I know I asked this question, but it was going to be kind of the lead-in to the rest of them because we digressed from it.
Now, did -- do you know if -- that's not the way -- did Mr. Antinoro pay his ex-wife for screwing other guys in front of him?

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 4 of 18



MR. RANDS: I'm going to just interpose the same objections as before in a continuing nature.

MR. FLANGAS: Certainly.

THE WITNESS: I have no idea.

BY MR. FLANGAS:

Q. Did he ever tell you?

A. No. Of the payment, no.

Q. He did tell you of a lifestyle where he liked to watch other guys screw his girlfriend, or ex-wife, as the case may be; right?

A. Of the lifestyle, yes.

Q. Okay. Did Mr. Antinoro ever tell you about a black guy that was pounding his ex-wife?

A. I heard many conversations. I don't know.

Q. But you've heard conversations to that, to that effect; is that a correct statement?

A. Correct.

Q. And you heard that from Mr. Antinoro; is that right?

A. Correct.

Q. And you heard statements from Mr. Antinoro that -- let me rephrase that.

Did you hear statements from Mr. Antinoro about the guy's dick choking her because he could hear her gagging?

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 5 of 18



A. I did not hear that statement, no.
Q. Did you hear from Mr. Antinoro that he was choking her because his penis was so long it was choking her from below?
A. I did not hear that statement.
Q. What's Mr. Antinoro's ex-wife's name?
A. I believe it's Laura. Lori.
Q. L-o-r-i?
A. I have no idea. I don't know how to spell it.
Q. What's her last name, Antinoro?
A. I, I don't know.
Q. Okay. All right. Are you aware that Mr. Antinoro goes to The Green Door in Las Vegas?
A. I've heard him say it.
Q. What is The Green Door?
A. It's a, I guess, swingers type atmosphere.
Q. Have you heard about him going to The Green Door with his ex-girlfriend?
A. I believe there was mention of it. I don't know if it for sure happened.
Q. Mention of it by Mr. Antinoro?
A. Yes.
Q. Who's his ex-girlfriend? What's her name?
A. Adrianna -- I don't -- the last name Ko -- I'm not sure how to pronounce it.

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 6 of 18



Q. Something like Kovacevich, or something?
A. Something along those lines, yes.
MR. FLANGAS: I'll get you a spelling after, because I do have it written down somewhere with the appropriate spelling.
BY MR. FLANGAS:
Q. Where is this Adrianna these days?
A. I have no idea.
Q. When is the last time you talked to her?
A. Probably before they broke up.
Q. When was that?
A. I, I believe a couple years ago.
Q. Let's talk about that break-up for a moment. That break-up seemed to adversely affect Mr. Antinoro; is that a correct statement?
A. I guess you can look at it that way.
Q. Or am I understating it?
A. No, I'm sure it affected him.
Q. It affected him to the point that he quit showing up for work?
A. Intermittently.
Q. Did there come a point in time where you had to go out, you and Ms. Keener had to go out there and do a wellness check on him?
A. We checked on him a few times, yes.

A. No, it does not.
Q. So if a SWAT team came, it would probably have to come from Sparks or Reno?
A. Or Carson or Douglas or Lyon County.
Q. Lyon County has a SWAT team?
A. Yes, it does.
Q. All right. You said you heard of an incident. What did you hear of?
A. That he had discharged a weapon.
Q. When did this occur?
A. I have no idea.
Q. It occurred while he was sheriff?
A. I don't believe so.
Q. It occurred while he was a deputy sheriff?
A. I don't believe so.
Q. It occurred while he was a sergeant?
A. I believe he was with a different agency.
Q. Well, it didn't happen in Storey County?
A. I don't believe so.
Q. And did Mr. Antinoro ever tell you that he liked going to strip clubs with his ex-girlfriend, where she would sit at the, at the bar near the stage and show her tits to guys?
A. He told me they went to the strip club.
Q. Did he also tell you that he liked to have his

girlfriend showing her tits to guys?

A. He may have said that.

Q. Did he also tell you that this ex-girlfriend would let guys fondle her under her skirt while he watched from the bar?

A. I believe he said that.

Q. Did he also tell you, then, that he would -- that his ex-girlfriend would then take these guys to a place somewhere on the premises and have sex with them so he could watch?

A. I do believe so.

Q. Now, this Adrianna broke up with Mr. Antinoro; right?

A. They're no longer together, yes.

Q. Is that because he allowed her to be, for lack of a better term, raped?

A. I don't believe so.

Q. Did he set up, did he set up situations where she would have sex with multiple partners while he watched?

A. I believe they engaged in that.

Q. Did she get angry because that occurred and she didn't want to be part of it?

A. I don't believe so.

Q. You don't believe so? Had you heard that before, though?

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 9 of 18



A. I may have heard mention of it, but I don't believe that.
Q. Who did you hear mention of that from?
A. I believe the sheriff.
Q. Now, the sheriff's been accused of rape; is that a correct statement? Let me make sure this is clear on the record.
Mr. Antinoro has been accused of rape; correct?
A. Accused.
Q. Okay. And that was in Sparks; right?
A. I do believe so, yes.
Q. Occurred, what, about eight or nine, ten -- eight or nine years ago?
A. At least, yes.
Q. And this occurred with a woman that you were dating; right?
A. Correct.
Q. All right. And then you guys were having a threesome and she accused Mr. Antinoro at some point in time of raping her?
A. That's how it's stated, yes.
Q. Did she accuse you of raping her?
A. I don't believe so.
Q. Just him?
A. I believe so.

Q. Did that stem from the episode where you guys were having a threesome, or did that stem from a separate episode where he was with her alone?

A. I don't believe there was a separate episode.

Q. Would it surprise you that Mr. Antinoro testified that he had a separate episode at this lady's house where you weren't involved?

A. That's unaware to me.

Q. Did Mr. Antinoro rape this lady?

A. No, he did not.

Q. What was the lady's name?

A. Penny Jensen.

Q. Where is Ms. Jensen now?

A. I have no idea.

Q. When was the last time you saw her or talked to her?

A. 2013.

Q. Did you ever see the police report accusing Mr. Antinoro of raping -- or the police report -- let's not say "accusing." Let's use a different term.

Did you ever see the police report pertaining to the allegations of Penny Jensen being raped by Mr. Antinoro?

A. I saw the report.

Q. And how did it come to pass that you saw the

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 11 of 18



2014.
Q. And what did the letter state?
A. I didn't read the letter, I was just advised of it.
Q. Do you know April Enloe?
A. I do.
Q. Who was she?
A. She was the former director at the senior center.
Q. Did Mr. Antinoro have a relationship with Ms. Enloe?
A. I believe they dated.
Q. Did they have sex?
A. I have no idea.
Q. Is Ms. Enloe a county employee?
A. She was.
Q. She was. Did you ever hear from Mr. Antinoro that the reason he broke off -- broke up with Ms. Enloe is because she got angry because he wanted her to have sex with multiple partners while he watched?
A. I heard that, but I didn't -- I'm not aware if that's why they broke up.
Q. But you heard that that, that occurred with Mr. Antinoro; right?
A. I heard that allegation, yes.
Q. From Mr. Antinoro?

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 12 of 18



A. No. Circulated around town.
Q. Did Mr. Antinoro ever tell you that he tried to entice Ms. Enloe to have sex with somebody else while he watched?
A. I can't honestly recall.
Q. And when I say that, was it with one or more partners? Did you hear anything like that?
A. I heard it involved several black individuals.
Q. You didn't hear that from -- did you hear that from Mr. Antinoro himself?
A. No, I did not.
Q. Have you ever -- now, you said you heard other allegations of rape, you said you saw it in a flier, or a circular, during the 2014 campaign; right?
A. Correct.
Q. All right. Now, we got the one allegation of rape that comes out of Sparks; right?
A. Correct.
Q. What was the year that the alleged rape took place?
A. I have no idea.
Q. Now, you're part of the lifestyle with Mr. Antinoro yourself; correct?
A. I've been in that lifestyle, correct.
Q. Watching your, your girlfriend, or whatever, have

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 13 of 18



sex with other people, that's part of your lifestyle?
A. In the past I've participated, yes.
Q. Threesomes?
A. Yes.
Q. And you've engaged in threesomes with Sheriff Antinoro?
A. Once.
Q. Once? When was that?
A. I have no idea.
Q. Last couple of years, three years?
A. No. Farther back.
Q. Farther back?
These allegations of rape, other than, other than this Penny Jensen, any other names come to mind of who he was alleged to have raped?
A. Barnes.
Q. Jennifer Barnes?
A. Jennifer Barnes, yes.
Q. Who is Jennifer Barnes?
A. She works, or was employed at the Mustang Ranch.
Q. What did you hear about this?
A. That supposedly I was involved in it, back in 1988.
Q. You were involved in 1988 with Jennifer Barnes?
A. And the rape of, yes.

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 14 of 18



Q. Where did this alleged rape take place --
A. I believe --
Q. -- or occur?
A. -- Angel Lake.
Q. Where is Angel Lake located?
A. South of Wells, Nevada.
Q. And you were supposed to have been involved in this?
A. Myself and Sheriff Antinoro.
Q. Were you and Sheriff Antinoro in Angel Lake at the time of this alleged rape?
A. In 1988, no.
Q. When would you and Mr. Antinoro have been together in Angel Lake? Because I'm asking that based on your answer to the last question.
A. Never.
Q. So you've never been to Angel Lake with Mr. Antinoro?
A. No.
Q. I've heard testimony that you and Mr. Antinoro go way back, beyond sheriff's deputy time at Storey County, that you knew each other years prior to that. Is that a mistaken testimony?
A. Yes, it is.
Q. So the first time you ever met Mr. Antinoro was

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 15 of 18



Q. And that's because you weren't married?
A. Correct.
Q. Now, second paragraph says:
"When Adrianna left Antinoro" -- let me rephrase again. It says, second paragraph says:
"When Adrianna left Antinoro, Misty had informed me that Adrianna was angry with Antinoro because he allowed her to be gang raped by a group of guys that he set up."
Misty ever tell you this?
A. I had heard it, but I don't believe that it actually happened.
Q. Where did you hear this from?
A. From Misty.
Q. Okay. Misty was your fiancée at the time?
A. Correct.
Q. Did you ever have any type of investigation instigated to determine whether or not Mr. Antinoro had allowed Adrianna to be gang raped by a group of guys that he set up?
A. Did I have an investigation?
Q. Yes.
A. No, I did not.
Q. Was Mr. Antinoro the sheriff at this time?
A. I believe so.

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 16 of 18



Q. Then it says:
"Evidentally, Antinoro would post Craig's List ads and he would follow Adrianna to a hotel room while he watched her have sex with men, sometimes multiple men."
Did Mr. Antinoro post Craigslist ads for such activities?
A. I believe so. I can't honestly say.
Q. You heard him talk about it, though?
A. I believe it was mentioned.
Q. Then it says:
"Antinoro got to the point where he would quit going to the hotel rooms and would have Adrianna call him and then leave the line open so he could hear her having sex with other men."
Did Mr. Antinoro engage in that type of activity?
A. I can't honestly say. I believe so.
Q. You heard it from him that he would do that?
A. I don't know if to that extent, but I believe he engaged in that stuff.
Q. Based on what he told you?
A. Correct.
Q. And this was along the line of questioning I think I talked to you a little while ago. It says:
"Antinoro was a mess after she left. He ended up

Case 3:17-cv-00498-RCJ-CBC Document 48-7 Filed 01/14/19 Page 17 of 18



getting counseling however; for a period of about two months he was non-functional."

Is that a true statement about Mr. Antinoro?

A. I don't know if you can say he was non-functional.

Q. What would you say for those two months?

A. He was distraught. He was upset about the break-up.

Q. Was he coming to work?

A. I believe sporadically, here and there.

Q. Did he take vacation?

A. I don't believe he has to take vacation.

Q. Did he take sick leave?

A. I don't believe he has to take sick leave.

Q. So he can just not show up to work?

A. I believe per NRS it states the sheriff has to be in office the day he's sworn in and the day he's out of the office.

Q. You may be right. Then it says:

"Dosen and I went to his residence to have paperwork signed at one point and he was on the couch, medicated, and in and out of awake state."

Is that a true statement? Did that occur?

A. We went to his house, yes.

Q. Okay. I know you went to his residence, but did

STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, SUSAN E. BELINGHERI, a Certified Court Reporter for the State of Nevada, do hereby certify;

That on Wednesday, the 14th day of February, 2018, at the hour of 1:00 p.m. of said day, at the offices of Bonanza Reporting & Videoconference Center, 1111 Forest Street, Reno, Nevada, personally appeared ANTHONY DOSEN, who was duly sworn by me, was thereupon was deposed in the matter entitled herein, and that before the proceeding's completion the reading and signing of the deposition has been requested by the deponent or party;

That the foregoing transcript, consisting of pages 1 through 127, is a full, true, and correct transcript of my stenotype notes of said deposition to the best of my knowledge, skill, and ability.

I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

DATED: At Reno, Nevada, this 27th day of February, 2018.

SUSAN E. BELINGHERI, CCR #655