Exhibit 13

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

-o0o-

| | |
|---|---|
| MELANIE KEENER,<br><br>Plaintiff,<br><br>vs.<br><br>GERALD R. ANTINORO, an individual; STOREY COUNTY, a political subdivision of the State of Nevada; et al.,<br><br>Defendants. | Case No. 3:17-CV-00498-RCJ-VPC |

==========================================================

DEPOSITION OF

JAMES MILLER

March 20, 2018

Reno, Nevada

Reported by: DIANNE M. BRUMLEY, NV CCR #205
California CSR #6796

Case 3:17-cv-00498-RCJ-CBC Document 48-13 Filed 01/14/19 Page 3 of 10



Q What kind of action?
A I don't know. I just said I thought about it. I had options. I could have suspended him, I could have fired him until he took over office, but I did neither. I just decided not to engage, but I told him.
That, to me, is when it started. I could see that maybe he wasn't -- I thought maybe something, he's excited, but that approach with me standing around with other people, it embarrassed me and it's not professional.
Q Let's go back. When was the first time you talked to Melanie -- I'm sorry, to Miss Keener about this situation?
A Again, it was just over -- I don't even know how long it's been since it started. It's probably been, what, a year-and-a-half, two years.
Q Was it after she left the sheriff's department?
A After she left, yeah.
Q So she never came to you before that time period and told you what was going on?
A She may have. Not to my home. Every time we talk, we were by phone and I know I called her a couple times over the time just to check in on her, see how she's doing.
I've also advised her that -- I don't think she

had an attorney and she was very distraught, very upset. I could tell she was and she told me she was, and I told her, maybe you need to get an attorney.

Q And how could you tell she was upset?

A I could tell by her voice. She told me she was upset. Her voice would elevate. She was angry and she had every right to be.

Q And she was angry why?

A Because she lost her career.

Q And did she describe to you the details of what led to that?

A I don't know if it was Mel that told me. It could have been Mel that told me when things started happening, when she was a chief deputy they went to a meeting in Las Vegas and he did what he did, but we didn't get into too much of that.

I don't know exactly what happened, and I just tried to tell her, you know, you need to talk with Pat or get an attorney, you need to try to get whole again, you need to make sure that this is not your fault.

We never did spend any length of time discussing it. I talked with Pat probably more than I did with Mel about the issue, and Pat was very receptive and very upset and concerned. I think that's why he did what he did, tried to get her out of that element, that

Case 3:17-cv-00498-RCJ-CBC Document 48-13 Filed 01/14/19 Page 5 of 10



space.

Q You said you've talked to him about that. Did you have anything to do with that procedure?

A No.

Q Did you suggest that he do that, or --

A No.

Q -- or have any counsel with him about what he was actually doing?

A No, not that I recall.

Q And you said that -- I know you can't give me an exact time, but approximately how many times have you talked to Miss Keener about this situation, the lawsuit?

A I don't know. Every time we talk on the phone, it was a short period of time and I would tell her, again, you don't need to tell me what's going on, you need to get an attorney and tell him, tell them. I can't do anything. I support you, I feel sorry for you and I apologize, so --

Q How many times did you talk with her?

A I don't know. Half a dozen, maybe six times. I don't know.

Q Always on the phone or in person?

A Well, I'd see her occasionally when I went into the courthouse to listen to the Commissioners or a certain issue that I had to go and talk about, but I

coming to Storey County that involved sexual issues?

A I don't know for a fact if there was.

Q And what do you know that may -- what have you heard about that?

A One, that he left Wendover and went to Las Vegas before the door slammed shut and being fired over some type of relationship with a young female. I don't know if that's true. I don't know if that's false or true. That was just a rumor that I had heard.

Q Any rumors about pornography charges while he was there?

A I was told by -- who was it -- that he was running a store that had pornography as well as other items in the store.

Q And pornography being sold from that store would have been illegal or unethical?

A I don't know. I can't answer that question.

Q Do you know who you heard the rumor from?

A I believe it -- well, no, I don't know.

Q And then you stated that Mr. Antinoro was hired by you and I think you've answered most of this, too, so I'll just ask you, you have regrets obviously from hiring him, is that a correct statement?

A I do.

Q And is one of the reasons that you have regrets

Case 3:17-cv-00498-RCJ-CBC Document 48-13 Filed 01/14/19 Page 7 of 10



for hiring Mr. Antinoro is because of the background investigation that was flawed?
A That's one of them, yes.
Q And you felt you were lied to by Mr. Antinoro, right?
A And Mr. Quirk.
Q Any other regrets that you had for hiring him?
A Well, I would think that one of the biggest ones is the one that we're here for today and that's Miss Keener. She lost her career, lost the role that she loved so much and that she did such a great job, and I'm not exaggerating here.
Like I said, she's a self-starter, but I'll tell you right now being an administrator, if I may, if a background check is done properly and if there's an officer out there that is really questionable for any reason and that person loses his or her job, they are not going to be hired anywhere.
I feel, just because I'm an administrator, that if Miss Keener tries to go to another agency, whether this is successful or not successful with the lawsuit, I don't believe she'll get hired. That's my own personal feeling.
Q As an administrator?
A As an administrator, and you have to understand

Case 3:17-cv-00498-RCJ-CBC Document 48-13 Filed 01/14/19 Page 8 of 10



this has been a very -- it's been in the press, it's been on television, there's been interviews which I did not participate in, but the sheriffs and chiefs, which I was a part of for many, many years, they know, and every one of those chiefs and every one of those sheriffs already know this case, and I don't believe there's an administrator or anybody, please don't take me wrong on this, that would touch Mel, that would give her a shot because of what's happening here in this room and what's happening with the lawsuit.

Q So let's assume that everything in her complaint is true as to what Mr. Antinoro did to her. Going from the chief deputy to the position she's at now is quite a step down, would you agree?

A She's lost a lot, yes, it's a step down.

Q Huge step down?

A Huge.

Q Lost her career as you've stated?

A Yes. The mental anguish, the family problems that these people go through when they're terminated is tremendous.

Q And Miss Keener told -- you've known Miss Keener a long time, right?

A Since I first became sheriff in 2005 until today, sure.

Q And I think you told us a little while ago you had roughly daily contact with her while on the job if she worked days?
A Yes.
Q And may have gone to coffee with her?
A I don't remember when, but I do that with all my people, my staff and whatnot. We could have gone together with other officers as well.
Q And you try to get to know your people?
A Absolutely. It's important.
Q Because you're a leader and as a good leader, you want to know --
A Yeah.
Q -- your people, right?
A Yeah.
Q We're kind of talking over each other, so if you could --
A I apologize.
Q It's hard for the court reporter to get us both at the same time. You know Miss Keener well enough to know if she's upset, right?
A I believe that even if I don't know a certain individual, I can usually tell when the person is upset and not upset, but yes, I can do that with just about everybody that I know.

Case 3:17-cv-00498-RCJ-CBC Document 48-13 Filed 01/14/19 Page 10 of 10



STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, DIANNE M. BRUMLEY, a Certified Court Reporter for the State of Nevada, do hereby certify:

That on Tuesday, the 20th day of March, 2018, at the hour of 10:00 a.m. of said day, at the offices of Rands, South & Gardner, Reno, Nevada, personally appeared JAMES MILLER, who was duly sworn by me and thereupon was deposed in the matter entitled herein, and that before the proceedings' completion, the reading and signing of the deposition has been requested by the deponent or party;

That the foregoing transcript, consisting of Pages 1 through 116, is a full, true and correct transcript of the stenographic notes of testimony taken by me to the best of my knowledge, skill and ability.

I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Dianne M. Brumley

DIANNE M. BRUMLEY, NEVADA CCR #205
CALIFORNIA CSR #6796