Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 1 of 31

Exhibit 14

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 2 of 31



UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-oOo-

| | |
|---|---|
| MELANIE KEENER, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>GERALD R. ANTINORO, an individual; STOREY COUNTY, a political subdivision of the State of Nevada; DOES I-V, inclusive; and ROE ENTITIES VI-X, inclusive,<br><br>Defendants. | Case No. 3:17-cv-00498-RCJ-VPC |

==================================================

DEPOSITION OF [redacted]

Tuesday, August 7, 2018

Reno, Nevada

REPORTED BY: SUSAN E. BELINGHERI, CCR #655

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 3 of 31



APPEARANCES:

For the Plaintiff:

FLANGAS DALACAS LAW GROUP
Attorneys at Law
By: GUS W. FLANGAS, ESQ.
3275 South Jones Boulevard, Suite 105
Las Vegas, Nevada 89146

For the Defendant:

RANDS, SOUTH & GARDNER
Attorneys at Law
By: DOUGLAS R. RANDS, ESQ.
9498 Double R Boulevard, Suite #A
Reno, Nevada 89521

For the Witness:

[redacted]

Also Present:

MELANIE KEENER

# I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Flangas | 4 |
| By Mr. Rands | 65 |

| EXHIBITS: | DESCRIPTION: | PAGE |
|---|---|---|
| (None marked) | | |

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 5 of 31



A. I got my real estate license. That was, that was it, though.

Q. When was that?

A. That was in 1980. And then I got my broker's license in -- two years later. That was 1982.

Q. Any other licenses that you have other than -- and don't tell me a driver's license. But any --

A. That's all.

Q. -- other licenses other than a broker's license or a real estate license?

A. That's it.

Q. And now, other than getting your real estate license and your broker's license, any other post-high school education?

A. None.

Q. What do you do for a living?

A. I can't work right now.

Q. Is that due to an illness?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. And I'm not going to ask you too much about it. I know kind of what it is. But if you don't mind putting it on the record, what is your illness?

A. I have a brain tumor.

then. Deputy, whatever. I don't know. Usually that was something that Chris Parsons would have done.
Q. Did there ever come a point in time where you and Mr. Antinoro dated?
A. Yes.
Q. When was that?
A. And that was in 2015, June.
Q. How long did you and Mr. Antinoro date?
A. It was, it was just, like, two months. Not even that long.
Q. How frequently were you dating?
A. Well, on the weekends.
Q. Your relationship with Mr. Antinoro ended eventually; correct?
A. Oh, yes.
Q. What happened?
A. Well, the -- well --
Q. If you need time to collect yourself, let me know.
A. He just set me up.
Q. Set you up in what way? And I apologize for having to ask you these. I really do.
A. He set me up to get raped.
Q. In what way?
A. Well -- where do I start?

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 7 of 31



[redacted] Just describe what happened.

BY MR. FLANGAS:

Q. Yeah, I would rather you tell me, where I don't have to -- you can just tell me, where I won't interrupt you.

A. We, we -- it started with we were -- we'd started going skydiving. It was my 60th birthday on June the 19th, and, you know, I'd been divorced for a couple of years. And so we started going skydiving.

Q. I'm sorry to interrupt you. What year? I'm sorry.

A. Oh, I'm sorry. It was in 2015.

Q. Okay. I'll try not to interrupt you.

A. So we started going skydiving. And, you know, he -- and I, you know, I -- when I met Jerry, he was really nice, and I -- you know, he came to the senior center all the time. I met John-Michael Mendoza, and they were just so helpful with the seniors. And you know, I, I just totally believed in him because he seemed just so thoughtful about all the seniors. And I thought he believed in what I believed in, which was the seniors. You know?

And then, you know, I'd gotten a divorce right after my son died, found out my husband was going out on me. So I got a divorce in 2012 and I moved to Reno.

And, you know, I didn't even want to go out with anybody. And then I was standing in line at the senior center, and Jerry said -- and it was going to be my 60th birthday, and he said, "Hey, you want to go skydiving on your birthday?"

And I said, "Well, it's on my bucket list. That sounds like fun."

So anyway, that's how that whole thing started. And I just thought: Well, I can really trust him.

And, you know, Melanie and Jerry -- and actually, I know it wasn't fucking Jerry, it was Melanie -- had been really so understanding and helpful when my son Austin was missing for, like, three weeks. And finally they found him, and Melanie went and looked at the body. I didn't even have to go do it. Anyway, I'm straying. But, you know, all of this stuff just made me feel comfortable with him. You know?

And, and then, you know, the more things that we did, I, I just felt comfortable with him. I thought he was an okay guy. You know? I never dated a cop. Never had. I never -- it's not like I didn't like them, it was just, I wasn't -- I never was -- it wasn't like I wasn't into him or anything, just never did. You know?

So, you know, we had some nice times, and, and this, the last time we were going to go -- I -- the time

before we went, we had to go to this wind tunnel, and I hurt my elbow really bad leaving the wind tunnel.

And I told Jerry, I said, "Jerry, I can't, I can't go, because I can't get certified because there's no way I can jump out of a plane and grab onto the plane with my elbow."

Q. Just real quick, the wind tunnel, where was that located?

A. That was -- it was in --

Q. Was it in Reno, or --

A. No, it was, it was down in California somewhere by Berkeley. I can't remember the name of it.

Q. Was it Lodi, California?

A. No, that one wasn't in Lodi. That was, like, the week before.

Q. Okay.

A. Everything was fine. You know, nothing was weird.

So then I told him, I said, "Jerry, I don't think I should go because then I'm going to have to take a day off work and" -- everything.

And he kept saying, "No. You should come. We'll have fun. We'll go out to dinner," and all this stuff.

And, and he told me, he said, "Wear that special dress, you know, that I like," and all this stuff.

And I didn't even think about it, and I said, "Okay."

And anyway, so we left on a Sunday, it was late, and we went to -- got, when we got there we went swimming. You know, they had a pool.

Q. Where was this at, now?

A. That was in Lodi. Went to the pool. And we got out and went to dinner. And, you know, I had a couple lemon drops. I love lemon drops, I'll admit. I didn't have to drive or anything.

So -- and then we got back from the pool and we were going to go swimming again, and I got my swimsuit on, and we went out by the pool. And, you know, we were just, you know, lazing around in the pool. And then he got out to go have a cigarette, and I stayed in the pool. And then I thought: Oh, okay. Well, I guess I'll get out and go see what, what he's doing.

And when I got out and I picked up my towel, there was, like, this brick wall that kind of was -- enclosed the pool. And I looked over and I, I saw him talking to these three guys. You know?

And so I walked over there and I said, "Jerry, who are -- are these your friends?"

And he said, "No. These guys are here to fill you up. That's what I like."

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 11 of 31



And I said, "No, Jerry. That's not what I like. That's not what I like."

And he had his cell phone in his hand, and he started pushing it into my face. And I think there was someone on the other line. I don't really know. But I just said -- I, I don't know what I even said to that person, but I just shoved it back in his face.

And I told him, "Jerry, you better get them the fuck out of here."

Q. I'm sorry to interrupt. Where are you at this time, are you at the pool or back in the room?

A. We were sitting -- no, no. There was tables by the pool. It was away from the pool, but, you know.

And he had, like, this sick, weird look on his face. Like his eyes were bugged out. And it was like he was another person or something. Like somewhere else, another person. I don't know who he was then. I do not know who that man was.

And I said --

Q. When you said you didn't know who that man was, you're still talking about Antinoro?

A. (No audible response.)

And I said --

Q. Is that a "yes" on that?

A. Yes.

Q. Okay. I'm sorry. Go ahead.

A. And then I said -- he didn't do anything. He didn't say anything to them.

And I told him one more time, I said, "Jerry, get them the fuck out of here."

And he doesn't do anything. And -- I mean, he was, like, in a trance or something. I really don't know.

And so then I got up and I looked at them and I said, "If you don't get the hell out of here, I'm calling 911. I'm calling 911."

And then they stood there. They just kept standing there. And then finally --

Q. "They" being the three guys?

A. The three guys. And then they started to walk off.

And I just started -- and then I told Jerry, I said, "Jerry, I want in the room, and I want in the room now."

And he just kind of sat there. And then the three guys started to move. Well, I was walking to the room at that point. You know, I didn't have my damn phone, I didn't have a key to the room. I didn't have anything. Nothing.

So I got into the room -- finally Jerry gets

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 13 of 31



there. And I get into the room, and I just went right into the bathroom. You know, I wanted to get away from him. I walked right into the bathroom. And I wasn't in there maybe -- I don't know. I don't know. I couldn't tell you about the time. But it probably wasn't any longer than a minute or two.

And the door opened, and one of the guys pulled me -- one of those guys that was out by the pool pulled me out of the room. And then they just, they threw me up against one of the other guys.

And I started screaming and screaming, and, and the other guy that was there put some duct tape on my mouth and threw me on the bed. It was all over after that.

Q. God, I hate asking this question. Did they enter you?

A. Oh, yeah.

Q. All three of them?

A. Yes.

Q. Can you describe these guys?

A. Oh, God. All I know, they were black. One of them was fat. They were all -- well, they all seemed tall to me. You know, they were tall.

Q. What was Mr. Antinoro doing?

A. I got -- I don't know. I -- you know, I was so

in and out of it, I couldn't tell you what he was doing.
Q. Was he in the room?
A. I don't know. I don't know if he was in the room, because he -- you know, I kicked one of them in the crotch, and then he kicked me -- or he kneed me so hard in my head, I just went out. You know? And I, I don't think I was out that long. I don't think so. I'm sure I wasn't, because everything hurt so bad. But --
Q. What happened after all this occurred in the room there? Did they leave? Did Antinoro come in the room? What happened?
A. Well, they left, they left, but I don't know -- you know, I was in and out of it. And Jerry was there, but I don't know where he was. You know what I mean?
Q. Okay. You were, you were in the bathroom when you got in the room, and then the door opened and -- who -- before we get to that, did Mr. Antinoro let you into the room?
A. Yeah.
Q. And then you went directly to the bathroom?
A. Uh-huh.
Q. Is that a "yes"?
A. Yes.
Q. And he stayed in the room, as far as you know?
A. Yeah, I didn't -- well, I didn't hear him leave.

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 15 of 31



I mean, I wasn't in the bathroom very long, and then it was just a big, a big mess after that.

Q. And the next thing you know, you just got yanked out of the bathroom and it was -- all of those horrible things started happening?

A. Yeah.

Q. What did you do after all this occurred?

A. I, I was just -- I just laid in bed.

Q. What did you -- did you talk to Mr. Antinoro about it?

A. I didn't say anything to him.

Q. Did he say anything to you?

A. Not until the next morning.

Q. What did you -- I mean, the next morning. You guys --

A. He didn't --

Q. -- didn't talk all night, or --

A. Oh, no. I didn't say -- I was in so much pain and I didn't -- I was in such shock. I didn't say a thing to him. I didn't.

Q. Were you in shock because he put you in that situation, plus what happened to you?

A. Yes. I couldn't believe it happened to me. I just couldn't even believe that he did that.

Q. When you eventually talked to Mr. Antinoro, what

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 16 of 31



was said between the two of you?

A. The next day?

Q. Yes.

A. Well, he got up the next morning and he was just -- like nothing ever happened. It was like nothing happened.

Q. He had his cell phone with him?

A. When? The next day?

Q. While you were on the trip, he had the cell phone that he put in your face; right?

A. Oh, yeah. Yeah. He had his cell phone. And I don't know who he was talking to.

Q. Do you know if he took pictures?

A. I don't know what he did. I have no flipping idea what he did.

Q. Did you report this?

A. No.

Q. Did you ask Mr. Antinoro why the hell he did this?

A. I was, I was scared of fucking shit of this guy, and I still am. I mean, my God. If you could have seen the look in his eyes and on his face, he's -- it's -- he's like -- he's something different. I mean, he is like from another world or something. I am scared to death of him. All I wanted to do was get home. That's

all I cared about, Gus, is getting home. Safe.

Q. Did -- when you talked about that look on his face, are you referring to the look that he had when you were out there at the pool?

A. Uh-huh.

Q. And is that a "yes"?

A. Yes.

Q. Do you know the names of any of these three gentlemen?

A. Oh, no.

Q. Do you have any idea how they -- how this was put together?

A. No. I mean, I have no idea. I mean, you know, Melanie and I talked about it later, but I, I didn't know at the time. I really had no idea.

Q. How did you guys travel to get to Lodi?

A. His car.

Q. Were you two the only ones on that trip?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Did you ever confront Mr. Antinoro about this ever again?

A. Yes.

Q. When?

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/24/19 Page 18 of 31



A. Well, I -- you know, I just, in my mind, on the way home, I thought: Oh, I'll just get home and I'll never see him again. You know? That was impossible.
Q. That just brings up another detail question. Did you leave to come back to Reno or Virginia City, or whatever the case may be, the next day?
A. Yeah.
Q. How did you get back?
A. With him.
Q. With him and you and he in the car alone?
A. Yeah.
Q. And were you still in shock?
A. Oh, I was in shock, I was in pain. I was all of those things. But I was in shock. I was still in shock. And my head was killing me, and my elbow was killing me. And I just still couldn't believe that someone could do that to me. You know?
Q. Did you seek medical care when you got back?
A. Well, I went to my doctor, yeah.
Q. What is your doctor's name?
A. [redacted]
Q. What kind of doctor is he?
A. He's a GP, internist.
Q. How long after this occurred before you met with Mr. Schroeder -- not met with [redacted], but sought

[redacted] services?

A. I think it was within the week.

Q. Was there ever a rape kit performed on you?

A. (No audible response.)

Q. Is that a "no"?

A. No, he didn't.

Q. In the car on the way home, was there any conversation between you and Mr. Antinoro?

A. Well, he talked, and turned up this weird music.

Q. What did he say when he was talking to you?

A. Just, you know, about what's on the -- you know, the scenery, and stuff like that. You know. Just, it just -- I mean, you know, and he was going to go get his -- you know, we were -- that was the day he was going to get his certification, and he -- well, he got up and, and he was all -- he was so happy the next morning. He was so flippin' happy. I mean, just ecstatic the next day.

And then he says, "Well, I'm not going to get my certificate today. I thought maybe you'd like to go somewhere else. We could go do something else since you can't get your certificate today."

And I'm, like, "I don't feel like doing anything. I just want to go home." You know?

Q. What was the name of the hotel or motel where

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 20 of 31



this occurred in Lodi?
A. I can't remember the name of it. I didn't book it. I can't remember the name of it.
Q. Did you pay for anything there?
A. No.
Q. Did Mr. Antinoro ever indicate whether or not he paid those guys to do this?
A. No. He acted like nothing ever happened.
Q. When you saw him at the pool before what they did to you occurred, did it look like he was having friendly conversation with them?
A. Yeah, they were talking and everything. It didn't look like -- I thought they were his friends, or something.
Q. And then he came over and you said what's going on here, and he said these guys are here to fill you up?
A. Yeah.
Q. And you told him this ain't happening, get the, you know, get the F out of here?
A. I told him to get them the F out of here, yeah. Twice.
Q. And after you told him that, where did these gentlemen go?
A. Well, they didn't go anywhere, because --
Q. They stayed there at the pool?

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 21 of 31



A. Yeah, until I said something to them, and then they stayed -- and then they left.

Q. And then they left.

A. When I said I was going to call the cops. They probably knew he was a cop. I don't know. I don't know.

Q. Do you fear for your safety with Mr. Antinoro?

A. Yes. Yes. Yes.

Q. Can you give me all the reasons? I know a lot of the reasons, but I want you to tell me.

A. Well, because I think he's psycho. A-1 psycho. I've seen it.

MR. RANDS: Objection, calls for a legal conclusion, medical conclusion, whatever. Go ahead.

BY MR. FLANGAS:

Q. What have you seen?

A. I've seen him when he is like that. I don't think anybody else has, but I have.

Q. Other than the night when you were attacked --

A. Uh-huh.

Q. -- had you ever seen that --

A. No.

Q. Let me finish.

Other than the night that you were attacked, did you ever see him get that look or act that way before?

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 22 of 31



A. No. Never.

Q. When you -- are there any other reasons you're afraid of him -- which God knows what happened to you gives you great reason, but are there any other reasons that you're afraid of him?

A. Well, I'm afraid because now that I've given this testimony, well, what's he going to do?

Q. You know, your attorney or I, if he ever does any form of harassment, can get that in front of a federal judge real quick. Do you understand that?

A. Well, real quick, when it's too late.

Q. Well --

A. You know, when it's too damn late. That's how I feel about it. That's why I didn't want to do this. It has nothing to do with Melanie. I -- you know.

Q. I understand completely, and I appreciate your courage.

A. I don't have the courage, but I'm doing it.

Q. Well, you do. You're here.

Are there other reasons you're afraid of him than what we've discussed so far? Has he ever threatened you? Has he ever had any of his henchmen threaten you --

MR. RANDS: Objection.

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 23 of 31



BY MR. FLANGAS:

Q. -- his supporters?

MR. RANDS: Objection to the characterization of "henchmen."

THE WITNESS: I can't say anything.

BY MR. FLANGAS:

Q. Any indirect threats?

A. Well, I haven't been up there. I -- you know, I don't even go to see my girlfriends in Virginia City anymore. And believe me, I have a lot of them. I don't even get to go see my friends anymore. I can't even go see my friends. God knows what will happen if I go up there.

Q. After you got back on this trip, have you had any other interactions with Mr. Antinoro?

A. Yes, I did.

Q. When? And what were the circumstances?

A. Okay. So I knew when I got back -- you know, when I got my shit together enough to realize this isn't going away. He's not going anywhere. And he would still have the damn nerve to come in and have lunch after he did that to me.

Q. At the senior center?

A. At the senior center. Prance in there and have lunch at the senior center. So -- and I, I told him --

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 24 of 31



after I got back I called him and I said, "I went" -- I told him that I went to see my therapist and I told him everything. I told my therapist everything he did to me.

Q. Did the therapist report him?

A. I didn't go see my therapist.

Q. You just told him that?

A. I just told him that. And he says to me, "Oh" -- he calls me "dear."

"Oh, dear. You know, I don't want to lose you, and you don't have to be involved in any of this."

Q. Involved in any of what?

A. This bullshit stuff he does, I guess.

Q. Did he tell you of any other stuff he engaged in --

A. No --

Q. -- in that regard?

A. -- he didn't. But he just said that, "You don't have to be involved in any of this."

Q. And this was when he was eating lunch over at the volunteer center?

A. No.

Q. At the senior center?

A. Well, see, I told him, I told him that over the phone. And then I said -- I told him I went to see my

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 25 of 31



therapist and I think you need -- we need to talk about it. But I didn't really want to talk to him. But I didn't want to see him anymore, you know, period. I didn't want him coming in the senior center and everything else. So I, I put him off -- that was a Monday. I put him off all the way until Friday. And then he comes and sits on my porch at the senior center.

Q. This is how long after the --

A. Like that week.

Q. Okay. I've got to get this, finish my question. This was how long after you were attacked?

A. That week.

Q. Okay.

A. Because I couldn't handle it.

So then that week -- then he's sitting on my porch on Friday, and he left -- he waited until everybody left at the senior center and it was only me.

So I went out on the front porch and I told him, I said, "You know, I went to see my therapist at the lake that I had gone to see after my husband died, and I told him everything that you did, and he wants me to go right to the police department."

And he goes, "Oh, I don't want to lose you, and you don't, you know, you don't have to be involved in any of this."

And he just said it like that, "involved in any of this."

Q. Did you feel threatened at that --

A. Yeah.

Q. Go on with your story. I'm sorry.

A. And I said, "I don't want to" -- you know, "I don't want to be involved in anything at all, Jerry."

And then I had to be -- one other time, we had National Night Out, that I had to do it for the sheriff's department, and I'd already committed myself to him -- to -- it's really a community event. I, you know, I was doing it for the community. And the kids love it because they all go to the park and get a bunch of free stuff and everything. So I had to do that.

And, I don't know, I --

Q. Did you interact with him that night?

A. No. Oh, yeah, I did. Text. He didn't, he didn't even show up. It was for the sheriff, and he didn't show up.

Q. Were you grateful?

A. I was pissed. I was pissed about that. Because everybody was waiting for him to show up, and he never showed up. So I called him a pompous ass.

And the next morning he showed up on -- and this, this was really the end. He showed up on the -- on my

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 27 of 31



porch at the senior center. He was sitting there when I got there. He didn't say one thing to me. And I was, you know, I was there -- I had a zillion things to do, and I had just gotten to work.

And he didn't say anything to me, and I just said, "You know, I don't have one more ounce of time for any of your shit." And I got up and walked in the office.

Q. Is that the last interaction you had with him?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes. That was it.

Q. Did you ever report this to law enforcement authorities?

A. Yes, I did.

Q. To who?

A. I reported it to Tim Guthrie. He is with -- he was with the sheriff's department in Virginia City. And I did that on purpose, because it was his last day of work at the sheriff's department. He had run against Antinoro, and obviously they were not on friendly terms. And I thought: Well, this won't make it hard for him, he's leaving anyway. I'll tell him.

Q. How long after you were attacked did you make this report to --

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 28 of 31



A. I don't know.

Q. -- this Guthrie?

A. I don't know.

Q. Guthrie was a deputy with the sheriff's department?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Okay. So then what happened?

A. So I start telling him about it, and he starts laughing. He starts to laugh about it, thought it was funny. And so I didn't even finish telling him the story.

Q. And then what did you do?

A. I just said, "Okay. Thanks." You know? I didn't even finish telling him the story.

Q. Did you give a written statement or anything?

A. No.

Q. Did you report it to any other law enforcement?

A. No.

Q. Did you ever report it to any law enforcement in Lodi, California?

A. No. Hell no. He was a cop. At that point I didn't trust anybody. You know? I didn't trust any cops. I thought I -- I thought Tim, I really did think

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 29 of 31



Tim would help me out. You know? And then...

MR. FLANGAS: Can we take a short break here?

THE WITNESS: Yeah.

MR. RANDS: It's your deposition.

MR. FLANGAS: Yeah, we'll go ahead and take a short break.

(A short break was taken at this time.)

MR. FLANGAS: Let's go back on the record.

BY MR. FLANGAS:

Q. We just took a short break. You understand you're still under oath?

A. Yes.

Q. Whose idea was this trip to Lodi?

A. This one, Jerry's. I really wasn't going to go.

Q. Did you -- have you ever heard talk of Mr. Antinoro's, for lack of better terms, sexual proclivities?

A. No.

Q. Have you ever heard that he's -- did he ever tell you that he was a voyeur?

A. Yes. Yes, he did.

Q. Okay. What did he specifically say and when?

A. Let me think.

Q. You don't have to give me an exact day, if I can

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 30 of 31



MR. RANDS: That's all I have. Thank you for your time.

THE WITNESS: Okay.

MR. FLANGAS: Anything?

I appreciate you coming today. Thank you very much. I'm glad we got this finally.

MR. RANDS: Before we go off the record -- or let's go off the record.

(Deposition concluded at 3:37 p.m.)

-oOo-

Case 3:17-cv-00498-RCJ-CBC Document 48-14 Filed 01/14/19 Page 31 of 31



STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, SUSAN E. BELINGHERI, a Certified Court Reporter for the State of Nevada, do hereby certify;

That on Tuesday, the 7th day of August, 2018, at the hour of 1:34 p.m. of said day, at the offices of Bonanza Reporting & Videoconference Center, 1111 Forest Street, Reno, Nevada, personally appeared [redacted] who was duly sworn by me, was thereupon was deposed in the matter entitled herein, and that before the proceeding's completion the reading and signing of the deposition has been requested by the deponent or party;

That the foregoing transcript, consisting of pages 1 through 90, is a full, true, and correct transcript of my stenotype notes of said deposition to the best of my knowledge, skill, and ability.

I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

DATED: At Reno, Nevada, this 9th day of August, 2018.

SUSAN E. BELINGHERI, CCR #655